# EXHIBIT A

## MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.

COUNSELLORS AT LAW

TWO CENTER PLAZA

SUITE 600

BOSTON, MASSACHUSETTS 02108-1922

www.MBBF.com

**RECEIVED**

AUG 1 0 2004

BRUSH WELLMAN INC.
LEGAL DEPARTMENT

LEO V. BOYLE
PETER J. BLACK
WARREN T. FITZGERALD
JOHN CARROLL
MICHAEL R. BOGDANOW
KAREN R. JEPPGREEN
ELOUISE YEE MULLOY
BRADLEY M. HENRY
PETER J. AINSWORTH

TELEPHONE
(617) 523-8300

FACSIMILE
(617) 523-0625

INFO@MBBF.com

August 5, 2004

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Chief Executive Officer
Brush Wellman, Inc.
17816 St. Clair Avenue
Cleveland, OH 44110

Re:   Suzanne Genereux and Barry Genereux, Individually and as Parents
      and Natural Guardians of their minor children, Angela Genereux and Krista
      Genereux

Dear Sir or Madam:

We represent Suzanne and Barry Genereux and their minor children Angela and Krista, in connection with injuries Suzanne, Barry, Angela and Krista suffered resulting from their exposure to beryllium manufactured, distributed, sold, supplied and/or shipped to and/or for use at Raytheon, Inc.'s plant at 190 Willow Street, Waltham, Massachusetts. Beryllium is a hazardous substance known to cause, among other illnesses, Chronic Beryllium Disease ("CBD"). During Suzanne Genereux's employment at the Waltham plant from 1982 through 1990, she was exposed to unlawful and dangerous levels of beryllium dust, fumes and particles, resulting in massive and permanent injuries. Suzanne Genereux's spouse Barry Genereux was exposed when he worked at the Waltham plant from May of 1982 through April of 1994, and was further exposed to toxic beryllium dust brought home on Suzanne Genereux's person and clothing. The Genereux children, Angela and Krista, occasionally visited the Waltham plant and were also further exposed to beryllium dust unknowingly brought home from the plant. The purpose of this letter is to put Brush Wellman on notice of its unfair and deceptive acts in

August 5, 2004
Page Two

connection with the manufacture, distribution, sale, supply and/or shipment of the beryllium-containing products that caused substantial injuries to the Genereux family members and to make a demand under the Massachusetts Consumer Protection Statute, G.L. c. 93A.

## FACTUAL BACKGROUND

Brush Wellman knew or should have known that Waltham plant employees such as Suzanne and Barry Genereux were being exposed to serious risks of beryllium disease, knew or should have known that beryllium emissions were enveloping the Waltham plant and deliberately and/or intentionally failed to issue appropriate warnings regarding the dangers and hazards that resulted in the Genereuxs' injuries. At all relevant times, Brush Wellman knew or should have known that Waltham plant employees, like Suzanne and Barry Genereux, would unknowingly expose members of their households, including Angela and Krista, to dangerous beryllium particles, by returning home with the dust upon their clothing and persons. Brush Wellman knew or should have known that these beryllium plant workers and their loved ones were at a heightened risk of developing lung diseases, including CBD, which is known to develop as early as four months after initial exposure and as late as thirty years after exposure has ceased. CBD most commonly causes lung scarring characterized by many symptoms, including non-productive cough, a progressive shortness of breath, chest pain, fatigue, anorexia, weight loss, fevers, night sweats and arthralgias (joint pain). The disease is also known to affect the liver.

Brush Wellman has fraudulently concealed its knowledge of beryllium's dangers, including the risk of contracting CBD, from purchasers and industrial workers, for more than fifty years. Since at least 1948, Brush Wellman knew that the Atomic Energy and/or Occupational Safety and Health Administration's permissible "safe" levels were in fact unsafe, because Brush Wellman knew or should have known that workers and neighboring community members would likely contract CBD if exposed to far lesser levels of airborne beryllium. The "permissible" levels of exposure for occupational settings was 2 micrograms per meter of air over an 8 hour period and for residential settings was .01 micrograms per cubit meter of air averaged over 30 days. Knowing that the aforementioned standard was not safe, Brush Wellman falsely attested that it was safe to users and others exposed to its beryllium products and to government regulators.

Brush Wellman continued its practice of deliberately concealing the true hazards of airborne beryllium dust from workers and community members into the 1950s and 1960s. Beginning in 1951, Brush Wellman (at that time "Brush Beryllium") agreed to implement the 2 microgram standard in its plants. In 1961, Brush Wellman joined the "Industry Wide Health and Safety Committee" which controlled the safety information on labeling and packaging of its beryllium-containing products, distributed propaganda about the hazards of beryllium and advocated less stringent regulatory standards. The Committee professed that the 2 microgram standard was completely effective in preventing beryllium disease.

August 5, 2004
Page Three

During the 1970s, Brush Wellman campaigned to persuade the EPA and OSHA to reaffirm the 1948 2 microgram standard based on false information that contradicted research conducted by Japan's medical director employed at NGK Insulators, Ltd. in Nagoya, confirming a risk of CBD at exposure to levels below the 2 microgram standard. Well into the 1990s, Brush Wellman opposed efforts to change the standards and, with Committee members, presented false information regarding beryllium's health risks. In the 1980s, Brush Wellman presented false information regarding health risks in opposition to European efforts to impose labeling requirements. In 1989 and 1990, Brush Wellman and others funded a "Scientific Advisory Committee" to conduct research that would counteract mounting scientific evidence that beryllium was more dangerous than Brush Wellman and others wanted to admit. Beginning in the 1970s and up to the present, Brush Wellman funded scientific experts to rebut and attack governmental agency evidence of beryllium's carcinogenic capacities, knowing that such evidence was accurate. Brush Wellman actively suppressed this discovery and continues, presently, to advocate the 2 microgram standard.

## LIABILITY

Brush Wellman's aforementioned conduct violated the Massachusetts Consumer Protection Statute, G.L. c. 93A, §2 and §9. Chapter 93A §2 provides in part that "...unfair or deceptive acts or practices in the conduct of any trade or commerce..." are illegal. Chapter 93A directs courts to §5 of the Federal Trade Commission Act contained in 15 U.S.C. § 45(a)(1) for guidance as to the nature of unfair or deceptive acts and practices. In Matter of International Harvester Co., 104 F.T.C. 949, 1064-1067 (1984), the Federal Trade Commission concluded that a "failure to warn of a defective or dangerous condition that could cause personal injury constitutes an unfair trade practice." Thus, if Brush Wellman is found to have failed to warn the ultimate users of the risks involved in using its dangerous beryllium products, such failure to warn will render Brush Wellman liable under Chapter 93A.

Chapter 93A §2(c) authorizes the Attorney General of the Commonwealth of Massachusetts to "make rules and regulations interpreting" conduct constituting unfair and deceptive acts, which "rules and regulations shall be consistent with the rules, regulations and decisions of the Federal Trade Commission..." Brush Wellman's conduct was unfair and deceptive under c. 93A by reason, among other things, of its violation of the Attorney General's regulations. A partial list of the applicable regulations follows:

1. 940 C.M.R. § 3.00: General Regulations (providing guidelines for conduct constituting unfair and deceptive practices).

A. § 3.01: Definition of "deceptive warranty" provides in pertinent part: "a guarantee or warranty that contains an affirmation, promise, description, or representation that is either false, fraudulent, or that, in the light of all the circumstances, would mislead the consuming public; or fails to contain the

August 5, 2004
Page Four

necessary information to avoid misleading the consuming public..."

