UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Suzanne Genereux, et al. ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | Case No. 04-CV-12137 JLT |
| v. ) | |
| ) | |
| American Beryllia Corp., et al. ) | |
| ) | |
|     Defendants. ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT BRUSH WELLMAN, INC.'S,
BRUSH WELLMAN CERAMIC INC.'S AND
BRUSH WELLMAN CERAMIC PRODUCTS INC.'S MOTION TO DISMISS**

Plaintiffs Suzanne Genereux, Barry Genereux, Angela Genereux, and Krista Genereux hereby submit their Opposition to the Motion to Dismiss of Defendants Brush Wellman, Inc. ("Brush"), Brush Wellman Ceramics Inc. ("Brush Ceramics") and Brush Wellman Ceramic Products Inc. ("Brush Ceramic Products"). As grounds for this Opposition, the plaintiffs submit that the allegations of the Amended Complaint state claims upon which relief can be granted, as discussed in detail below.

**I.     FACTUAL BACKGROUND**

*<u>The Dangers of Exposure to Beryllium</u>*

Beryllium is an exceptionally hard metal that is used in commercial and military applications. Exposure to beryllium can cause Chronic Beryllium Disease ("CBD"), an irreversible, largely untreatable, chronic scarring of the lungs. *See* Amended Complaint, at ¶¶ 22-26. CBD causes a painful, progressive decline in lung function leading to impairment, and often suffocation and death. *Id.* CBD has a slow, insidious onset, and a long latency period, *i.e.,* initial symptoms may not become manifest until thirty or forty years after exposure. *Id.* While

there is presently no known cure for CBD, early detection allows for a range of treatments that can delay and diminish the debilitation caused by the disease. *Id*.

### *The Parties*

The plaintiffs' claims are based upon their exposure to respirable beryllium dust, fumes and particulate matter. Amended Complaint, at ¶¶ 17-18, 27-29. From 1982 through 1990, Suzanne Genereux was employed by Raytheon and worked exclusively at its plant located in Waltham, Massachusetts ("the Waltham plant"). During her employment, she performed operations, including, but not limited to, sandblasting, welding, filing and/or brazing of beryllium ceramics, beryllium copper and other beryllium-containing products, which activities produced respirable beryllium dust, fumes and particulate matter. Amended Complaint, at ¶ 17. Suzanne Genereux's spouse, Barry Genereux, also worked at the Waltham plant. Neither minor plaintiff ever worked at the Waltham plant but occasionally visited their father at the Waltham plant. Amended Complaint, at ¶ 18.

The beryllium products at issue in this case were processed and manufactured by the several defendants, including, but not limited to Brush, Brush Ceramics and Brush Ceramic Products. *Id.*, at ¶¶ 3- 5, 11, 20-21. All of plaintiffs' exposures to beryllium occurred as a direct and proximate result of contact with the beryllium-containing products distributed, sold, supplied and/or shipped by the defendants to Raytheon's Waltham plant. *See* Amended Complaint, at ¶¶27-28.

During Suzanne Genereux's employment at the Waltham plant, she was exposed to unlawful, dangerous and unhealthy levels of beryllium dust, fumes and particulate, resulting in serious and permanent injury, including CBD, as described more particularly in the Amended

Complaint. Barry Genereux, has asserted claims arising out of his exposure to respirable beryllium at the plant, as well as that brought home by Suzanne Genereux upon her clothing and person as a result of her employment at the plant, and minor plaintiffs Angela Genereux and Krista Genereux have asserted claims arising out of their exposure to respirable beryllium brought home to the Genereux residence by Barry Genereux upon his clothing and person as a result of his employment at the Waltham plant. *See* Amended Complaint, at ¶29.

## II.     ARGUMENT

The Brush Wellman defendants seek dismissal of Counts IV, V, VI, VII, VIII, XII and XIII. The plaintiffs will voluntarily dismiss the claims based on theories of "ultrahazardous activity" in Counts IV and XII. However, the remaining Counts all state claims upon which relief can be granted, as discussed below.

