31.

Plaintiff, Marlin Moran, was diagnosed with chronic beryllium disease in January 2003. Plaintiff, Alvin Pittman, Sr., tested positive for beryllium sensitization in 2003. Plaintiffs, Terry Lemon, Joseph Harris and Rodney Sorapuru, tested positive for beryllium sensitization in 2002. The injuries of these plaintiffs have been proximately caused by the wrongful acts and omissions of defendants, as more fully described throughout this Complaint.

## FIRST CLAIM FOR RELIEF: PRODUCT LIABILITY

### JOSEPH P. HARRIS, TERRY R. LEMON, MARLIN MORAN, RODNEY SORAPURU AND ALVIN PITTMAN, SR. v. MANUFACTURING DEFENDANTS

32.

Plaintiffs for their first claim for relief assert a claim for strict liability in tort and products liability pursuant to the Mississippi Product Liability Act, Miss. Code Ann. § 11-1-63 (Rev. 2002).

33.

The beryllium-containing products manufactured and sold by the Manufacturing Defendants and used at the Stennis facility were unreasonably hazardous and dangerous and were Adefective@ within the meaning of the controlling Mississippi statutory authority. The products manufactured by defendants failed to contain appropriate warnings and/or instructions as required by law to ensure the safety of the persons, such as plaintiffs, who would ultimately encounter and use those products.

34.

As a foreseeable, direct and proximate result of Manufacturing Defendants' failure to warn, plaintiffs have suffered personal injuries and damages.

35.

Manufacturing Defendants are liable to the plaintiffs pursuant to the Mississippi Products Liability Act for their failure to warn.

## SECOND CLAIM FOR RELIEF: NEGLIGENCE

## JOSEPH P. HARRIS, TERRY R. LEMON, MARLIN MORAN, RODNEY SORAPURU AND ALVIN PITTMAN, SR. v. MANUFACTURING DEFENDANTS.

36.

The second claim for relief is negligence. The Manufacturing Defendants, as manufacturers, fabricators, distributors, machiners and sellers of beryllium-containing products, owed a duty to the plaintiffs to use reasonable care in the placement and provision of warnings and/or instructions as required by law particularly because defendant knew or should have known that plaintiffs would be exposed to beryllium dust, fumes, and particulate matter and, as a result of such exposure, would suffer personal injuries.

37.

A duty of reasonable care owed by the Manufacturing Defendants must be commensurate with the risk. Because beryllium is a highly toxic substance, Manufacturing Defendants owed a duty to plaintiffs to exercise extraordinary care as manufacturers, fabricators, distributors, machiners and sellers of beryllium-containing products.

38.

In breach of its duty of care, the Manufacturing Defendants were negligent by failing among other things to:

(a) Warn and advise plaintiffs of the hazards of their beryllium products of which they had knowledge;

(b) Provide plaintiffs with instructions and information for the safe use of their beryllium products and sufficient safeguards to prevent them from suffering from beryllium exposure and developing chronic beryllium disease;

(c) Provide plaintiffs with knowledge concerning safe and sufficient safeguards to prevent beryllium exposure;

(d) Package and contain their beryllium products in a manner so as to adequately warn users of the hazards attendant to their use and the necessary safeguards to take in using them;

(e) Adequately test, research and develop safety guidelines and methods for the protection of users and bystanders from the toxic beryllium dusts, particles and fumes emitted by their beryllium products.

### THIRD CLAIM FOR RELIEF: BREACH OF WARRANTY

### JOSEPH P. HARRIS, TERRY R. LEMON, MARLIN MORAN, RODNEY SORAPURU AND ALVIN PITTMAN, SR. v. MANUFACTURING DEFENDANTS

39.

By their conduct, as alleged, the Manufacturing Defendants warranted to plaintiffs by their labeling, or the lack thereof, and by their conduct, that their beryllium-containing products were of merchantable quality, and safe and effective for their intended use.

40.

Manufacturing defendants breached said warranty in that their beryllium-containing products were neither fit for their ordinary or reasonably foreseeable use nor of merchantable quality as they were inadequately labeled in that they failed to warn of the nature and degree of risks related to lung cancer and chronic beryllium disease, and said condition existed at the time

these beryllium-containing products left the manufacturing defendants' hands.

41.

Manufacturing defendants had reason to know and did know that plaintiffs were relying on said warranty.

42.

