negligent infliction of emotional distress.  After carefully considering the cited authorities, however, the Court does not believe either line of precedent advances Plaintiffs' position here.

The first set of cases cited by Plaintiffs includes <u>Lee v. State Farm Mutual Insurance Company</u>, 533 S.E.2d 82 (Ga. 2000), and <u>Chambley v. Apple Restaurants, Inc.</u>, 504 S.E.2d 551 (Ga. Ct. App. 1998).  In <u>Lee</u>, the Georgia Supreme Court found "an appropriate and compelling situation" to depart from the traditional impact rule in a case involving a mother's claim for emotional distress arising out of witnessing the death of her daughter in a car accident in which both mother and daughter were involved.  <u>See</u> 533 S.E.2d at 86-87.  In <u>Chambley</u>, as discussed *supra*, the Georgia Court of Appeals permitted a woman to recover for emotional injuries she suffered in connection with her ingesting a salad in which she later discovered an unwrapped condom.

The Court acknowledges that both <u>Lee</u> and <u>Chambley</u> illustrate the Georgia courts' openness to engage in limited departures and/or flexible applications of the "impact rule" in especially compelling cases.  Neither case, however, purported to abandon the impact rule's mandates altogether; indeed, a thorough reading of <u>Lee</u> underscores the Georgia Supreme Court's strong

22

inclination to retain the impact rule as a "bright line" test for recovery of negligently inflicted emotional distress damages. Lee, 533 S.E.2d at 86. Moreover, both Lee and Chambley presented circumstances in which the plaintiffs exhibited some manifestations of physiological injury (albeit ones whose relationship to the relevant "impact" were somewhat attenuated). Consequently, the courts' allowance of narrow departures from the strictest application of the impact rule did not implicate the concerns of speculative claims and "floods" of litigation that the rule was crafted to avoid. See Lee, 533 S.E.2d at 86 (discussing policies underlying impact rule).

In sharp contrast, opening the door to emotional distress claims in connection with a person's actual or potential exposure to dynamic toxins (which could just as easily include automobile exhaust, cigarette smoke, pesticides, or contaminants found in drinking water as beryllium dust) would effectively erase the "bright" line the Georgia judiciary has drawn to act as an indelible barrier to a significant increase in the number of such claims. It is difficult to imagine *any* Georgia resident who would not be able to bring a suit for emotional distress if such a *de minimis* threshold were adopted in place of the "impact rule." For that reason, the Court does not read either Lee or

23

AO 72A
(Rev.8/82)

Chambley as providing a basis for recognizing the claims Plaintiffs attempt to advance here.

The second line of authorities cited by Plaintiffs involve claimants who developed a fear of contracting Human Immunodeficiency Virus (HIV) after coming into contact with an agent or substance that could conceivably transmit the disease. See, e.g., Johnson v. Am. Nat'l Red. Cross, 578 S.E.2d 106, 110 (Ga. 2003) (affirming grant of summary judgment to blood bank on negligent infliction of emotional distress claim); Russaw v. Martin, 472 S.E.2d 508, 512 (Ga. Ct. App. 1996) (affirming grant of summary judgment to hospital and nurse on negligent infliction of emotional distress claim). Those cases, according to Plaintiffs, establish that a claimant may recover for emotional distress in connection with a fear of contracting a disease if she can demonstrate both a "channel of communication" and "actual exposure" to the disease-causing agent.

The Court recognizes that some language exists in the Johnson opinion that could give rise to such an understanding of Georgia law. Cf. Johnson, 578 S.E.2d at 110 ("Russaw sets forth a requirement of evidence of 'actual exposure' in addition to a 'channel of communication' or order to allow

24

recovery for emotional injuries and mental anguish.") (citing Russaw, 472 S.E.2d at 511-12). A closer reading of the cited decisions, however, simply illustrates a *per se* rejection by the Georgia courts of any tort recovery predicated on fear of contracting HIV in the absence of "actual exposure" to the virus. See, e.g., Russaw, 472 S.E.2d at 512 ("To allow recovery for emotional injuries and mental anguish, without any proof whatsoever that [plaintiff] was actually exposed to HIV or hepatitis is per se unreasonable."). The Court has found no Georgia authority relying on this line of precedent actually *permitting* recovery for negligent infliction of emotional distress in any case where exposure to some potentially disease-causing agent is shown.