B. § 3.01: Definition of "warranty" provides in pertinent part: "[t]he terms 'warranty' and 'guarantee' are synonymous. The terms apply also to purported warranties and guarantees and to any promise or representation in the nature of a warranty or guarantee. A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind...goods to be merchantable must be at least such as to pass without objection in the trade under the contract description...and are fit for the ordinary purpose for which such goods are used....and are adequately contained, packaged, and labeled as the agreement may require."

C. § 3:05: General Misrepresentations, provides in relevant part: "[n]o claim or representation shall be made by any means concerning the product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. The prohibition includes, but is not limited to, representations, or claims relating to the construction...safety..condition ...or utility of such product or...the benefit to be derived thereof."

D. § 3:08(2): Warranties provides in relevant part: "[i]t shall be an unfair and deceptive act or practice to fail to perform or fulfil any promises or obligations arising under a warranty. The utilization of a deceptive warranty is unlawful."

E. § 3.16: General, stating, in part, that "[w]ithout limiting the scope of any other rule, regulation or statute...an act or practice is a violation of...c.93A, § 2 if (1) [i]t is oppressive...(2)...[it] fails to disclose ...any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction..."

Under the regulations, Brush Wellman's failure to disclose the fact that sandblasting, metalizing, welding, filing, grinding, machining, brazing and/or otherwise fabricating beryllium would produce invisible airborne dust, particles and fumes capable of causing CBD constituted a violation of c. 93A. Brush Wellman falsely represented to purchasers and government agencies that the 2 microgram level was safe, knowing that workers exposed to beryllium below such level could potentially develop CBD.

Brush Wellman's liability under c. 93A is also based upon the evidence of its breach of warranty in connection with the sale and distribution of beryllium products. The regulations make failures to perform duties under warranties "unfair and deceptive acts" giving rise to c. 93A liability and include the implied warranty of merchantability in their definition of "warranty." Further, the Supreme Judicial Court held in Maillet v. A.T.F. Davidson Co., 407 Mass. 185 (1990) that a breach of warranty constitutes a c. 93A violation. Since Brush Wellman's

August 5, 2004
Page Five

beryllium-containing products were both unmerchantable and not fit for the purpose for which they were intended, these breaches of warranty are also c. 93A violations. Furthermore, the Supreme Judicial Court held in Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 582 (1982) that "lack of privity ... is no longer a defense" to breach of warranty claims. Thus, the fact that Suzanne, Barry, Angela and Krista Genereux were not "privy" to the sales contract between Brush Wellman and Raytheon is not a defense to their warranty and c. 93A causes of action.

Brush Wellman breached the implied warranty by producing an unreasonably dangerous product unfit for its intended purpose and by failing to adequately package and/or label it with warnings of the dangers involved in its use. In spite of Brush Wellman's knowledge of the risks involved in using its beryllium-containing products, Brush Wellman took inadequate or no steps to inform the Waltham plant workers of the risks involved in their work of sandblasting, metalizing, welding, filing, grinding, machining, and/or brazing of beryllium, which work would foreseeably create respirable by-products which were dangerous and unhealthful to workers. Brush Wellman placed the beryllium products on the market knowing such would be used by industrial beryllium workers ignorant as to the products' unreasonably dangerous condition. Brush Wellman failed to adequately test, research and develop methods for protection of users and bystanders from the toxic beryllium emissions, knowing that its products would emit invisible airborne dust particles and fumes capable of causing CBD. Brush Wellman, instead, manufactured, fabricated, packaged, sold and distributed beryllium-containing products that were dangerous and likely to cause harm without instructing purchasers and users of proper industrial hygiene, emission and pollution control measures and without minimizing Suzanne's and Barry's risk of exposure to beryllium dust and particles by using an alternative safer design or product composition. Upon a finding that the beryllium-containing products were not merchantable, Brush Wellman will be found to have violated c. 93A §9 and the Genereuxs will be entitled to recover not only for their physical injuries, pain, suffering and loss of consortium resulting from Brush Wellman's conduct, but also attorney's fees and costs (inclusive of expert witness fees and other litigation expenses).

## MULTIPLE DAMAGES

Chapter 93A §9 imposes multiple damages for unfair or deceptive acts that are willful or knowing. Since Brush Wellman was on actual notice of its unfair and deceptive acts, the defectiveness of its products and the inadequacies of the warnings associated with its products, but failed to correct such defects or to warn users and foreseeable bystanders, its conduct was knowing and willful under c. 93A. As a result of a willful or knowing violation of c. 93A, Brush Wellman is liable for double or triple the amount of damages. In addition, if Brush Wellman, with knowledge of its c. 93A violation, fails to make a good faith settlement offer, then it will be liable for multiple damages under c. 93A §9, even if its original infraction was neither knowing or willful.

August 5, 2004
Page Six

## DAMAGES

Brush Wellman's knowing concealment of the dangers associated with beryllium, its failure to provide adequate warnings and its manufacture, fabrication, distribution and sale of products containing beryllium resulted in the Genereuxs' injuries. Suzanne Genereux was diagnosed in August, 2002 with CBD, suffers from permanent severe shock to her nervous system and is at an increased risk of developing cancer and other diseases. As a further result of her CBD, Suzanne Genereux suffers chronic and irreversible lung scarring, a significant diminution in her lung function and vital capacities and is at significant risk of developing cardiac complications including cor pulmonale. She has suffered permanent physical, mental and emotional injuries and damages and has lost the enjoyment of life's pleasures. Suzanne's CBD has severely impaired her ability to ambulate, and has been a cause of her confinement to a wheelchair and her dependency on assistive oxygen. Barry Genereux, too, was exposed to toxic beryllium dust both during his employment at Raytheon and through his residency with Suzanne Genereux. He is dangerously at risk of developing CBD and other lethal ailments resulting from Brush Wellman's knowing concealment of information about the hazardous beryllium and its failure to warn of such hazards. The children, Angela and Krista, have been exposed to greater than normal levels of beryllium in their home, subjecting them to a significantly increased risk of contracting CBD or other potentially deadly diseases. Barry, Angela and Krista are forced to live knowing that they have a substantial risk of suffering CBD and related diseases.

The demand is hereby made upon Brush Wellman in the amount of $6,000,000.00 (Six Million Dollars) to settle all claims of Suzanne, Barry, Angela and Krista Genereux caused by Brush Wellman's unfair and deceptive acts. This settlement demand is an attempt to reach an amicable resolution of this matter, and thereby, avoid the costs, expenses and risks involved in litigation. If we do not receive a reasonable settlement offer from Brush Wellman within thirty (30) days of your receipt of this letter, we will have no choice but to bring suit seeking multiple damages, attorney's fees and costs under c. 93A.

Very truly yours,

*Leo V Boyle*

MEEHAN, BOYLE, BLACK &
FITZGERALD, P.C.
Leo V. Boyle, Esq.
Warren F. Fitzgerald, Esq.
Michael B. Bogdanow, Esq.

GOLOMB & HONIK, P.C.
Richard Golomb, Esq.
Ruben Honik, Esq.

# MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.

### COUNSELLORS AT LAW
### TWO CENTER PLAZA
### SUITE 600
### BOSTON, MASSACHUSETTS 02108-1922
### www.MBBF.com

LEO V. BOYLE
PETER J. BLACK
WARREN F. FITZGERALD
JOHN CARROLL
RICHARD E. ROSSIANOW
KAREN E. KISTNER
JEREMY THE MULLOT
BRADLEY M. HENRY
PETER E. AINSWORTH

TELEPHONE
(617) 523-8300

FACSIMILE
(617) 523-0595

INFO@MBBF.com

August 5, 2004

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Chief Executive Officer
Brush Wellman Ceramics Inc.
22 Graf Road
Newburyport, MA 01950

> Re:   Suzanne Genereux and Barry Genereux, Individually and as Parents
>        and Natural Guardians of their minor children, Angela Genereux and Krista
>        Genereux

Dear Sir or Madam:

We represent Suzanne and Barry Genereux and their minor children Angela and Krista, in connection with injuries Suzanne, Barry, Angela and Krista suffered resulting from their exposure to beryllium manufactured, distributed, sold, supplied and/or shipped to and/or for use at Raytheon, Inc.'s plant at 190 Willow Street, Waltham, Massachusetts. Beryllium is a hazardous substance known to cause, among other illnesses, Chronic Beryllium Disease ("CBD"). During Suzanne Genereux's employment at the Waltham plant from 1982 through 1990, she was exposed to unlawful and dangerous levels of beryllium dust, fumes and particles, resulting in massive and permanent injuries. Suzanne Genereux's spouse Barry Genereux was expose when he worked at the Waltham plant from May of 1982 through April of 1994, and was further exposed to toxic beryllium dust brought home on Suzanne Genereux's person and clothing. The Genereux children, Angela and Krista, occasionally visited the Waltham plant and were also further exposed to beryllium dust unknowingly brought home from the plant. The purpose of this letter is to put Brush Wellman Ceramics on notice of its unfair and deceptive acts in connection with the manufacture, distribution, sale, supply and/or shipment of the beryllium-containing products that caused substantial injuries to the Genereux family members and to make a demand under the Massachusetts Consumer Protection Statute, G.L. c. 93A.

August 5, 2004
Page Two

Brush Wellman Ceramics knew or should have known that Waltham plant employees such as Suzanne and Barry Genereux were being exposed to serious risks of beryllium disease, knew or should have known that beryllium emissions were enveloping the Waltham plant and deliberately and/or intentionally failed to issue appropriate warnings regarding the dangers and hazards that resulted in the Genereuxs' injuries. At all relevant times, Brush Wellman Ceramics knew or should have known that Waltham plant employees, like Suzanne and Barry Genereux, would unknowingly expose members of their households, including Angela and Krista, to dangerous beryllium particles, by returning home with the dust upon their clothing and persons. Brush Wellman Ceramics knew or should have known that these beryllium plant workers and their loved ones were at a heightened risk of developing lung diseases, including CBD, which is known to develop as early as four months after initial exposure and as late as thirty years after exposure has ceased. CBD most commonly causes lung scarring characterized by many symptoms, including non-productive cough, a progressive shortness of breath, chest pain, fatigue, anorexia, weight loss, fevers, night sweats and arthralgias (joint pain). The disease is also known to affect the liver.

Brush Wellman Ceramics' aforementioned conduct violated the Massachusetts Consumer Protection Statute, G.L. c. 93A, §2 and §9. Chapter 93A §2 provides in part that "...unfair or deceptive acts or practices in the conduct of any trade or commerce..." are illegal. Chapter 93A directs courts to §5 of the Federal Trade Commission Act contained in 15 U.S.C. § 45(a)(1) for guidance as to the nature of unfair or deceptive acts and practices. In Matter of International Harvester Co., 104 F.T.C. 949, 1064-1067 (1984), the Federal Trade Commission concluded that a "failure to warn of a defective or dangerous condition that could cause personal injury constitutes an unfair trade practice." Thus, if Brush Wellman Ceramics is found to have failed to warn the ultimate users of the risks involved in using its dangerous beryllium products, such failure to warn will render Brush Wellman Ceramics liable under Chapter 93A.

Chapter 93A §2(c) authorizes the Attorney General of the Commonwealth of Massachusetts to "make rules and regulations interpreting" conduct constituting unfair and deceptive acts, which "rules and regulations shall be consistent with the rules, regulations and decisions of the Federal Trade Commission..." Brush Wellman Ceramics' conduct was unfair and deceptive under c. 93A by reason, among other things, of its violation of the Attorney General's regulations. A partial list of the applicable regulations follows:

1. 940 C.M.R. § 3.00: General Regulations (providing guidelines for conduct constituting unfair and deceptive practices).

   A. § 3.01: Definition of "deceptive warranty" provides in pertinent part: "a guarantee or warranty that contains an affirmation, promise, description, or representation that is either false, fraudulent, or that, in the light of all the circumstances, would mislead the consuming public; or fails to contain the necessary information to avoid misleading the consuming public..."

August 5, 2004
Page Three

B.  § 3.01: Definition of "warranty" provides in pertinent part: "[t]he terms 'warranty' and 'guarantee' are synonymous. The terms apply also to purported warranties and guarantees and to any promise or representation in the nature of a warranty or guarantee. A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind...goods to be merchantable must be at least such as to pass without objection in the trade under the contract description...and are fit for the ordinary purpose for which such goods are used....and are adequately contained, packaged, and labeled as the agreement may require."

C.  § 3:05: General Misrepresentations, provides in relevant part: "[n]o claim or representation shall be made by any means concerning the product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. The prohibition includes, but is not limited to, representations, or claims relating to the construction...safety..condition ...or utility of such product or...the benefit to be derived thereof."

D.  § 3:08(2): Warranties provides in relevant part: "[i]t shall be an unfair and deceptive act or practice to fail to perform or fulfil any promises or obligations arising under a warranty. The utilization of a deceptive warranty is unlawful."

E.  § 3.16: General, stating, in part, that "[w]ithout limiting the scope of any other rule, regulation or statute...an act or practice is a violation of...c.93A, § 2 if (1) [i]t is oppressive...(2)...[it] fails to disclose ...any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction..."

Under the regulations, Brush Wellman Ceramics' failure to disclose the fact that sandblasting, metalizing, welding, filing, grinding, machining, brazing and/or otherwise fabricating beryllium would produce invisible airborne dust, particles and fumes capable of causing CBD constituted a violation of c. 93A.

Brush Wellman Ceramics' liability under c. 93A is also based upon the evidence of its breach of warranty in connection with the sale and distribution of beryllium products. The regulations make failures to perform duties under warranties "unfair and deceptive acts" giving rise to c. 93A liability and include the implied warranty of merchantability in their definition of "warranty." Further, the Supreme Judicial Court held in Maillet v. A.T.F. Davidson Co., 407 Mass. 185 (1990) that a breach of warranty constitutes a c. 93A violation. Since Brush Wellman Ceramics's beryllium-containing products were both unmerchantable and not fit for the purpose for which they were intended, these breaches of warranty are also c. 93A violations. Furthermore, the Supreme Judicial Court held in Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 582 (1982) that "lack of privity ... is no longer a defense" to breach of warranty claims.

August 5, 2004
Page Four

Thus, the fact that Suzanne, Barry, Angela and Krista Genereux were not "privy" to the sales contract between Brush Wellman Ceramics and Raytheon is not a defense to their warranty and c. 93A causes of action.

Brush Wellman Ceramics breached the implied warranty by producing an unreasonably dangerous product unfit for its intended purpose and by failing to adequately package and/or label it with warnings of the dangers involved in its use. In spite of Brush Wellman Ceramics' knowledge of the risks involved in using its beryllium-containing products, Brush Wellman Ceramics took inadequate or no steps to inform the Waltham plant workers of the risks involved in their work of sandblasting, metalizing, welding, filing, grinding, machining, and/or brazing of beryllium, which work would foreseeably create respirable by-products which were dangerous and unhealthful to workers. Brush Wellman Ceramics placed the beryllium products on the market knowing such would be used by industrial beryllium workers ignorant as to the products' unreasonably dangerous condition. Brush Wellman Ceramics failed to adequately test, research and develop methods for protection of users and bystanders from the toxic beryllium emissions, knowing that its products would emit invisible airborne dust particles and fumes capable of causing CBD. Brush Wellman Ceramics, instead, manufactured, fabricated, packaged, sold and distributed beryllium-containing products that were dangerous and likely to cause harm without instructing purchasers and users of proper industrial hygiene, emission and pollution control measures and without minimizing Suzanne's and Barry's risk of exposure to beryllium dust and particles by using an alternative safer design or product composition. Upon a finding that the beryllium-containing products were not merchantable, Brush Wellman Ceramics will be found to have violated c. 93A §9 and the Genereuxs will be entitled to recover not only for their physical injuries, pain, suffering and loss of consortium resulting from Brush Wellman Ceramics's conduct, but also attorney's fees and costs (inclusive of expert witness fees and other litigation expenses).