### A.     Counts V and XIII Complied With The Chapter 93A Demand Letter Requirements.

#### 1.     The Demand Letters Complied With The Thirty-Day Notice Requirement.

The defendants seek dismissal of the claims under G.L. c. 93A based on their contention that the demand letters did not comply with the notice requirements of the statute. However, they admit that the plaintiffs sent G.L. c. 93A demand letters on August 5, 2004, and that the plaintiffs waited thirty days for a good faith settlement offer from the defendants, and, having failed to receive such an offer, the plaintiffs amended the complaint on September 9, 2004 to add claims under c. 93A. Nonetheless, without any support in the case law, the defendants contend that the c. 93A claims should be dismissed because the original complaint, *which had no c. 93A claims*,

was filed prior to the time the plaintiffs sent the 93A demand letter.[1] On the contrary, this argument has been rejected by every court that has considered it. As stated in *Towne v. North End Isuzu, Inc.* 10 Mass.L.Rptr. 340, 1999 WL 674140 (Mass.Super.1999) (Hillman, J.), "Contrary to the defendants' assertion, the plaintiffs need not have filed this pre-suit demand letter prior to the filing of any action against the defendants, but merely before the c. 93A claims are propounded, *either by a motion to amend the original suit*, or in a separate suit."[2]

The defendants had more than thirty days to respond to the demand letters before the plaintiffs added the c. 93A claims by filing an Amended Complaint. This served the demand letter's purpose "to encourage negotiation and settlement and to control the amount of damages which the consumer might ultimately recover." S*tark*, 30 Mass.App.Ct. at 199. The thirty day notice requirement was satisfied.

    **2.**    <u>**The Demand Letters Adequately Described The Unfair Or Deceptive Acts or Practices and the Resulting Harm.**</u>

To comply with notice requirements, a 93A demand letter must "reasonably describ[e] the unfair or deceptive act or practice relied upon and the injury suffered." Mass.Gen.L. ch. 93A

---

[1] The demand letter requirement does not even apply to the defendant Brush Wellman. Under G.L. c. 93A, § 9, the requirement only applies to Massachusetts businesses, and Brush Wellman is a Ohio corporation with a principal place of business in Ohio. *See Hadar v. Concordia Yacht Builders, Inc.,* 886 F. Supp. 1082, 1094 (S.D.N.Y. 1995).

[2] Accord: *Tarpey v. Crescent Ridge Dairy, Inc.*, 47 Mass.App.Ct. 380, 391 (1999) (demand letter sent after suit was instituted but before complaint was amended to add c. 93A claim satisfied the 93A notice requirements); S*tark v. Patalano Ford Sales, Inc.*, 30 Mass.App.Ct. 194, 199 (1991) (demand letter sent after original complaint was filed but before amendment adding new defendant satisfied 93A); *Medeiros v. Woburn Nursing Center, Inc.*, 13 Mass.L.Rptr. 555, 2001 WL 1174141 (Mass.Super. 2001) (Murphy, J.) (demand letter sent after suit was filed but before amendment adding 93A claim satisfied 93A notice requirements); *Lilly v. Turboprop East, Inc.*, 2004 WL 540445 (E.D.Pa. 2004).

§ 9(3). Such notice requirement is intended to give the defendant "'an opportunity to review the facts and the law involved to see if the requested relief should be granted or denied' and to enable [it] to make 'a reasonable tender of settlement' in order to limit the recoverable damages." *Brandt v. Olympic Constr.,* 16 Mass.App.Ct. 913, 915 (1983) *quoting York v. Sullivan*, 369 Mass. 157, 162 (1975). As stated in *Cassano v. Gogos*, 20 Mass.App.Ct. 348, 350-51 (1985), in addition to defining the "injury suffered" and the "relief sought," a demand letter must contain at least one of the following six references:

> (1) any express reference to c. 93A; (2) any express reference to the consumer protection act; (3) any assertion that the rights of the claimants as consumers have been violated; (4) any assertion that the defendant has acted in an unfair or deceptive manner;... (5) any reference that the claimants anticipate a settlement offer within thirty days....or (6) any assertion that the claimant will pursue multiple damages and legal expenses, should relief be denied.

In the present case, the plaintiffs' demand letter (attached to the defendants' Memorandum) "described the unfair or deceptive act[s] or practice[s] relied upon and the injury suffered," referenced c. 93A and the Massachusetts Consumer Protection Statute, and explained how the rights of the plaintiffs as consumers had been violated, how the defendants acted unfairly and deceptively, that the plaintiffs anticipated a settlement offer within thirty days and that the plaintiffs would pursue multiple damages and legal expenses if no settlement was offered.