As a direct and proximate result of the breach of said warranty, plaintiffs were injured, as alleged herein.

## FOURTH CLAIM FOR RELIEF: FRAUDULENT CONCEALMENT AND CIVIL CONSPIRACY

## JOSEPH P. HARRIS, TERRY R. LEMON, MARLIN MORAN, RODNEY SORAPURU AND ALVIN PITTMAN, SR. v. DEFENDANTS, BRUSH ENGINEERED MATERIALS, INC. AND BRUSH WELLMAN, INC.

43.

Defendant, Brush Wellman, Inc., and its predecessors, have fraudulently concealed the risks and dangers of beryllium-containing products and have conspired with others in the beryllium processing industry to prevent the disclosure of accurate and complete information about the risks and hazards of beryllium.

44.

Brush Wellman, Inc. has known since at least 1948 that an airborne concentration of beryllium substantially below the Atomic Energy Commission=s and/or Occupational Safety & Health Administration=s permissible exposure level of 2 micrograms per cubic meter of air, over an eight hour period, was not safe and that workers exposed to airborne concentrations of beryllium substantially below the regulatory levels could and would develop chronic beryllium disease. Notwithstanding this knowledge, Brush Wellman, Inc. failed to warn and instruct the

-14-

purchasers and users of its beryllium-containing products of the risks.

45.

Despite the fact that Brush Wellman, Inc. knew or should have known that the referenced permissible exposure level of 2 micrograms per cubic meter would not protect workers, Brush Wellman, Inc. has fraudulently claimed to users and others exposed to its beryllium products, and to government regulators and private agencies, that such airborne concentrations were safe even for the most sensitive individuals. It has failed to warn of the hazards of which it had actual knowledge.

46.

Beginning at least as early as 1951, Brush Wellman, Inc., along with others in the domestic and foreign beryllium processing industry, consciously conspired and deliberately pursued a common plan to fraudulently conceal the true hazards and risks of airborne beryllium dust and particulate from those workers and their family members who would be exposed to beryllium dust. The conspiracy and the fraudulent concealment are manifest in the following series of events:

(a) In the 1950s, Brush Wellman, Inc. cooperated with the United States Atomic Energy Commission in a program to conceal from the public and from workers the true health risks of beryllium. During this period, the conspirators agreed to advocate and implement in their own plants a Atentative@ occupational safety standard (the 2 microgram standard) that they did not honestly believe would protect all workers from the disease. In furtherance of this agreement, they did not advise workers or the public of the full state of industry knowledge about the

    health risks of beryllium and did not tell workers or the public that the safety standards were flawed and left some workers at risk.

(b) On 13 December 1961, Brush Wellman, Inc. formed an "Industry Wide Health and Safety Committee" to control and standardize the safety information provided in the labeling and packaging of their beryllium-containing products, to conduct public relations campaigns to distribute the company propaganda about the hazards of beryllium, and to advocate less stringent regulatory standards. In the words of one of its members, this Committee kept the beryllium "health problem... under control from a public relations standpoint." Among other things, the companies began to publicly represent that since the imposition of the AEC standard, "industry experience" had proven the 2 microgram standard to be completely effective in preventing beryllium disease. They also disseminated false information to undermine an earlier scientific study that had shown that chronic beryllium disease could develop at levels far below 2 micrograms.

(c) When the Environmental Protection Agency and the Occupational Safety & Health Administration were created in the early 1970s, Brush Wellman, Inc. agreed to cooperate with other beryllium processors in a joint plan to persuade EPA and OSHA to adopt and reaffirm the existing Atomic Energy Commission standards for beryllium exposure, based on false information about the health risks of beryllium. Since the initial adoption of such standards, and well into the 1990s, the conspirators have continued to jointly oppose efforts to change them and agreed to coordinate the information that would be presented to the agencies, so

-16-

    as to perpetuate false information about the health risks of beryllium. For example, from 1975 through approximately 1979, Brush Wellman, Inc. and other beryllium processors agreed to jointly oppose the Occupational Safety and Health Administration=s effort to impose a stricter occupational safety standard and jointly funded expert testimony that presented false and incomplete information about the health risks of beryllium disease.

 (d) In 1989, Brush Wellman, Inc. agreed to fund and did fund (along with "such other companies as may wish to participate") a Scientific Advisory Committee to conduct industry approved research that would counteract mounting scientific evidence that beryllium was more dangerous than the companies wished to acknowledge. The Committee remained active through the 1990s.