Further, the Court observes that, in any event, the law surrounding feared HIV exposure has developed into a unique subspecies of emotional distress doctrine–one which may not easily or seamlessly be supplanted into other areas of the tort law. Cf. generally Kimberly C. Simmons, Annotation, Recovery for Emotional Distress Based on Fear of Contracting HIV or AIDS, 59 A.L.R. 5th 535 (1998). To the contrary, the Court believes that a real and meaningful distinction may be drawn between cases involving exposure to highly contagious viral agents (such as HIV), which are in and of themselves

25

"diseases," from toxins that have only the remote *potential* to result in the development of illness or injury at some point in the future.

In sum, with respect to those Plaintiffs who are alleged to have endured only subclinical effects, the absence of any cognizable injury forecloses any recovery for negligently inflicted emotional distress under Georgia's "impact rule." Insofar as Defendants move to dismiss these "subclinical" Plaintiffs' claims for increased risk and negligent infliction of emotional distress, their motions are **GRANTED**.

## B.    Medical Monitoring

Defendants likewise move to dismiss Count I of Plaintiffs' Complaint, seeking the establishment of a medical monitoring fund.[9]  Plaintiffs argue against this result, pointing out, correctly, that many (if not most) states to have confronted the issue have approved of the creation of such funds when plaintiffs have been exposed to potentially injury-inducing agents, but have not yet manifested any physiological symptoms associated with such exposure.

---

[9]Plaintiffs alternatively suggest in Count I of their Complaint that this Court should permit recovery of medical monitoring costs as "future medical expenses." To the extent the plaintiffs seeking such relief have suffered only "subclinical" effects, such recovery is not available for all the reasons set forth *supra*, Part II.A.

26

Plaintiffs' argument, while well-researched and skillfully presented, does

not persuade this Court that Count I of the Complaint states a viable claim for

relief under Georgia law.  While a remedy permitting creation of medical

monitoring funds has garnered support in several jurisdictions, no Georgia court

has ever indicated an inclination to recognize such a remedy.  Moreover, several

courts have recently rejected the creation of such funds as an available avenue

of relief for persons exposed to hazardous agents who have not yet suffered

manifest physiological injury, and the remedy remains a controversial one.  See

Trimble v. Asarco, Inc., 232 F.3d 946, 963 (8th Cir. 2000) (refusing to

recognize medical monitoring fund as remedy); Wood v. Wyeth-Ayerst Labs.,

82 S.W.3d 849, 856 (Ky. 2002) (same); Hinton v. Monsanto Co., 813 So. 2d

827, 830-31 (Ala. 2001) (same); Badillo v. Am. Brands, Inc., 16 P.3d 435, 438-

39 (Nev. 2001) (same).  Again, it is not the function of a federal court to expand

state tort doctrine in novel directions[10] absent clear state authority suggesting the

---

[10]Plaintiffs argue that the establishment of medical monitoring funds is not an exceptional remedy, but rather, a natural extension of traditional tort doctrine.  Although the Court recognizes those authorities so stating, see, e.g., Day v. NLO, 851 F. Supp. 869, 880 (S.D. Ohio 1994), it tends to agree with those jurisdictions that have instead recognized that providing relief to persons who have suffered no cognizable "harm" is a drastic and fundamental departure from traditional tort doctrine.  See, e.g., Badillo, 16 P.3d at 438 ("Medical monitoring is a novel, non-traditional tort and remedy.").

27

AO 72A
(Rev.8/82)

propriety of such an extension. <u>See</u> <u>Cargill, Inc.</u>, 615 F.2d at 215 (it is up to state high court, and not federal court, to change state law); <u>Beretta U.S.A. Corp.</u>, 277 F.3d at 421 (same); <u>Paz v. Brush Engineered Materials, Inc.</u>, 351 F. Supp. 2d 580, 586 (S.D. Miss. 2005) (in case alleging exposure to beryllium, refusing to recognize medical monitoring fund as available remedy as a matter of Mississippi law absent any Mississippi authority approving of such a remedy); <u>Jones v. Brush Wellman, Inc.</u>, Case No. 1:00-CV-0777, 2000 WL 33727733, at *8 (N.D. Ohio 2000) (in case alleging exposure to beryllium, refused to recognize medical monitoring fund as available remedy as a matter of Tennessee law absent any Tennessee authority approving of such a remedy). This Court declines to do so here.

Accordingly, Defendants' motions, to the extent they seek dismissal of Count I of Plaintiffs' Complaint, are **GRANTED**. This Court does not read Georgia law as permitting the establishment of a medical monitoring fund with respect to persons who have not endured a cognizable tort injury. That said, nothing in this opinion should be read as foreclosing Plaintiffs who *have* suffered manifest physiological injury from recovering future medical expenses as an element of their total relief.