Chapter 93A §9 imposes multiple damages for unfair or deceptive acts that are willful or knowing. Since Brush Wellman Ceramics was on actual notice of its unfair and deceptive acts, the defectiveness of its products and the inadequacies of the warnings associated with its products, but failed to correct such defects or to warn users and foreseeable bystanders, its conduct was knowing and willful under c. 93A. As a result of a willful or knowing violation of c. 93A, Brush Wellman Ceramics is liable for double or triple the amount of damages. In addition, if Brush Wellman Ceramics, with knowledge of its c. 93A violation, fails to make a good faith settlement offer, then it will be liable for multiple damages under c. 93A §9, even if its original infraction was neither knowing or willful.

Brush Wellman Ceramics' knowing concealment of the dangers associated with beryllium, its failure to provide adequate warnings and its manufacture, fabrication, distribution and sale of products containing beryllium resulted in the Genereuxs' injuries. Suzanne Genereux was diagnosed in August, 2002 with CBD, suffers from permanent severe shock to her nervous system and is at an increased risk of developing cancer and other diseases. As a further result of

August 5, 2004
Page Five

her CBD, Suzanne Genereux suffers chronic and irreversible lung scarring, a significant diminution in her lung function and vital capacities and is at significant risk of developing cardiac complications including *cor pulmonale*. She has suffered permanent physical, mental and emotional injuries and damages and has lost the enjoyment of life's pleasures. Suzanne Genereux's CBD has severely impaired her ability to ambulate and has been a cause of her confinement to a wheelchair and her dependency on assistive oxygen. Barry Genereux, too, was exposed to toxic beryllium dust both during his employment at Raytheon and through his residency with Suzanne Genereux. He is dangerously at risk of developing CBD and other lethal ailments resulting from Brush Wellman Ceramics's knowing concealment of information about the hazardous beryllium and its failure to warn of such hazards. The children, Angela and Krista, have been exposed to greater than normal levels of beryllium in their home, subjecting them to a significantly increased risk of contracting CBD or other potentially deadly diseases. Barry, Angela and Krista are forced to live knowing that they have a substantial risk of suffering CBD and related diseases.

The demand is hereby made upon Brush Wellman Ceramics in the amount of $6,000,000.00 (Six Million Dollars) to settle all claims of Suzanne, Barry, Angela and Krista Genereux caused by Brush Wellman Ceramics' unfair and deceptive acts. This settlement demand is an attempt to reach an amicable resolution of this matter, and thereby, avoid the costs, expenses and risks involved in litigation. If we do not receive a reasonable settlement offer from Brush Wellman Ceramics within thirty (30) days of your receipt of this letter, we will have no choice but to bring suit seeking multiple damages, attorney's fees and costs under c. 93A.

Very truly yours,

*Leo V. Boyle*

MEEHAN, BOYLE, BLACK &
FITZGERALD, P.C.
Leo V. Boyle, Esq.
Warren F. Fitzgerald, Esq.
Michael B. Bogdanow, Esq.

GOLOMB & HONIK, P.C.
Richard Golomb, Esq.
Ruben Honik, Esq.

# MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.

### COUNSELLORS AT LAW
### TWO CENTER PLAZA
### SUITE 600
### BOSTON, MASSACHUSETTS 02108-1922
### www.MBBF.com

LEO V. BOYLE
PETER J. BLACK
WARREN D. FITZGERALD
JOHN GAROLI
MICHAEL R. BOGDANOW
KAREN M. SHITTEEN
CHERRY YEE MOLLOY
BRADLEY M. HENRY
PETER F. AINSWORTH

TELEPHONE
(617) 523-8300

FACSIMILE
(617) 523-0323

INFO@MBBF.COM

August 5, 2004

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Chief Executive Officer
Brush Wellman Ceramics Products, Inc.
22 Graf Road
Newburyport, MA 01950

> Re:  Suzanne Genereux and Barry Genereux, Individually and as Parents
> and Natural Guardians of their minor children, Angela Genereux and Krista
> Genereux

Dear Sir or Madam:

We represent Suzanne and Barry Genereux and their minor children Angela and Krista, in connection with injuries Suzanne, Barry, Angela and Krista suffered resulting from their exposure to beryllium manufactured, distributed, sold, supplied and/or shipped to and/or for use at Raytheon, Inc.'s plant at 190 Willow Street, Waltham, Massachusetts. Beryllium is a hazardous substance known to cause, among other illnesses, Chronic Beryllium Disease ("CBD"). During Suzanne Genereux's employment at the Waltham plant from 1982 through 1990, she was exposed to unlawful and dangerous levels of beryllium dust, fumes and particles, resulting in massive and permanent injuries. Suzanne Genereux's spouse Barry Genereux was exposed when he worked at the Waltham plant from May of 1982 through April of 1994, and was further exposed to toxic beryllium dust brought home on Suzanne Genereux's person and clothing. The Genereux children, Angela and Krista, occasionally visited the Waltham plant and were also further exposed to beryllium dust unknowingly brought home from the plant. The purpose of this letter is to put Brush Wellman Ceramics Products on notice of its unfair and deceptive acts in connection with the manufacture, distribution, sale, supply and/or shipment of the beryllium-containing products that caused substantial injuries to the Genereux family

August 5, 2004
Page Two

members and to make a demand under the Massachusetts Consumer Protection Statute, G.L. c. 93A.

Brush Wellman Ceramics Products knew or should have known that Waltham plant employees such as Suzanne and Barry Genereux were being exposed to serious risks of beryllium disease, knew or should have known that beryllium emissions were enveloping the Waltham plant and deliberately and/or intentionally failed to issue appropriate warnings regarding the dangers and hazards that resulted in the Genereuxs' injuries. At all relevant times, Brush Wellman Ceramics Products knew or should have known that Waltham plant employees, like Suzanne and Barry Genereux, would unknowingly expose members of their households, including Angela and Krista, to dangerous beryllium particles, by returning home with the dust upon their clothing and persons. Brush Wellman Ceramics Products knew or should have known that these beryllium plant workers and their loved ones were at a heightened risk of developing lung diseases, including CBD, which is known to develop as early as four months after initial exposure and as late as thirty years after exposure has ceased. CBD most commonly causes lung scarring characterized by many symptoms, including non-productive cough, a progressive shortness of breath, chest pain, fatigue, anorexia, weight loss, fevers, night sweats and arthralgias (joint pain). The disease is also known to affect the liver.

Brush Wellman Ceramics Products' aforementioned conduct violated the Massachusetts Consumer Protection Statute, G.L. c. 93A, §2 and §9. Chapter 93A §2 provides in part that "...unfair or deceptive acts or practices in the conduct of any trade or commerce..." are illegal. Chapter 93A directs courts to §5 of the Federal Trade Commission Act contained in 15 U.S.C. § 45(a)(1) for guidance as to the nature of unfair or deceptive acts and practices. In Matter of International Harvester Co., 104 F.T.C. 949, 1064-1067 (1984), the Federal Trade Commission concluded that a "failure to warn of a defective or dangerous condition that could cause personal injury constitutes an unfair trade practice." Thus, if Brush Wellman Ceramics Products is found to have failed to warn the ultimate users of the risks involved in using its dangerous beryllium products, such failure to warn will render Brush Wellman Ceramics Products liable under Chapter 93A.