The demand letter detailed the defendants' history of unfair and deceptive acts beginning in 1948 and continuing through the present and how those acts violated c. 93A. Demand Letter, pp. 2-3. The letter provided in part: "...Brush Wellman knew that the Atomic Energy and/or Occupational Safety and Health Administration's permissible 'safe' levels [of exposure to beryllium] were in fact unsafe because Brush Wellman knew or should have known that

workers...would likely contract CBD if exposed to far lesser levels of airborne beryllium." *Id.* Further, the letter provided that "Brush Wellman agreed to implement the 2 microgram standard in its plants...professed that [it] was completely effective in preventing beryllium disease...[and] campaigned to persuade the EPA and OSHA to reaffirm the...standard based on false information that contradicted research...confirming the risk of CBD at exposure to levels below 2 microgram[s]." *Id.* The letter stated that "Brush Wellman and others funded a 'Scientific Research Advisory Committee' to conduct research that would counteract mounting scientific evidence that beryllium was more dangerous than Brush Wellman...wanted to admit." *Id.*

The letter also described how the defendants' unfair and deceptive acts violated c. 93A. The letter explained that the defendant was liable under c. 93A for its failure to adequately warn the ultimate users of the product, because "...a 'failure to warn of a defective or dangerous condition that could cause personal injury constitutes an unfair trade practice.'" *Id.* The letter explained that c. 93A was violated because Brush Wellman failed to disclose the fact that the work performed at the Waltham plant "would produce visible airborne dust, particles and fumes capable of causing CBD." *Id.* The letter also noted that Brush Wellman's liability could be established by its breach of warranty because its products were "unmerchantable and not fit for the purpose for which they were intended" and "...a breach of warranty constitutes a c. 93A violation." *Id.*, citing *Maillet v. A.T.F. Davidson Co.*, 407 Mass. 185 (1990).

The demand letter also described how Brush Wellman's "knowing concealment of the dangers associated with beryllium [and] its failure to provide adequate warnings....resulted in the Genereuxs' injuries." *Id.*, p. 6. The letter gave details of the damages resulting from the

plaintiffs' exposure to toxic beryllium, specifically describing Suzanne Genereux's debilitating CBD and resulting injuries and her family's increased risks of developing CBD. *Id.*

The plaintiffs' demand letter included not one but all six of the references required under *Cassano,* 20 Mass.App.Ct. at 350-51. To dismiss the plaintiffs' c. 93A claims, when the demand letters fully complied with all notice requirements, would run contrary to legislative intent, as the statute "...was not designed to limit [consumers'] preexisting rights and remedies, or to create obstacles in their pursuit." *York v. Sullivan*, 369 Mass. 157, 164 (1975); *Fredericks v. Rosenblatt,* 40 Mass.App.Ct. 713, 717-18 (1996) (demand letter sufficient where claim was "reasonably ascertainable"). The c. 93A claims should not be dismissed.

**B.    Count VI Adequately States A Claim For Fraudulent Concealment or Nondisclosure.**

Count VI adequately states a claim for fraudulent concealment or nondisclosure by alleging that Brush Wellman fraudulently concealed information about the risks associated with beryllium, while knowing that workers would be exposed to levels of beryllium capable of causing CBD. Complaint, ¶65; Demand Letter, p. 2.

When "an individual chooses to provide information to another, therefore, he is obligated to do so honestly and to divulge all material facts within his knowledge." *Malihi v. Gholizadeh*, 11 Mass.L.Rpt. 659, 2000 WL 1299485 *4 (Mass.Super) *quoting Kannavos v. Annino*, 356 Mass. 42, 47 (1969). Therefore, a fraud claim is established where a party "made a false representation or 'uttered a half truth which may be tantamount to a falsehood.'" *Id., quoting Kannavos v. Annino*, 356 Mass. 42, 47 (1969).