 (e) Beginning in the 1970s and up to the present, Brush Wellman, Inc. retained and funded the work of so-called scientific experts to attack and rebut the work of NIOSH and other governmental agencies who established that beryllium is a human carcinogen when Brush Wellman, Inc. and its co-conspirators knew or should have known that their attack of NIOSH=s establishment that beryllium is a human carcinogen was entirely without merit or basis and was intended to advance false and misleading information to the scientific, industrial hygiene and public health community.

47.

In furtherance of said conspiracy and common plan to conceal the true hazards, risks and toxicity of airborne beryllium, Brush Wellman, Inc. expressly and tacitly agreed with other

-17-

beryllium processors that beryllium workers and the public would not be told that those who were susceptible to beryllium would develop the disease at airborne concentrations below 2 micrograms of beryllium dust per cubic meter of air. Rather, Brush Wellman, Inc. agreed to tell beryllium workers and the public that, so long as the eight hour average airborne concentration of beryllium dust remained below 2 micrograms of beryllium per cubic meters of air, workers, and in turn those neighboring communities, would be protected from developing chronic beryllium disease.

48.

Notwithstanding the fact that Brush Wellman, Inc. was publicly stating that those exposed to airborne concentrations of beryllium dust were safe so long as the eight hour average airborne concentration remained below 2 micrograms of beryllium dust per cubic meter of air, Brush Wellman, Inc. knew that those who were susceptible to the toxic effects of beryllium dust would develop chronic beryllium disease at airborne concentrations substantially below that which they stated were safe and protective.

49.

As a result of Brush Wellman's fraudulent concealment and civil conspiracy, plaintiffs have suffered injury and damages.

## FIFTH CLAIM FOR RELIEF: NEGLIGENCE

## PLAINTIFF RODNEY SORAPURU v. THE BOEING CO.

50.

Plaintiff Rodney Sorapuru asserts a claim for negligence against Boeing. Boeing had a duty to make its premises reasonably safe for all invitees, contract and outside workers.

51.

Rodney Sorapuru is a Quality Assurance Specialist for the Defense Contract Management Agency and, in that capacity, has been assigned to the Boeing facility from 2000 to the present.

52.

During the period that plaintiff was assigned to Boeing, Boeing knew or should have known that its operations involved, among other things, the sanding, metalizing, welding, filing, grinding, machining and/or brazing of beryllium-alloy fuel pump housing, in connection with engines for the space shuttle, which created respirable beryllium dust and particulate matter, and thus presented a serious risk of injury to persons on the premises of the plant, including the plaintiff.

53.

At all material times, Boeing knew or should have known that its operations presented a serious risk of harm, injury and death to persons, including plaintiff herein, who was working in the plant, and thus the utilization and employment of proper analytical, monitoring, ventilatory, emission and/or process controls, equipment facilities and/or techniques was required.

54.

At all material times, Boeing actively concealed from its invitees, including plaintiff, the

-19-

hazards associated while working in close proximity to the grinding and sanding of beryllium-containing products.

55.

Notwithstanding that it knew, or in the exercise of reasonable care should have known, of the risks and hazards involved, entailed, inherent and/or presented in its operations, Boeing negligently, recklessly and/or intentionally caused or allowed its invitees, including plaintiff, to continue to be exposed to poisonous, toxic and hazardous levels of beryllium inside the plant which were health-and-life threatening. Therefore, Boeing was under a duty to warn invitees and bystanders, such as Plaintiff, of these health hazards and to use reasonable care in the machining and use of beryllium-containing products.

56.

In breach of its duty of care, Boeing was negligent by, among other things:

(a) Failing to warn and advise plaintiff of the hazard of working in a plant during operations involving the sanding, metalizing, welding, filing, grinding, machining and/or brazing of beryllium products, which operations introduced respirable beryllium into the workplace;

(b) Failing to provide plaintiff with instructions and information regarding sufficient safeguards to prevent plaintiff from suffering from beryllium exposure and developing chronic beryllium disease;

(c) Failing to adequately test, research and develop safety guidelines and methods for the protection of users and bystanders from the toxic beryllium dusts, particles and fumes emitted by the beryllium-containing parts;

(d) Failing to operate and/or perform its machining processes with proper and adequate ventilatory or emissions controls, devices or processes;

(e) Engaging in or conducting defective, dangerous and unhealthful emissions, discharges and/or carriage of beryllium dust, fumes and particulate matter in the workplace;

(f) Violating applicable regulations and standards concerning indoor air pollution;

(g) Failing to monitor and enforce compliance with applicable rules and regulations concerning the safe operation of its machining process;

(h) Failing to cease operations when it appeared likely or certain that safe operations could not be reasonably achieved;

(i) Failing to ascertain the actual levels of beryllium dust and particulate matter, which were being emitted, discharged and/or carried throughout the workplace, to assure that such levels did not pose a risk to those invitees or bystanders in the plant.