28

## C.    Strict Liability (Ultrahazardous Activities)

Defendants additionally move to dismiss Count IV of Plaintiffs'

Complaint, in which Plaintiffs seek to recover on a theory of strict liability in

connection with activities of Defendants that Plaintiffs characterize as

abnormally dangerous and ultra-hazardous.  The asserted grounds for dismissal

are twofold.  First, Defendants argue that such strict liability in Georgia is

limited, as a matter of law, to activities "historically regarded as

ultrahazardous"–*i.e.*, blasting and retention and diking of water.  Second, they

argue that, in any event, the mere manufacture of a dangerous product cannot

serve as the basis for such liability, the focus instead being on the whether the

*activity* engaged in by the defendant was itself abnormally dangerous.

Georgia law as it relates what constitutes an abnormally dangerous activity

sufficient to sustain strict liability is not voluminous.  As recently explained by

the District Court for the Middle District of Georgia,

> Georgia courts have provided little guidance as to
> what constitutes an abnormally dangerous activity.
> "[T]he activity of holding highly acidic water in ponds
> which may pollute streams running through the
> property of adjoining landowners is not a dangerous
> activity" as a matter of law.  [Cit.]  Neither is the
> "'piling of dirt on defendant's own property in

29

> carrying out a legitimate business activity.' " [Cit.]
> Blasting "has always been considered, as a matter of
> law, an abnormally dangerous activity." [Cit.] Thus
> blasting in Georgia is abnormally dangerous, but
> holding highly acidic water on one's property might
> not be. The Court is unable to find any other Georgia
> law on what constitutes an abnormally dangerous
> activity.

Gullock v. Spectrum Scis. and Software, Inc., 146 F. Supp. 2d 1364, 1374

(M.D. Ga. 2001). This Court has likewise found little guidance under Georgia

law to assist it in ruling on Defendants' motions here. Nevertheless, for the

reasons that follow, the Court concludes that Defendants are not entitled to

prevail on their motions to dismiss at this juncture.

First, while the Georgia courts have deemed certain activities to be

abnormally dangerous as a matter of law, and others not, the Court finds

nothing in applicable precedent either expressly or implicitly limiting the doctrine

of strict liability for abnormally dangerous activities to those activities

Defendants contend have "historically" been recognized as such. Indeed, the

Georgia Court of Appeals has appeared (in a departure from the prevailing view)

to hold that, in many instances, the question of what constitutes an abnormally

dangerous activity will be one of fact for the jury to decide. See Combustion

30

AO 72A
(Rev.8/82)

Chems., Inc. v. Spires, 433 S.E.2d 60, 63 (Ga. Ct. App. 1993) ("An

appropriate charge *to the jury* in this case would simply have instructed the jury

that if *they* found defendant conducted an abnormally dangerous activity which

proximately caused plaintiffs' injuries, then defendant should be held liable for

those injuries.") (emphasis supplied).

Second, while Defendants appear to be correct in asserting that the mere

manufacture of a dangerous product is not sufficient to impose strict liability,

see, e.g., Akee v. Dow Chem. Co., 293 F. Supp. 2d 1140, 1144 (D. Haw. 2002)

("the fact that a defendant is engaged in the manufacture of an extremely harmful

substance or product does not compel the conclusion that the manufacture of

that substance or product is itself an ultrahazardous activity"); Splendorio v.

Bilray Demolition Co., 682 A.2d 461, 465-66 (R.I. 1996) ("Absolute liability

attaches only to ultrahazardous or abnormally dangerous *activities* and not to

ultra-hazardous or abnormally dangerous *materials*.") (emphasis in original),

that does not answer the question whether the instant claims are subject to Rule

12(b)(6) dismissal. Here, in the current iteration of the Complaint, Defendants

are identified as both "manufacturers" *and* "users" of beryllium-containing

products (see Compl. ¶¶ 15-16), and Plaintiffs claim to have been exposed to

31

respirable beryllium dust "as a . . . result of the sale *and use* of beryllium-containing products by the Defendants at the Lockheed Marietta facility." (Compl. ¶ 21 (emphasis supplied).)  This allegation that Defendants *used* beryllium-containing products at the relevant facility takes this controversy outside of the "pure" manufacturing cases cited by Defendants, and puts in issue whether Defendants actually engaged in an *activity* (*i.e.*, use of beryllium) that was itself abnormally dangerous.  Cf. Akee, 293 F. Supp. 2d at 1143 (in dismissing claim against manufacturers under "ultra-hazardous activity" doctrine, emphasized that complaint was "devoid of any '*use* or application' allegations with respect to the Manufacturing Defendants") (emphasis supplied).