Chapter 93A §2(c) authorizes the Attorney General of the Commonwealth of Massachusetts to "make rules and regulations interpreting" conduct constituting unfair and deceptive acts, which "rules and regulations shall be consistent with the rules, regulations and decisions of the Federal Trade Commission..." Brush Wellman Ceramics Products's conduct was unfair and deceptive under c. 93A by reason, among other things, of its violation of the Attorney General's regulations. A partial list of the applicable regulations follows:

1. 940 C.M.R. § 3.00: General Regulations (providing guidelines for conduct constituting unfair and deceptive practices).

   A. § 3.01: Definition of "deceptive warranty" provides in pertinent part: "a

August 5, 2004
Page Three

guarantee or warranty that contains an affirmation, promise, description, or representation that is either false, fraudulent, or that, in the light of all the circumstances, would mislead the consuming public; or fails to contain the necessary information to avoid misleading the consuming public..."

B. § 3.01: Definition of "warranty" provides in pertinent part: "[t]he terms 'warranty' and 'guarantee' are synonymous. The terms apply also to purported warranties and guarantees and to any promise or representation in the nature of a warranty or guarantee. A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind...goods to be merchantable must be at least such as to pass without objection in the trade under the contract description...and are fit for the ordinary purpose for which such goods are used....and are adequately contained, packaged, and labeled as the agreement may require."

C. § 3.05: General Misrepresentations, provides in relevant part: "[n]o claim or representation shall be made by any means concerning the product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. The prohibition includes, but is not limited to, representations, or claims relating to the construction...safety..condition ...or utility of such product or...the benefit to be derived thereof."

D. § 3:08(2): Warranties provides in relevant part: "[i]t shall be an unfair and deceptive act or practice to fail to perform or fulfil any promises or obligations arising under a warranty. The utilization of a deceptive warranty is unlawful."

E. § 3.16: General, stating, in part, that "[w]ithout limiting the scope of any other rule, regulation or statute...an act or practice is a violation of...c.93A, § 2 if (1) [i]t is oppressive...(2)...[it] fails to disclose ...any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction..."

Under the regulations, Brush Wellman Ceramics Products's failure to disclose the fact that sandblasting, metalizing, welding, filing, grinding, machining, brazing and/or otherwise fabricating beryllium would produce invisible airborne dust, particles and fumes capable of causing CBD constituted a violation of c. 93A.

Brush Wellman Ceramics Products' liability under c. 93A is also based upon the evidence of its breach of warranty in connection with the sale and distribution of beryllium products. The regulations make failures to perform duties under warranties "unfair and deceptive acts" giving rise to c. 93A liability and include the implied warranty of merchantability in their definition of "warranty." Further, the Supreme Judicial Court held in Maillet v. A.T.F. Davidson Co., 407

August 5, 2004
Page Four

Mass. 185 (1990) that a breach of warranty constitutes a c. 93A violation. Since Brush Wellman Ceramics Products's beryllium-containing products were both unmerchantable and not fit for the purpose for which they were intended, these breaches of warranty are also c. 93A violations. Furthermore, the Supreme Judicial Court held in Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 582 (1982) that "lack of privity ... is no longer a defense" to breach of warranty claims. Thus, the fact that Suzanne, Barry, Angela and Krista Genereux were not "privy" to the sales contract between Brush Wellman Ceramics Products and Raytheon is not a defense to their warranty and c. 93A causes of action.

Brush Wellman Ceramics Products breached the implied warranty by producing an unreasonably dangerous product unfit for its intended purpose and by failing to adequately package and/or label it with warnings of the dangers involved in its use. In spite of Brush Wellman Ceramics Products's knowledge of the risks involved in using its beryllium-containing products, Brush Wellman Ceramics Products took inadequate or no steps to inform the Waltham plant workers of the risks involved in their work of sandblasting, metalizing, welding, filing, grinding, machining, and/or brazing of beryllium, which work would foreseeably create respirable by-products which were dangerous and unhealthful to workers. Brush Wellman Ceramics Products placed the beryllium products on the market knowing such would be used by industrial beryllium workers ignorant as to the products' unreasonably dangerous condition. Brush Wellman Ceramics Products failed to adequately test, research and develop methods for protection of users and bystanders from the toxic beryllium emissions, knowing that its products would emit invisible airborne dust particles and fumes capable of causing CBD. Brush Wellman Ceramics Products, instead, manufactured, fabricated, packaged, sold and distributed beryllium-containing products that were dangerous and likely to cause harm without instructing purchasers and users of proper industrial hygiene, emission and pollution control measures and without minimizing Suzanne's and Barry's risk of exposure to beryllium dust and particles by using an alternative safer design or product composition. Upon a finding that the beryllium-containing products were not merchantable, Brush Wellman Ceramics Products will be found to have violated c. 93A §9 and the Genereuxs will be entitled to recover not only for their physical injuries, pain, suffering and loss of consortium resulting from Brush Wellman Ceramics Products's conduct, but also attorney's fees and costs (inclusive of expert witness fees and other litigation expenses).

Chapter 93A §9 imposes multiple damages for unfair or deceptive acts that are willful or knowing. Since Brush Wellman Ceramics Products was on actual notice of its unfair and deceptive acts, the defectiveness of its products and the inadequacies of the warnings associated with its products, but failed to correct such defects or to warn users and foreseeable bystanders, its conduct was knowing and willful under c. 93A. As a result of a willful or knowing violation of c. 93A, Brush Wellman Ceramics Products is liable for double or triple the amount of damages. In addition, if Brush Wellman Ceramics Products, with knowledge of its c. 93A violation, fails to make a good faith settlement offer, then it will be liable for multiple damages under c. 93A §9, even if its original infraction was neither knowing or willful.

August 5, 2004
Page Five

Brush Wellman Ceramics Products's knowing concealment of the dangers associated with beryllium, its failure to provide adequate warnings and its manufacture, fabrication, distribution and sale of products containing beryllium resulted in the Genereuxs' injuries. Suzanne Genereux was diagnosed in August, 2002 with CBD, suffers from permanent severe shock to her nervous system and is at an increased risk of developing cancer and other diseases. As a further result of her CBD, Suzanne Genereux suffers chronic and irreversible lung scarring, a significant diminution in her lung function and vital capacities and is at significant risk of developing cardiac complications including cor pulmonale. She has suffered permanent physical, mental and emotional injuries and damages and has lost the enjoyment of life's pleasures. Suzanne Genereux's CBD has severely impaired her ability to ambulate and has been a cause of her confinement to a wheelchair and her dependency on assistive oxygen. Barry Genereux, too, was exposed to toxic beryllium dust both during his employment at Raytheon and through his residency with Suzanne Genereux. He is dangerously at risk of developing CBD and other lethal ailments resulting from Brush Wellman Ceramics Products's knowing concealment of information about the hazardous beryllium and its failure to warn of such hazards. The children, Angela and Krista, have been exposed to greater than normal levels of beryllium in their home, subjecting them to a significantly increased risk of contracting CBD or other potentially deadly diseases. Barry, Angela and Krista are forced to live knowing that they have a substantial risk of suffering CBD and related diseases.

The demand is hereby made upon Brush Wellman Ceramics Products in the amount of $6,000,000.00 (Six Million Dollars) to settle all claims of Suzanne, Barry, Angela and Krista Genereux caused by Brush Wellman Ceramics Products's unfair and deceptive acts. This settlement demand is an attempt to reach an amicable resolution of this matter, and thereby, avoid the costs, expenses and risks involved in litigation. If we do not receive a reasonable settlement offer from Brush Wellman Ceramics Products within thirty (30) days of your receipt of this letter, we will have no choice but to bring suit seeking multiple damages, attorney's fees and costs under c. 93A.