Because the defendant made representations to the public regarding the safety of beryllium, it assumed a duty to disclose the information honestly. As stated in the Amended Complaint, the defendants "...actually knew...that an airborne concentration of beryllium that was substantially below the...permissible exposure levels of 2 micrograms of beryllium per cubic meter of air...would not protect all workers...[and yet]...concealed the true hazards...of airborne beryllium dust from those workers...who would be exposed to airborne beryllium dust, including the Plaintiffs." Amended Complaint, ¶¶68-70. The defendants "...advocate[d]... a 'tentative' occupational safety standard ... that they did not believe would protect workers." *Id.*, at ¶70. The defendants

> disseminated false information to undermine an earlier scientific study that had shown that CBD could develop at levels far below 2 micrograms,...oppose[d] European efforts to impose labeling requirements on beryllium... funded the work of purported scientific experts to attack and rebut the work of certain governmental agencies that had established that beryllium is a human carcinogen at a time when the Defendants...knew...that such attacks were entirely without merit or basis and were intended to advance false and misleading information to the scientific, industrial hygiene and public health community. *Id.*

Count VI alleged that the defendants attempted to conceal the dangers of their products by providing false information and/or uttering "half truths." Therefore, the fraudulent concealment allegations adequately state a claim upon which relief can be granted.

**C.     Count VII Adequately States A Claim For Civil Conspiracy.**

Count VII states a claim for civil conspiracy under Massachusetts law. The Amended Complaint states that the defendants, "acting in concert," failed to issue adequate warnings and instructions to purchasers, ultimate users and those in the neighboring community that would

reasonably be exposed to beryllium dust and discharges when the defendants knew that such exposure was likely to cause CBD.  Amended Complaint, ¶68.

Civil conspiracy is an "explicitly recognized" cause of action in Massachusetts, requiring a "common design or agreement, although not necessarily express, between two or more persons to do a wrongful act, and...proof of some tortious act in furtherance of the agreement." *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994) *citing* Restatement (Second) of Torts, § 876 cmt. b (1977).  As the Supreme Judicial Court has stated, "[t]he gist of a civil action of this sort is not the conspiracy, but the deceit or fraud causing damage to the plaintiff, the combination being charged merely for the purpose of fixing joint liability on the defendants." *New England Foundation Co. v. Reed*, 209 Mass. 556, 560 (1911).[3]

Count VII alleges that Brush, Brush Ceramics and Brush Ceramic Products conspired to issue inadequate warnings to workers and surrounding community members. Amended Complaint, ¶¶69-74.  The plaintiffs allege that the defendants "consciously conspired and deliberately pursued a common plan to conceal the true hazards and risks of airborne beryllium dust from those workers and members of the public who would be exposed to airborne beryllium

---

[3]Citing a single case applicable only to antitrust law, the defendants have relegated to a footnote their alternative argument that a parent and its subsidiaries cannot conspire.  On the contrary, it is well settled that in the context of tort claims, parents, subsidiaries and related corporations may be liable for a civil conspiracy.  *In re Conticommodity Services, Inc.*, 733 F.Supp. 1555, 1568 (N.D.Ill.1990) (wholly-owned subsidiary may engage in civil conspiracy with its parent); *Shared Communications Serv. v. Bell Atl. Properties Inc.*, 692 A.2d 570, 573 (Pa.Super. 1997) ("no compelling reason...to justify a *per se* rule ignoring legal corporate form in the common law conspiracy context"); *Valores Corporativos, S.A. de C.V. v. McLane Co., Inc.*, 945 S.W.2d 160, 168 (Tex.App. 1997) ("parent corporation is capable of conspiring with its wholly-owned subsidiary for purposes of common law torts"); *Outdoor Technologies Inc. v. Allfirst Financial Inc.*, 2000 WL 141275 (Del.Super.) (neither Maryland nor Delaware specifically prohibits "civil conspiracy claims that arise from conduct that occurs between sister and parent corporations").

dust, including the Plaintiffs." Amended Complaint, ¶70. Beginning in the 1950's and continuing to the present, the defendants agreed "not to advise workers about the health risks of beryllium and did not tell workers or the public that the safety standards were 'tentative' and left some workers and others at risk." Amended Complaint, ¶70. During the 1960's, the defendants "agreed to cooperate and did cooperate in joint efforts to defend litigation even in suits brought only against one of the conspirators, so that they could control what information became publically available about the health risks of beryllium." Amended Complaint, ¶70. In the 1980's, the defendants "agreed to oppose European efforts to impose labeling requirements on beryllium and presented false and incomplete information about the health risks of beryllium." Amended Complaint, ¶70. The defendants joined a Scientific Advisory Committee, which remained active into the 1990's, "to conduct industry-approved research that would counteract mounting scientific evidence that beryllium was more dangerous than the companies wished to acknowledge." Amended Complaint, ¶70. The defendants "expressly or tacitly agreed that beryllium workers and the public would not be told that those who were susceptible to beryllium would develop the disease" at airborne concentrations below the levels to which such workers and the public were exposed. Amended Complaint, ¶71.