(j) Failing to warn Rodney Sorapuru of the danger to his wife, Hermelinda Sorapuru, and his other family members, if he took home this poisonous dust on his work clothes, thereby exposed his family to the aforementioned hazards.

### SIXTH CLAIM FOR RELIEF: LOSS OF CONSORTIUM

### MARGARET ANN HARRIS AND JUDITH A. LEMON v. MANUFACTURING DEFENDANTS; HERMELINDA SORAPURU v. MANUFACTURING DEFENDANTS AND THE BOEING CO.

57.

Plaintiffs, Margaret Ann Harris, Judith A. Lemon and Hermelinda Sorapuru, have and will

in the future be deprived of their husband's services, companionship and society, and hereby claim loss of consortium to their great detriment and loss.

### SEVENTH CLAIM FOR RELIEF: PUNITIVE DAMAGES

### JOSEPH P. HARRIS, TERRY R. LEMON, MARLIN MORAN, RODNEY SORAPURU AND ALVIN PITTMAN, SR. v. BRUSH ENGINEERED MATERIALS, INC. AND BRUSH WELLMAN, INC.

58.

Plaintiffs seek to recover punitive damages. All defendants' actions, as alleged above, show willful misconduct, malice, fraud, wantonness, intent, concert of action, oppression, and the entire want of care which would raise the presumption of conscious indifference to the consequences within the meaning of the controlling law of the State of Mississippi regarding punitive damages.

59.

Defendants are liable for punitive damages to plaintiffs to punish defendants for their conduct and to deter others from engaging in similar conduct in the future.

60.

The plaintiffs seek damages as follows:

(a) Past, present and future medical expenses, including the cost of medical monitoring;

(b) Past lost wages, loss of future earnings, impairment of earning capacity, and loss of fringe benefits;

(c) Pain and suffering, past, present and future, including mental anguish and worry, such as fear of contracting cancer or chronic beryllium disease;

(d) Punitive damages;

(e) Legal fees, litigation expenses and costs; and

(f) All general and equitable relief which the court is empowered to provide.

61.

All plaintiffs seek trial by jury on all issues.

**WHEREFORE**, plaintiffs, Joseph P. Harris, Margaret Ann Harris, Terry R. Lemon, Judith A. Lemon, Marlin Moran, Rodney Sorapuru, Hermelinda Sorapuru and Alvin Pittman, Sr. pray, that after due proceedings are had, that there be judgment rendered in their favor, and against defendants, Brush Engineered Materials, Inc., Brush Wellman, Inc., Wess-Del, Inc. and for Plaintiffs, Rodney Sorapuru, and Hermelinda Sorapuru, also against The Boeing Co., for all damages in this complaint, including medical monitoring, and for all other relief which is just and equitable in the premises.

Respectfully submitted, this 29th day of July, 2004.

ROBERT C. LATHAM (#1076)
TRULY, SMITH & LATHAM, P.L.L.C
100 South Pearl Street
Natchez, Mississippi 39120
Telephone: (601) 442-6495
Facsimile:   (601) 442-8874

RANDALL A. SMITH (#2117)
STEPHEN M. WILES (#17865)
of
SMITH & FAWER, L.L.P.
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
Facsimile:   (504) 525-2205

Please Serve:

Brush Wellman, Inc.,
c/o Registered Agent
Michael C. Hasychak
17876 St. Claire Avenue
Cleveland, Ohio  44110

Brush Engineered Materials, Inc.
c/o Registered Agent
Michael C. Hasychak
17876 St. Claire Avenue
Cleveland, Ohio  44110

Wess-Del, Inc.
c/o Registered Agent
David A. Kirst
1502 Arbuckle Court
Santa Clara, California  95054

The Boeing Co.
c/o Registered Agent
Corporation Service Company
506 S. President Street
Jackson, Mississippi  39201