Accordingly, insofar as Defendants seek to dismiss Count IV of Plaintiffs' Complaint, their motions are **DENIED**.

### III.    Defendant Axsys Technologies Motion to Dismiss for Lack of Personal Jurisdiction

The final motion pending before the Court is Axsys' Motion to Dismiss for Lack of Personal Jurisdiction [28-1].  The plaintiff bears the burden of establishing personal jurisdiction over a defendant.  Francosteel Corp. v. M/V Charm, 19 F.3d 624, 626 (11th Cir. 1994); Paul, Hastings, Janofsky, & Walker,

32

LLP v. City of Tulsa, 245 F. Supp. 2d 1248, 1253 (N.D. Ga. 2002). For purposes of resolving a motion to dismiss for lack of personal jurisdiction, the court generally construes as true the plaintiff's allegations supporting the existence of jurisdiction. Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988). Nevertheless, if the defendant controverts the plaintiff's allegations with evidence, the plaintiff, to survive the motion to dismiss, must produce evidence of his own to make a *prima facie* jurisdictional showing. Welt Indus., Inc. v. Weingart, Inc., 660 F. Supp. 424, 425 (N.D. Ga. 1987); see also Weinstock v. Gannett, Inc., Case No. 1:00-CV-2935-ODE, 2001 WL 1147214, at *2 (N.D. Ga. June 20, 2001) (holding likewise).

Here, Plaintiffs have sued Axsys, a Delaware corporation with its principal place of business in Connecticut, as the parent corporation and alleged "successor-in-interest" to Speedring, Inc. ("Speedring"), which is alleged to have sold beryllium containing products to the Lockheed Marietta facility. (Compl. ¶ 7.) Plaintiffs do not, however, attempt to argue that Axsys *itself* has had any "contacts" with Georgia sufficient to sustain this Court's exercise of either general or specific jurisdiction over the corporation. (See Pls.' Resp. to Axsys Technologies, Inc.'s Mot. to Dismiss for Lack of Personal Jurisdiction

33

[62-1] at 1 ("Personal jurisdiction exists over Axsys . . . because the tortious acts of Speedring caused injury in Georgia." ).)

In order to exercise personal jurisdiction over a parent company by virtue of their subsidiary's activities within or affecting the forum state, the parent must have exercised an unusually high degree of control over the subsidiary. See, e.g., Vogt v. Greenmarine Holding, LLC, Case No. 1:01-CV-0311-JOF, 2002 WL 534542, at *4-*7 (N.D. Ga. Feb. 20, 2002) (citing cases); cf. also Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1293 (11th Cir. 2000) (in context of Fed. R. Civ. P. 4(k)(2), held that so long as subsidiary has maintained "some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary") (quoting Portera v. Winn Dixie of Montgomery, Inc., 996 F. Supp. 1418, 1423 (M.D. Ala.1998)); Coca-Cola Co. v. Procter & Gamble Co., 595 F. Supp. 304, 308 (N.D. Ga. 1983) (court may exercise jurisdiction over parent based on actions of subsidiary "if the parent's control over the subsidiaries' [sic] activities is so complete that the subsidiary is, in fact, merely a division or department of the parent"); Cobb County v. Jones Group P.L.C., 460 S.E.2d 516, 520-21 (Ga. Ct. App. 1995) (holding likewise, and finding that parent's control over

34

subsidiary was insufficient to exercise jurisdiction over it based upon acts of its

subsidiary). Here, Axsys has submitted sworn testimony that it has not

exercised such control over Speedring, that Speedring has continued to operate

as a going concern following Axsys' 1996 acquisition of its parent company,

and that the corporations maintain separate offices and identities. Plaintiffs have

failed to counter such testimony with any evidence, and have instead offered

only unauthenticated documents showing that Speedring accepted beryllium-

containing products on behalf of Lockheed from Brush Wellman *prior* to

Axsys' acquisition of Speedring's parent corporation in 1996. Such "evidence"

is plainly insufficient to carry Plaintiffs' burden of making a *prima facie*

showing of jurisdiction over Axsys under the foregoing authorities.

Plaintiffs, appearing to acknowledge the insufficiency of their present

showing, nevertheless request that they be permitted jurisdictional discovery

prior to this Court's resolution of Axsys' motion to dismiss.[11]  Given the total

dearth of evidence supporting a conflation of Axsys and Speedring's corporate

---

[11]Significantly, Plaintiffs do not state, and the record does not reflect, that they have already submitted such discovery requests to Axsys during the course of this litigation. See Posner v. Essex Ins. Co., 178 F.3d 1209, 1214 n.7 (11th Cir. 1999) (plaintiff has qualified right to jurisdictional discovery only if discovery is underway at the time court rules on motion to dismiss).