Very truly yours,

*Leo V Boyle*

MEEHAN, BOYLE, BLACK &
FITZGERALD, P.C.
Leo V. Boyle, Esq.
Warren F. Fitzgerald, Esq.
Michael B. Bogdanow, Esq.

GOLOMB & HONIK, P.C.
Richard Golomb, Esq.
Ruben Honik, Esq.

# EXHIBIT B

LEXSEE 2000 U.S. DIST. LEXIS 21897

**David Wayne Jones, et al., Plaintiffs, vs. Brush Wellman, Inc., Defendant.**

**CASE NO. 1:00 CV 0777**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2000 U.S. Dist. LEXIS 21897*

**September 13, 2000, Filed**

**DISPOSITION:** [*1] Defendant's Motion to Dismiss granted. Judgment entered in favor of defendant and against plaintiffs.

**LexisNexis(R) Headnotes**

**COUNSEL:** For DAVID WAYNE JONES, JOHN C WATKINS, SR., WAYNE MORAN, plaintiffs: Steve Baughman Jensen, Esq., Frederick M. Baron, Esq., Alicia Butler, Esq., Baron & Budd, Dallas, TX.
For BRUSH WELLMAN, INC., defendant: Jeffrey D. Ubersax, Esq., and Brian A. Troyer, Esq., Jones Day Reavis and Pogue, Cleveland, OH.

**JUDGES:** PATRICIA A. GAUGHAN, United States District Judge.

**OPINIONBY:** PATRICIA A. GAUGHAN

**OPINION:**

**Memorandum of Opinion and Order**

**Introduction**

This matter is before the Court upon defendant's Motion to Dismiss (Doc. 8). This case arises out of the alleged exposure of plaintiffs to beryllium or beryllium-containing products their employer purchased from defendant. The Complaint sets forth two causes of action. Count One alleges that defendant negligently misrepresented and concealed the dangers of its beryllium-containing products and that such negligence "proximately caused Plaintiffs to be placed at increased risk of developing chronic beryllium disease." Count Two alleges that defendant is strictly liable for failure to warn and nonconformance to representations. For the following reasons, the Motion is GRANTED.

**Facts**

Because defendant has moved to dismiss pursuant to *Rule 12(b)(6) of the* [*2] *Federal Rules of Civil Procedure*, the facts as set forth in the Complaint are assumed to be true. Defendant is an Ohio corporation which engages in the mining, milling, manufacturing, compounding, converting, sale and/or distribution of beryllium or beryllium-containing products. (Compl. P 15). Plaintiffs, David Wayne Jones, John C. Watkins, Sr., Wayne Moran and Mayford H. Garland, are four employees of one of defendant's customers who allege that they have been exposed to the hazards of beryllium or beryllium-containing products sold by defendant in the course and scope of their employment. (Compl. P 1). Plaintiffs seek to bring this action on behalf of a class consisting of all persons who are current or former employees of current and former customers of defendant and its predecessor, Brush Beryllium, Inc., who have worked in facilities where defendant's beryllium-containing products were present. (Compl. P 8). The proposed class includes tens of thousands of workers. (Compl. P 9).

Dust and fumes from beryllium-containing products can cause chronic beryllium disease (hereafter "CBD") after even brief or small exposure. (Compl. P 2). CBD is a progressive, incurable lung disease [*3] that sometimes results in death. (Compl. P 2). Symptoms of CBD include coughs, shortness of breath, fatigue, weight loss, loss of appetite, fevers and night sweats. (Compl. P 2). Those who are susceptible to the toxic effects of beryllium can develop CBD, which is caused by an immune response to beryllium. (Compl. P 21). The lung tissues thicken, which impedes the flow of oxygen

Case 1:04-cv-12137-JLT    Document 13-2    Filed 11/10/2004    Page 20 of 24

Page 2
2000 U.S. Dist. LEXIS 21897, *

between the lungs and circulatory system. (Compl. P 21). The physiological process of injury begins in those susceptible to beryllium's toxic effects at initial exposure and inhalation and continues even after the exposure has ended through the slow, progressive and continuous deterioration and impairment of new portions of lung tissue. (Compl. P 21). CBD has a latency period from 6 months to 20 years or longer, (Compl. P 21).

Plaintiffs seek medical surveillance and screening for beryllium sensitivity, CBD and cancer. (Compl. P 3). The United States Department of Energy has determined that medical surveillance and screening for beryllium sensitivity and CBD is essential for those exposed to beryllium. (Compl. P 28). The purpose of such screening and surveillance is the early detection of beryllium sensitivity [*4] and CBD so that workers can be removed from exposure and treatment can begin. (Compl. P 29).

Plaintiffs allege that defendant failed to provide adequate warnings to its customers and to plaintiffs about the dangers of beryllium exposure, intentionally and negligently misrepresented the hazards of beryllium exposure and actively concealed its knowledge regarding the hazards of beryllium exposure. (Compl. P 3). In particular, plaintiffs allege that defendant knew or should have known that exposure to airborne concentrations of beryllium substantially below the Atomic Energy Commission and/or Occupational Safety and Health Administration's permissible level was not safe for those who are susceptible to beryllium's toxic effects. (Compl. P 23, 25). Plaintiffs allege that defendant's misconduct placed them "at substantially increased risk" of developing CBD. (Compl. P 20). The increased risk of CBD has caused each plaintiff to need baseline and periodic medical testing regardless of how small his recorded exposure to beryllium. (Compl. P 30).

The Complaint sets forth causes of action for negligence and strict product liability. Defendant has moved to dismiss pursuant to Federal Rule of [*5] Civil Procedure 12(b)(6).

### Standard of Review

When considering a motion to dismiss plaintiffs' Complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the allegations of the complaint must be taken as true and construed liberally in favor of plaintiffs. *Lawrence v. Chancery Court of Tenn., 188 F.3d 687 (6th Cir. 1999)*. The Complaint is only to be dismissed if plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Hammond v. Baldwin, 866 F.2d 172 (6th Cir. 1989)*. However, the Complaint must set forth "more than the bare assertion of legal conclusions." *In Re*

*DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir. 1993); Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)*.

"In practice, a...complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* Legal conclusions are not accepted as true nor are mere conclusions afforded liberal Rule [*6] 12(b)(6) review. *Fingers v. Jackson-Madison County General Hospital District, 1996 U.S. App. LEXIS 30864*, No. 95-5903 (6th Cir. November 21, 1996). Dismissal is proper if the Complaint lacks an allegation regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co., 899 F.2d 485 (6th Cir. 1990)*.

### Discussion

As an initial matter, the parties disagree regarding what substantive law should govern plaintiffs' claims. Defendant argues that Tennessee law should apply, while plaintiffs argue in favor of Ohio law.

In moving to dismiss, defendant argues that plaintiffs fail to state a claim upon which relief can be granted in that they fail to allege a past or present injury. Defendant argues that Tennessee law does not recognize a cause of action seeking medical surveillance because of an increased risk of future disease in the absence of a present injury. Because an actual injury is an element of every tort, defendant argues that the mere risk of future injury is not a cognizable injury. Defendant also argues that the mere exposure to beryllium is not an injury since it is harmless to most people. Only those who are susceptible to the toxic effects of beryllium [*7] develop CBD, which is an immune response akin to an allergic reaction to beryllium. Additionally, defendant points to several other courts which have rejected medical monitoring claims in the absence of physical or emotional injury and argue that, if necessary, the Tennessee legislature, not this Court, should expand state law to recognize a claim for medical monitoring due to the increased risk of future disease.

Plaintiffs argue that they have presented a valid claim under the law of both Ohio and Tennessee. According to plaintiffs, hazardous exposure constitutes an injury and no additional physical injury is required. Plaintiffs are not, they claim, seeking damages for the increased risk of future disease, but compensation for present, legally-cognizable damages.