Since the allegations of Count VII provide that three legal entities conspired to conceal the true hazards associated with beryllium, Count VII adequately states a claim for civil conspiracy and should not be dismissed.[4]

---

[4] The defendants also contend that Brush Ceramics and Brush Ceramic Products do not exist and have not existed since 1981. As to that separate argument, the Plaintiffs refer to their Opposition to Brush Wellman's Motion to Drop Misjoined Parties, which addresses this argument in detail.

**D.      A Cause of Action for Medical Monitoring is Consistent with Massachusetts Law, Is Supported by the Force of Logic, Well-Reasoned Authorities and Public Policy Imperatives And Would Be Recognized by the Supreme Judicial Court of Massachusetts**

The defendants also contend that the claims seeking the costs of medical monitoring (Count VIII) should be dismissed, because, according to the defendants, the plaintiffs have not alleged a present injury. The plaintiffs addressed this argument in detail in their Opposition to the Motion to Dismiss of Raytheon Company, and the plaintiffs incorporate by reference herein the entirety of that Opposition.

Barry Genereux, individually, and Suzanne Genereux and Barry Genereux, as parents and natural guardians of their minor children, Angela Genereux and Krista Genereux, seek the establishment of a medical monitoring trust fund due to the reasonable certainty that they require diagnostic testing to detect the onset of any illness arising from their tortious exposure to the dangers of respirable beryllium dust, fumes and particulate matter, as a result of the failure of the defendants to warn of the dangers of respirable beryllium, a toxin which may cause severe illness or death. "[M]edical monitoring [is] simply the extension of traditional tort theory to modern medical practice." *Day v. NLO*, 851 F.Supp. 869, 880 (S.D. Ohio 1994). "It is the combination of the traditional tort policy of compensation for reasonable diagnostic procedures and the medical understanding of diseases with protracted latency periods that have led courts to order prospective medical monitoring." *Id.*

Medical monitoring serves the public health interest in encouraging and fostering access to early medical testing for those exposed to hazardous substances. Medical monitoring levels financial inequities by requiring a defendant to pay for exams necessitated by defendant's

wrongful conduct. Medical monitoring promotes the conventional goals of the tort system: the deterrence of tortfeasors and elemental justice.

By contrast, defendants seeks dismissal of this action because plaintiffs are without physical injury at this time. Defendants' argument defies logic because it requires plaintiffs to already possess the physical injury that plaintiffs are seeking to detect and prevent. Defendants seek to subvert the public policy concerns underlying medical monitoring which require medical monitoring to be available to permit early diagnosis of toxic related medical conditions.

Defendants concede that this Court has already recognized the viability of medical monitoring, albeit as an item of damages. *See Anello v. Shaw Industries, Inc.*, 2000 WL 1609831, *7 (D. Mass. 2000). The *Anello* decision implied that medical monitoring costs could be recovered as damages, and did not need to be pursued as a separate cause of action. However, in the present case, the defendants seek a ruling that such damages cannot be recovered at all, directly contrary to the *Anello* decision.

### The Plaintiffs Have Suffered An Injury For Purposes of Medical Monitoring Jurisprudence.

A plaintiff in a medical monitoring action states a claim for injury, but not physical injury. As stated in *Bower v. Westinghouse Electric Corp.*, 206 W. Va. 133, 138, 522 S.E.2d 424, 429 (W. Va. 1999), "[t]he 'injury' that underlies a claim for medical monitoring – just as with any other cause of action sounding in tort – is 'the invasion of any legally protected interest.' Restatement (Second) of Torts sec. 7(1) (1964)." The Third Circuit commented in *Paoli*, 916 F.2d at 851 (citation omitted), that "[d]efining injury in this way is not novel ... 'It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic

examinations just as he or she has an interest in avoiding physical injury. . . When a defendant negligently invades this interest, the injury which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations.'" *See Lewis v. Lead Industries Ass'n, Inc.*, 342 Ill. App. 3d 95, 101-2, 793 N.E.2d 869, 874 (Ill. App. 1st Dist. 2003) ("If a defendant's breach of duty makes it necessary for a plaintiff to incur expenses to determine if he or she has been physically injured, we find no reason why the expense of such an examination is any less a present injury compensable in a tort action than the medical expenses that might be incurred to treat an actual physical injury caused by such a breach of duty."); *Bocook v. Ashland Oil, Inc.*, 819 F. Supp. 530, 538 (S.D. W.Va. 1993) ("this court cannot discern the purpose for requiring a [medical monitoring] plaintiff to also be seeking compensation for present manifest physical injuries. The very essence of toxic exposure cases is the contention that physical injuries therefrom are presently indiscernible; instead the effects are latent.").