35

identifies in a manner sufficient to attribute the latter's jurisdictional contacts to the former, however, the Court is not inclined to grant Plaintiffs leave to conduct a "fishing expedition" in hopes that discovery will sustain the exercise of personal jurisdiction over Axsys. See Posner, 178 F.3d at 1214 n.7 (affirming dismissal of case based on lack of personal jurisdiction prior to allowance of jurisdictional discovery); Vogt, 2002 WL 534542, at *7 (denying jurisdictional discovery under similar circumstances); Milligan Elec. Co. v. Hudson Constr. Co., 886 F. Supp. 845, 850 (N.D. Fla. 1995) (same).

Accordingly, Axsys' Motion to Dismiss for Lack of Personal Jurisdiction [28-1] is **GRANTED**. Plaintiffs' claims against Axsys are **DISMISSED** for lack of personal jurisdiction.

### Conclusion

Defendants' Unopposed Motion for Leave to Exceed Page Limits in their Joint Reply Brief [87] is **GRANTED** *nunc pro tunc*.

Defendant Alcoa, Inc.'s Motion to Dismiss for Failure to State a Claim, or in the Alternative, Motion for a More Definite Statement [5], Defendant Lockheed Martin Corporation's Motion to Dismiss or, in the Alternative, for a

36

More Definite Statement [8], Motion of Defendant McCann Aerospace

Machining Corporation to Dismiss Plaintiffs' Complaint/Motion for More

Definite Statement, or in the Alternative, Motion for Judgment on the Pleadings

[31], and Schmiede Corporation's Motion to Dismiss or, in the Alternative, for

a More Definite Statement [57], to the extent such motions seek to compel a

more definite statement from Plaintiffs, are **GRANTED in part and DENIED**

**in part**.  Plaintiffs are **ORDERED**, within twenty (20) days from the date

appearing on this Order, to amend their pleading: (1) to include factual

allegations respecting whether Plaintiffs were exposed to each individual

Defendant's beryllium-containing products; (2) to include approximate date

ranges of the alleged exposure; and (3) to segregate out those Plaintiffs who

have endured only subclinical, cellular, and subcellular effects from those who

have sustained actionable tort injuries.

Defendant Lockheed Martin Corporation's Motion for Judgment on the

Pleadings as to Plaintiff's Medical Monitoring, Strict Liability (Ultrahazardous

Activity), Increased Risk and Fear Claims [17], Defendant Alcoa Inc.'s Motion

for Judgment on the Pleadings as to Plaintiffs' Claims for Medical Monitoring,

Strict Liability (Ultra-Hazardous Activity), and Increased Risk and Fear [18],

37

Defendant Brush Wellman Inc.'s Motion for Judgment on the Pleadings Based

on Plaintiffs' Lack of Any Cognizable Injury [22], Motion of Defendant

McCann Aerospace Machining Corporation to Dismiss Plaintiffs'

Complaint/Motion for More Definite Statement, or in the Alternative, Motion for

Judgment on the Pleadings [31], and Schmiede Corporation's Motion to

Dismiss or, in the Alternative, for a More Definite Statement [57], to the extent

they seek dismissal of Plaintiffs' claims for reasons other than imprecise

pleading, are **GRANTED in part and DENIED in part**.  To the extent

Defendants seek to preclude Plaintiffs' recovery for "sub-clinical, cellular, and

sub-cellular" injuries, their motions are due to be granted.  Plaintiffs are directed,

in conformity with the ruling announced above, to amend their pleading to

segregate out those Plaintiffs who have endured only subclinical, cellular, and

subcellular effects from those who have sustained actionable tort injuries.

Following the amendment, the Court will enter an Order dismissing the claims

asserted by the former subset of claimants.  Likewise, to the extent Plaintiffs

enduring only such "injuries" bring claims for increased risk and emotional

distress, such claims are **DISMISSED**.  In addition, Count I of Plaintiffs'

Complaint, seeking the creation of a medical monitoring fund, is **DISMISSED**.

38

AO 72A
(Rev.8/82)

However, insofar as Defendants seek the wholesale dismissal of Count IV of Plaintiffs' Complaint, their motions to dismiss are **DENIED**.

Finally, Defendant Axsys Technologies Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction [28] is **GRANTED**.  Plaintiffs' claims against Axsys are **DISMISSED** for lack of personal jurisdiction.

**SO ORDERED** this   29th   day of March, 2005.

/s/ Richard W. Story
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

39

AO 72A
(Rev.8/82)