#### (1) choice of law

In diversity cases, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)*. Thus, Ohio's choice of law rules apply to this case.

In *Fox v. Morrison Motor Freight, Inc.*, 25 Ohio St. 2d 193, 267 N.E.2d 405, 406-408 (Ohio 1971), the Ohio Supreme Court abandoned **[*8]** automatic application of the rule of *lex loci delicti* to choice of law questions and stated, "the true search in each instance is for substantial state governmental interest." The court did not, at that time, discuss what factors should be considered in determining which state's governmental interests were substantial.

In *Morgan v. Biro Mfg. Co.*, 15 Ohio St. 3d 339, 474 N.E.2d 286, 288 (Ohio 1984), the Ohio Supreme Court clarified the holding of *Fox* and its progeny, stating that "the traditional rule of *lex loci delicti* is still viable in Ohio, but is no longer used to automatically determine the prevailing state law." The court adopted the Restatement approach to choice of law questions:

> [A] presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit. To determine the state with the most significant relationship, a court must then proceed to consider the general principles set forth in Section 145 [of the Restatement of the Law of Conflict of Laws]. The factors within this section are: (1) the place of the injury; (2) the place where the conduct causing the **[*9]** injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 which the court may deem relevant to the litigation. n1

*474 N.E.2d at 289.*

> n1 The factors in Section 6 include (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of law to be applied.

The plaintiff in *Morgan* brought a product liability suit for personal injuries against the manufacturer of a meat grinder. The plaintiff was a resident of Kentucky who was injured while employed **[*10]** at a grocery store located in Kentucky. *Id.* The plaintiff received workers' compensation benefits from the State of Kentucky for his injury. *Id.* The defendant was incorporated under the laws of Ohio and manufactured the meat grinder in Ohio. *Id.* While noting that Ohio had an important interest in deterring the manufacture and sale of defective products, the court nonetheless held that Kentucky law should apply because Kentucky had "the most significant relationship to the parties and events" involved in the case. *Id. See also Lawson v. Valve-Trol Co.*, 81 Ohio App. 3d 1, 610 N.E.2d 425, 427 (Ohio App. 9th Dist. 1991) (applying Indiana law to product liability action brought against Ohio manufacturer where plaintiffs were Indiana residents, were injured in Indiana and received Indiana workers' compensation benefits); *Jernigan v. Columbia Electric Mfg. Co.*, 1992 Ohio App. LEXIS 6412, 1992 WL 388872 (Ohio App. 8th Dist. Dec. 17, 1992) (applying Tennessee law to product liability action brought against Ohio manufacturer where plaintiffs were Tennessee and Georgia residents, were injured in Tennessee and could receive Tennessee workers' compensation benefits).

Similarly, **[*11]** in this case, Tennessee has a more significant relationship to the parties and events than does Ohio. Beginning with the presumption that the law of the place of injury controls, it is not clear from the facts of the Complaint that Ohio's governmental interests in the litigation are sufficient to overcome that presumption. Plaintiffs allege that they have been injured through exposure to defendant's beryllium or beryllium-containing products. This alleged exposure occurred in Tennessee. Plaintiffs are all residents of Tennessee and are employed in Knoxville, Tennessee at Fulton Bellows & Components. Defendant is incorporated under the laws of Ohio and its corporate headquarters are located in Ohio.

Plaintiffs cite *Schiltz v. Meyer*, 29 Ohio St. 2d 169, 58 Ohio Op. 2d 391, 280 N.E.2d 925 (Ohio 1972), in support of their argument that because they have chosen Ohio rather than their state of residence as the forum state, Ohio has an increased governmental interest in this case. However, the Supreme Court has held that a plaintiff's choice of forum should be accorded "little or no significance" in a choice of law determination. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 820, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985). **[*12]** To the contrary, a plaintiff's "desire for forum law is rarely, if ever controlling," for if "a plaintiff could choose the substantive rules to be applied to an action...the invitation to forum shopping would be irresistible." *Id.* (citing *Allstate Insur. Co. v. Hague*, 449 U.S. 302, 337, 66 L. Ed. 2d 521, 101 S. Ct. 633 (1981)).

Plaintiffs allege that it was defendant's failure to warn them and their employer of the potentially harmful affects of beryllium exposure that caused their injuries. Plaintiffs argue in their Brief in Opposition that this misconduct occurred in Ohio, since that is the location of defendant's headquarters from which all corporate policies and decisions originated.

There appears to be some disagreement as to where an omission, e.g., a failure to warn, occurs for the purposes of choice of law issues. The Restatement of the Law of Conflicts does not address this question. However, the majority of courts hold that a failure to warn occurs at the place where the plaintiffs could reasonably have been warned regardless of where the decision not to warn took place. *See, e.g.,* *Vhora v. Michelin North America, Inc., 1999 U.S. Dist. LEXIS 1246, 1999 WL 63682* *2 (N.D. Ill. Feb. 4, 1999)* [*13] (applying Illinois law because plaintiffs first encountered and had opportunity to inspect tires in Illinois); *Ducey v. United States, 713 F.2d 504 (9th Cir. 1983)* (applying Nevada law despite plaintiffs' argument that omissions stemmed from decisions made in California). Plaintiffs in this case encountered and were exposed to defendant's products in Tennessee. Therefore, any failure to warn which might have proximately caused plaintiffs' injuries occurred in Tennessee.

Even assuming defendant's alleged misconduct occurred in Ohio and recognizing Ohio's interest in determing the manufacture and sale of defective products, Ohio's interests in this case are not sufficient to overcome the presumption that Tennessee law controls.

Plaintiffs cite *In re Bendectin Litigation, 857 F.2d 290 (6th Cir. 1988),* in support of their argument that Ohio law should be applied. That case involved multi-district product liability litigation by hundreds of claimants alleging that Bendectin increased the risk of birth defects in the children of pregnant mothers who ingested the drug. *Id.* The court determined that Ohio law should control [*14] since Bendectin was manufactured in Ohio and no other state had more significant contacts with the parties and events. *Id. at 305.* Some of the plaintiffs argued that the law of their domicile should be applied. *Id.* The court disagreed, stating,

> Those plaintiffs who seek to apply the law of their state of domicile may also do so on the assumption that this is where the injury occurred. Such an assumption, however, is not at all clear, for the state of domicile at the time of suit may bear little or no relation to where a mother may have taken a morning sickness drug years before.

*Id.*

In this case, plaintiffs' domicile is also the location of their alleged injury and of their employment, which is the site of their exposure to defendant's products. The only contact between Ohio and this litigation is that defendant is an Ohio corporation that maintains its headquarters in Ohio. Unlike the plaintiffs in *Bendectin,* plaintiffs do not allege that the beryllium-containing products to which they were exposed were manufactured in or shipped from Ohio. In addition, although plaintiffs ultimately seek class certification in this action, at present [*15] this case involves only four individual plaintiffs-all of whom live, work and were allegedly injured in Tennessee. Thus, *Bendectin* is distinguishable on several grounds.

Weighing all the factors in light of the presumption that the law of the location of the injury controls, Tennessee law will be applied to this case.

### (2) plaintiffs' injuries

Plaintiffs argue that they have stated a valid claim under Tennessee law for recovery of medical monitoring costs due to their increased risk of developing CBD. According to plaintiffs, exposure to a hazardous substance constitutes a cognizable injury by itself, and Tennessee courts do not require proof of a separate physical injury. Plaintiffs assert that their medical monitoring claim seeks damages for a present, legally-cognizable injury and not for the mere increased risk of a future injury. Plaintiffs cite three Tennessee cases in support of these arguments: *Laxton v. Orkin Exterminating Co., 639 S.W.2d 431 (Tenn. 1982), Carroll v. Sisters of Saint Francis Health Services, Inc., 868 S.W.2d 585 (Tenn. 1993),* and *Camper v. Minor, 915 S.W.2d 437 (Tenn. 1996).* None of these cases [*16] supports a claim for medical monitoring. All three involved claims for negligent infliction of emotional distress.