As explained in *Leardi v. Brown,* 394 Mass. 151, 159-160, 474 N.E.2d 1094, 1101 (Mass. 1985)[5], Massachusetts law is consistent with medical monitoring jurisprudence as it follows the definition of "injury" found in the Restatement (Second) of Torts section 7 (1965):

> According to the Restatement (Second) of Torts § 7 (1965), the term "injury" denotes "the invasion of any legally protected interest of another." Moreover, "[t]he most usual form of injury is the infliction of some harm; but there may be an injury although no harm is done." Restatement (Second) of Torts § 7, comment a (1965). As Professor McCormick has explained, "What the law always requires as a basis for a judgment for damages is not loss or damage, but 'injuria,'

---

[5] Although *Leardi* involved the Consumer Protection Act, its definition of the term "injury" was based on the "interpretation of well-defined words and phrases in the common law..." *Leardi v. Brown,* 394 Mass. at 159 (citing Sutherland Statutory Construction § 50.03).

and hence damages are allowed, though there has been no loss or damage." McCormick, Damages § 20 (1935).

This Court has also relaxed the physical injury requirement in a fear of cancer case, permitting expert medical testimony to substantiate subcellular changes, *see Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1228 (D. Mass. 1986), *aff'd sub nom. Anderson v. Beatrice Foods Co.*, 900 F.2d 388 (1st Cir.), *cert. denied,* 111 S. Ct. 233 (1990), which is analogous to the relaxation of the injury requirement in a medical monitoring action, which permits proof of economic harm due to the reasonably certain need to pay for prospective medical testing and evaluation, caused by defendants' tortious conduct.

### Sound Public Policy Supports Recovery Of Medical Monitoring Costs

The Pennsylvania Supreme Court in *Redland Soccer Club, Inc. v. Dept. of the Army and Dept. of Defense of the U.S.*, 548 Pa. 178, 194-195, 696 A.2d 137, 145 (Pa.1997) (citation and footnote omitted) explained a number of public policy reasons to recognize claims for medical monitoring:

> [M]edical surveillance damages promote early diagnosis and treatment of disease or illness resulting from exposure to toxic substances caused by a tortfeasor's negligence. *Ayers,* 525 A.2d at 311. Allowing recovery for such expenses avoids the potential injustice of forcing an economically disadvantaged person to pay for expensive diagnostic examinations necessitated by another's negligence. Indeed, in many cases a person will not be able to afford such tests, and refusing to allow medical monitoring damages would in effect deny him or her access to potentially life-saving treatment. It also affords toxic-tort victims, for whom other sorts of recovery may prove difficult, immediate compensation for medical monitoring needed as a result of exposure. Additionally, it furthers the deterrent function of the tort system by compelling those who expose others to toxic substances to minimize risks and costs of exposure. Allowing such recovery is also in harmony with "the important public health interest in fostering access to medical

>testing for individuals whose exposure to toxic chemicals creates
>an enhanced risk of disease." *Ayers,* 525 A.2d at 311.

The *Paoli* court's well reasoned support for medical monitoring recognized that:

>[the tort of medical monitoring] does not require courts to speculate about the
>probability of future injury. It merely requires courts to ascertain the probability
>that the far less costly remedy of medical supervision is appropriate. Allowing
>plaintiffs to recover the cost of this care deters irresponsible discharge of toxic
>chemicals by defendants and encourages plaintiffs to detect and treat their injuries
>as soon as possible.

*In re Paoli*, 916 F.2d at 852

The principles which underlie medical monitoring jurisprudence are already the law of this Commonwealth. Massachusetts follows the doctrine of avoidable consequences which permits the plaintiff to recover any sums reasonably spent to minimize damages, *see Burnham v. Mark IV Homes, Inc.,* 387 Mass. 575, 586, 441 N.E.2d 1027 (1982), thus encouraging a plaintiff to submit to medically advisable treatment, and follows the rule allowing reasonably anticipated future medical damages, *Cassidy v. Constantine*, 168 N.E. 169, 170 (Mass. 1929), including that of periodic diagnostic examinations.