In *Laxton,* the plaintiffs sought to recover for mental anguish, personal injury and property damage caused by the defendant's negligent contamination of their water supply with a toxic chemical. *639 S.W.2d 431.* The trial court directed a verdict in favor of the plaintiffs on the issue of negligence, and the jury awarded damages of $ 6,000.00 per plaintiff for mental pain and suffering and $ 6,721.00 for property damage and expenses. *Id.* The Tennessee Supreme Court affirmed the verdict because "a jury could find sufficient 'injury' to these plaintiffs to justify a recovery for their natural concern and anxiety for the welfare of themselves and of their infant children." *Id. at 434.* The court held,

> Recovery for the negligent infliction of mental anguish should be allowed in cases

where, as a result of a defendant's negligence, a plaintiff has ingested an indefinite amount of a harmful substance. In such cases the finder of fact may conclude that the plaintiff has sustained sufficient physical injury to support an award for mental [*17] anguish even if subsequent medical diagnosis fails to reveal any other physical injury. The period of mental anguish, of course, would be confined to the time between discovery of the ingestion and the negative medical diagnosis or other information that puts to rest the fear of injury.

*Id.* Thus, in *Laxton*, the ingestion of a harmful substance was found to be a physical injury sufficient to support the plaintiffs' claims for emotional distress.

The plaintiff in *Carroll* sought damages for negligent infliction of emotional distress based on her fear of contracting AIDS. *868 S.W.2d 585.* Mistaking a container of contaminated needles for a paper towel dispenser, the plaintiff reached inside and was pricked by sharp objects. *Id. at 586.* The plaintiff tested negative for AIDS six times over the next three years. *Id. at 587.* However, she alleged that she suffered from great anxiety, fear and emotional distress that she might contract AIDS. *Id.* Citing *Laxton*, the Tennessee Supreme Court noted that the physical injury requirement in claims of negligent infliction of emotional distress had "been gradually weakened so [*18] that a minimal physical injury will now suffice." *Id. at 593.* However, the court held that the requirement had not been completely abandoned, and, absent proof of the plaintiff's actual exposure to the AIDS virus, she failed to state a claim upon which relief could be granted. *Id. at 593-594.*

In *Camper*, the Tennessee Supreme Court discussed both *Laxton* and *Carroll* and officially abandoned the physical injury requirement in negligent infliction of emotional distress cases. *915 S.W.2d at 446.* The plaintiff in *Camper* was involved in a car accident in which he was not injured, but the other driver, a 16 year old girl, was instantly killed. *Id. at 439.* He brought an action to recover for the emotional injuries he received as a result of viewing her body soon after the accident. *Id.* The court noted that the law governing recovery for negligent infliction of emotional distress was "one of the most disparate and confusing areas of tort law." *Id. at 440.* As a result of the confusion and the sometimes harsh results of the physical injury requirement, "Tennessee courts have continually found [*19] it necessary to deviate from the 'physical manifestation'

rule by either formally creating exceptions to the rule or by applying the rule in a nonrigorous fashion." *Id. at 445.* Because the physical injury requirement proved to be "inflexible and inadequate" and "completely ignored the fact that some valid emotional injuries simply may not be accompanied by a contemporaneous physical injury or have physical consequences," the court abandoned it. *Id. at 446.* Instead, the court held that negligent infliction of emotional distress claims should be analyzed under a general negligence approach: "the plaintiff must present material evidence as to each of the five elements of general negligence-duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause." *Id.* In addition, the claimed emotional injury must be serious or severe and must be supported by expert medical or scientific proof. *Id.* The court remanded the case in light of its holding. *Id.*

It is clear from *Camper* that, although Tennessee law no longer requires a separate physical injury in negligent infliction of emotional distress cases, an identifiable, [*20] present injury or loss is still required.

In any event, *Laxton, Carroll* and *Camper* are not directly on point with the facts of this case. Plaintiffs do not state a cause of action for negligent infliction of emotional distress. They do not seek damages for fear, anxiety or emotional injuries caused by the alleged exposure. Plaintiffs do not seek damages for the cost of medical examinations they have been forced to undergo due to the alleged exposure. They do not seek damages for any other medical expenses incurred. Plaintiffs do not allege any physical injury, harm or symptoms caused by the alleged exposure. They do not allege any present injury or loss. Instead, they demand that defendant "pay for a reasonable medical surveillance and screening program" because their exposure to beryllium and beryllium-containing products caused them "to be placed at increased risk of developing chronic beryllium disease."

In *Potts v. Celotex Corp., 796 S.W.2d 678 (Tenn. 1990),* the plaintiff brought a product liability claim seeking damages for her husband's death caused by mesothelioma, an asbestos-related cancer. Several years before bringing the claim for mesothelioma, [*21] the plaintiff had been tentatively diagnosed with asbestosis. *Id. at 679.* However, recovery was sought only for damages arising from the mesothelioma, not from the asbestosis. *Id.* The defendant argued that the plaintiff's claim was barred by the statute of limitations. *Id.* The court disagreed, finding that "asbestosis and mesothelioma are two independent, distinct and separate diseases" and the statute of limitations did not begin to run on the plaintiff's mesothelioma claim until her husband was diagnosed with that disease. *Id. at 684.*

2000 U.S. Dist. LEXIS 21897, *

[A] cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered. . . .[A] cause of action in tort does not exist until a judicial remedy is available to the plaintiff. Before a judicial remedy exists, two elements must coalesce: (1) a breach of some legally recognized duty owed by the defendant to the plaintiff and (2) some legally cognizable damage caused to the plaintiff by the breach of duty.

*Id. 681.* The court specifically noted that, **[*22]** in light of the medical uncertainty that those who suffer from asbestosis will eventually develop mesothelioma, the plaintiff's husband could not have recovered for damages "caused by any future cancer or increased risk of cancer" at the time he was initially diagnosed with asbestosis even if he had wanted to. *Id.* Under Tennessee law,

> to recover for future effects of an injury, the future effects must be shown to be reasonably certain and not a mere likelihood or possibility and...before a plaintiff may recover for potential injuries, there must be a reasonable degree of medical certainty that the plaintiff will develop a disease in the future as a result of an injury.

*Id. See also Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1204 (6th Cir. 1988)* (applying Tennessee law and reversing award of damages for increased risk of cancer caused by exposure to contaminated water supply

because plaintiffs failed to prove future disease was "medically reasonably certain to follow from the existing present injury").

In this case, plaintiffs are not even seeking to recover for the future effects of an existing injury. They are seeking to recover for testing **[*23]** for the development of a possible future injury. It is clear that under Tennessee law, a plaintiff must allege a present injury or loss to maintain an action in tort. No Tennessee cases support a cause of action for medical monitoring in the absence of a present injury. Although plaintiffs point to cases in several other jurisdictions which allow such a cause of action, in the absence of Tennessee case law or a statute authorizing this relatively new and controversial type of claim, this Court will not create a new cause of action for Tennessee plaintiffs. As such, plaintiffs fail to state a claim upon which relief can be granted.

### Conclusion

For these reasons, defendant's Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

PATRICIA A. GAUGHAN

United States District Judge

### Judgment Entry

This Court, having issued its Memorandum of Opinion and Order granting defendant's Motion to Dismiss (Doc. 8), hereby enters judgment in favor of defendant and against plaintiffs.

IT IS SO ORDERED.

PATRICIA A. GAUGHAN

United States District Judge