Additional reasons for permitted medical monitoring recovery were stated by the Court in *Day v. NLO*, 851 F. Supp. 869, 879-80 (S.D. Ohio 1994):

>When liability has been established courts have allowed for compensation for
>reasonable medical procedures incurred in an attempt to establish whether a
>plaintiff has been injured, even when those procedures prove that the plaintiff has
>not in fact been injured. . . . Responsibility for procedures required to discover
>whether an injury has occurred are a reasonable consequence of tort liability. It is
>from this well accepted allowance for recovery of diagnostic procedures
>subsequent to a tort that courts have developed the remedy of medical monitoring.
>. . . [T]he court's concerns over damages which are uncertain, speculative, or
>conjectural are overcome by the reasonableness of compensation for diagnostic
>tests in cases where liability has been established. The safeguard against
>speculative recovery is the reasonableness of the procedures ordered in light of the
>tortious act. . . In any case, the reasonableness of the tests is one the court can

adequately adjudicate in light of expert testimony, with minimal risks of uncertain, speculative or conjectural recoveries.

In sum, as succinctly stated in *Ayers*, it "is inequitable for an individual wrongfully exposed to dangerous toxic chemicals but unable to prove that disease is likely, to have to pay his own expenses when medical intervention is clearly reasonable and necessary." *Ayers v. Township of Jackson*, 525 A.2d 287, 312 (N.J.1987)

**Defendants Contentions That Medical Monitoring Claims Should Be Dismissed Are Are Without Merit**.

Defendants' attacks on plaintiffs' claims are without merit. Defendants seek to support their concept of injury-as-physical injury by citing to cases addressing the accrual of a cause of action for physical injury. *See* Brush Memorandum, at 14. Yet, courts have found that cases on the accrual of a personal injury action are inapplicable in the context of a medical monitoring action. *See Bocook v. Ashland Oil, Inc.*, 819 F. Supp. 530, 537 (S.D. W.Va. 1993).

Contrary to defendants' argument that a physical harm requirement cannot be met by subcellular or subclinical injury, this Court, in *Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1228 (D. Mass. 1986), found that subcellular changes alone may be enough injury to support a claim for fear of cancer if substantiated by expert medical testimony. According to this Court, there had been no ruling by the Supreme Judicial Court that the physical harm should be immediately apparent as compared to subcellular. *Id.* at 1226-27. Thus, the court held that T-cell damage could prove the physical injury requirement of the tort cause of action of negligent infliction of emotional distress. *Id.*

Defendant's reliance upon *Caputo v. Boston Edison Co.*, 1990 WL 98694 (D. Mass.), for the proposition that cellular damage does not rise to the level of physical injury as a matter of

16

law, is misplaced as that statement was made in an unpublished opinion, in reliance upon *Eagle-Picher Industries, Inc. v. Liberty Mutual Ins. Co.*, 682 F.2d 12 (1st Cir. 1982), which itself was based on Ohio and Illinois law. In any event, *Caputo* did not address or even involve the issue of recovery of the costs of medical monitoring.

Nor are the defendants correct in their contention that the claims should be dismissed as seeking damages for increased risk. In predicting that Pennsylvania would recognize a cause of action for medical monitoring, the Third Circuit persuasively explained the distinction between these claims:

> [A]n action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur....
>
> ... *The injury in an enhanced risk claim is the anticipated harm itself. The injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect that injury.* The former is inherently speculative because courts are forced to anticipate the probability of future injury. The latter is much less speculative because the issue for the jury is the less conjectural question of whether the plaintiff needs medical surveillance.

*Paoli I,* 916 F.2d at 850-51 (footnote omitted) (emphasis added).

Nor is plaintiffs' claim an exposure-as-injury claim. *See* Brush Memorandum, at 15-16. *See Hansen v. Mountain Fuel Supply*, 858 P.2d at 978 ("Mere exposure to an allegedly harmful substance, however, is not enough for recovery. Courts have set forth several criteria for determining whether a plaintiff is entitled to recover the costs of medical monitoring.").

In addition, though defendant relies upon an unpublished decision by a federal district court in Ohio construing Tennessee law, *Jones v. Brush Wellman*, *see* Brush Memorandum at 16, it failed to mention a published decision by a federal district court in Tennessee also construing

17

Tennessee law which certified a medical monitoring class of women and children exposed to radioactive iron isotope. *Craft v. Vanderbilt University*, 174 F.R.D. 396, 406 (M. Tenn. 1996).

### **Compelling Reasons Favor Permitting the Plaintiffs' Claims to Go Forward.**

The reasons for permitting the plaintiffs to go forward on their claim for medical monitoring are compelling. Following exposure to toxic torts, there is a gap of many years or decades before a disease may manifest itself. During this period, periodic testing may lead to early diagnosis and detection of disease, and then to early treatment. An individual wrongfully exposed to dangerous toxic chemicals should not have to pay for diagnostic testing when medical intervention is reasonable and necessary.

The majority of courts that have predicted or recognized a medical monitoring cause of action or remedy impose a series of parameters and limitations on the action. Expert testimony is required to prove the elements of the cause of action; the standard of proof requires reasonable certainty of the need for specific monitoring beyond that which an individual should pursue in the absence of exposure; the remedy is usually limited to a medical monitoring program which may consist of a medical monitoring trust fund or court-supervised program. This structure limits defendant's funds to payment only for the tests taken.

Defendant raises the specter of a flood of litigation based on speculative claims, and urges that the medical monitoring issue be left to the legislature and not the courts. Yet, the costs of the medical tests that would be prescribed in this instance are certain and no speculation whatsoever is involved. Further, over 20 federal and state courts have predicted or adopted medical monitoring as a cause of action or item of damages, without a finding of present physical injury, and thus have decided that this is an issue that the courts are competent to resolve.

Medical monitoring is consistent with the precedent of the Supreme Judicial Court. The Court follows the definition of "injury" which denotes the invasion of any legally protected interest and recognizes the existence of an injury although no harm is done. Applying this definition to the context of medical monitoring, courts have stated that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury.

The public policy imperatives served by medical monitoring include the public health interest in encouraging and fostering access to early medical testing for those exposed to hazardous substances, promotion of the conventional goals of the tort system of deterrence of tortfeasors, and elemental justice. Without medical monitoring, there is no other way to vindicate public policy.

As stated in *Bocook v. Ashland Oil, Inc.*, 819 F.Supp. at 534, a "majority of the courts" have "allowed recovery of [medical monitoring] costs upon proof of exposure to the toxins without requiring proof of a physical injury also." Consistent with such decisions, this court should deny the defendants' motion to dismiss.

## CONCLUSION

For the reasons addressed above, the plaintiffs respectfully request that Brush Wellman's motion to dismiss Counts V, VI, VII, VII and XIII be denied, and the plaintiffs will voluntarily

dismiss Counts IV and XII.

>Respectfully submitted, this 22nd day of December, 2004.
>**MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.**
>
>/s/ Leo V. Boyle
>_____
>Leo V. Boyle (B.B.O. 052700)
>Two Center Plaza, Suite 600
>Boston, Massachusetts 02108
>617.523.8300
>
>OF COUNSEL (motions for admission *pro hac vice* pending):
>
>**GOLOMB & HONIK, P.C.**
>Ruben Honik
>Sherrie J. Cohen
>Stephan Matanovic
>121 S. Broad Street, Ninth Floor
>Philadelphia, PA 19107

Respectfully submitted, this 22nd day of December, 2004.
**MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.**

/s/ Leo V. Boyle
_____
Leo V. Boyle (B.B.O. 052700)
Two Center Plaza, Suite 600
Boston, Massachusetts 02108
617.523.8300

OF COUNSEL (motions for admission *pro hac vice* pending):

**GOLOMB & HONIK, P.C.**
Ruben Honik
Sherrie J. Cohen
Stephan Matanovic
121 S. Broad Street, Ninth Floor
Philadelphia, PA 19107

CERTIFICATE OF SERVICE

I, Bradley M. Henry, certify that on December 22, 2004, I served the foregoing Opposition to the Motion to Dismiss of Defendants Brush Wellman, Inc., Brush Wellman Ceramics Inc. and Brush Wellman Ceramic Products Inc. by electronic filing and mailing an exact copy postage prepaid to counsel of record.

/s/ Bradley M. Henry

Bradley M. Henry