Tab 7 **to Appendix of Exhibits to Motion of Defendant Brush Wellman, Inc. for Summary Judgment:**

**KOLANZ DEPOSITION EXCERPTS AND CERTAIN EXHIBITS**

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3    SUZANNE GENEREUX and BARRY   *

4    GENEREUX, wife and husband,  *

5    individually and as parents  *

6    and natural guardians of     *

7    their minor children,        *

8    ANGELA GENEREUX and KRISTA    *

9    GENEREUX,                     *

10      Plaintiffs             *   Case No.

11      vs.                    *   04CV12137JLT

12   AMERICAN BERYLLIA CORP.,      *

13   BRUSH WELLMAN, INC., BRUSH    *

14   WELLMAN CERAMICS, INC.,       *

15   BRUSH WELLMAN CERAMIC         *

16   PRODUCTS, INC., HARDRIC       *

17   LABORATORIES, INC., KYOCERA *

18   AMERICA, INC., KYOCERA        *

19   INDUSTRIAL CERAMICS CORP.     *

20   and RAYTHEON COMPANY,         *

21      Defendants             *

22          VIDEOTAPED DEPOSITION OF

23             MARC EDWARD KOLANZ

24               June 6, 2006

1  media after it came in contact with Brush's BeO
2  product?
3  A. The only correspondence I recall with
4  Raytheon with regard to abrasive blasting was I
5  had sent one or two memos or letters to them
6  discussing --- they had contacted us regarding
7  how to remove metallization to be able to
8  re-use parts.  And they were talking about using
9  abrasive blasting to do that.  And I sent them a
10  letter back that said I didn't advise that you
11  remove it in that --- not using that method, but
12  to use a chemical removal method of doing it.
13  So I never had a correspondence with them on
14  disposal of abrasive material other than they
15  may well have received this report that would
16  have said that.  I don't remember if that was
17  attached to one of those letters or not.
18  Q. What did Brush do to confirm that
19  Raytheon's Waltham operation heeded Brush's
20  advice to use a chemical removal process for the
21  metallization rather than the grit blasting?
22  A. I'm not sure we --- what kind of access
23  we ever had to the production operations.  I
24  wasn't involved with the checking up to see if

1  they utilized the suggested method or not.  It
2  doesn't mean they couldn't use abrasive
3  blasting, just it would take more care.  And we
4  weren't advising against that.  If there
5  was a safer method to follow, we thought they
6  should follow the other method.
7  Q. And that safer method that Brush
8  recommended was the use of a chemical removal
9  process; correct?
10  A. Yes.
11  Q. All right.  And I'm not, for the
12  moment, asking you, Mr. Kolanz, what access, if
13  any, Brush had or didn't have to the plant or
14  the operation.  I'm merely asking what, if
15  anything, did Brush do to ascertain whether
16  Raytheon's Waltham facility heeded Brush's
17  advice to employ an alternative removal process
18  for the metallization on the BeO products sold
19  by Brush to Raytheon?
20  A. I don't know if we did anything
21  specifically to ascertain whether they did or
22  did not use the method that we had suggested to
23  them.
24  Q. In fact, what did Brush do to ascertain

1  the precise grit blasting or abrasive blasting
2  operation that was in use at Raytheon's Waltham
3  plant during the 1980s?
4  A. I'm not aware that we knew that they
5  were, for sure, using abrasive blasting at the
6  Waltham plant in the 1980s.
7  Q. What effort, if any, was expended by
8  Brush to ascertain whether any abrasive blasting
9  was being undertaken at Raytheon's Waltham plant
10  of Brush's beryllium oxide parts?
11  A. I've not seen any information that
12  would indicate that we had attempted to
13  ascertain what they might have been doing with
14  abrasive blasting at the Waltham facility.
15  Q. Brush in the 1980s was aware of a
16  health risk associated with abrasive blasting of
17  its own beryllium oxide parts; correct?
18  A. I'm aware of those potential health
19  risks, depending on how people might perform the
20  task.
21  Q. Right.  And you were aware that Brush
22  was selling quantities of beryllium oxide parts
23  to Raytheon's Waltham facility; correct?
24  A. Say that again, please?

1  Q. I'm simply asking you to confirm that
2  BeO parts were sold by Brush to Raytheon during
3  the 1980s at its Waltham plant.
4  A. Yes, Brush Wellman sold BeO parts to
5  the Waltham plant.  What they did with the
6  parts, I don't know.
7  Q. Okay.  In view of the potential risk
8  associated with the abrasive blasting of those
9  parts, what exactly did Brush do to ascertain if
10  it was, in fact, being abrasively blasted at
11  Waltham during the 1980s?
12  A. I'm not aware that we did anything to
13  ascertain whether they were or were not doing
14  abrasive blasting of our materials at their
15  facility.
16  Q. In view of the known risk to Brush,
17  health risks associated with such blasting, why
18  didn't you ask Raytheon if it was abrasively
19  blasting your product?
20  ATTORNEY FAXON:
21  Object to form.
22  A. Well, we had received a question
23  regarding abrasive blasting, and we gave
24  guidance as to how to do that, what they were

1  The objection ---.
2  ATTORNEY HONIK:
3  Let me ask the question, then
4     you can respond.
5  ATTORNEY FAXON:
6  Okay.
7  ATTORNEY HONIK:
8  What is the objection you have
9     to the form of the question presently pending?
10  ATTORNEY FAXON:
11  The question assumes that Brush
12     sold beryllium windows to Raytheon for use, and
13     I don't recall the witness ever testifying to
14     that effect.
15  ATTORNEY HONIK:
16  Thank you.
17     BY ATTORNEY HONIK:
18     Q. Can you answer the question?
19     A. Can you repeat the question?
20     COURT REPORTER READS BACK PREVIOUS QUESTION
21     A. I think I said earlier I was not aware
22     of what materials would be considered windows,
23     so I don't think I can answer your question.
24     BY ATTORNEY HONIK:

1     Q. Prior to coming here today, Mr. Kolanz,
2     you didn't look at any specifications or
3     drawings that revealed to you that Raytheon
4     manufactured beryllium oxide windows that were
5     sold to Raytheon for use at its Waltham plant in
6     the 1980s?
7     A. Did you say Raytheon again?  You're
8     confusing me.
9     Q. That Brush sold ---
10     A. Brush sold.
11     Q. --- to Raytheon for use at its Waltham
12     facility?
13     A. I didn't see anything that denoted
14     windows that I recall in the records I was
15     looking at.  This stuff typically has size and
16     shape and number and that sort of thing.
17     Q. Okay.  Do you know the use to which
18     Raytheon made of any beryllium ceramic parts
19     sold to it by Brush during the 1980s?
20     A. Say that again, please?
21     Q. Prior to coming here today, did you do
22     anything to acquaint yourself with the manner in
23     which your customer, Raytheon, in the 1980s,
24     made use of beryllium oxide parts sold to it by

1  Brush?
2     A. I did learn that for example, the
3     washers, what are called washers, how those were
4     used.
5     Q. What did you learn about the use of
6     washers?
7     A. That washers are used to --- usually as
8     a means of allowing electric wire to pass into a
9     microwave tube, and that those washers would act
10     as both an electrical insulator and a heat
11     dissipater ---
12     Q. Okay.
13     A. --- to allow the entry of a wire into a
14     tube.
15     Q. What other uses did you learn about?
16     A. I also heard of a piece called a
17     matchstick, but I can't remember exactly what it
18     was used for.
19     Q. Okay.  And a matchstick is some kind of
20     beryllium ceramic shape that looks like a
21     matchstick?
22     A. Yeah, it's about the size of a
23     matchstick.
24     Q. Okay.  What other uses were made that

1     you learned about of Brush's products by
2     Raytheon?
3     A. That's all I know of that I'm recalling
4     at this time, what the materials were used for.
5     Q. Did you read Frank Ballance's
6     deposition prior to today?
7     A. Frank Ballance?
8     Q. Yes, sir.
9     A. No.
10     Q. Okay.  Were you shown any exhibits from
11     Mr. Ballance's deposition testimony?
12     A. No.
13     Q. Were you shown photographs or drawings
14     of something called a klystron tube?
15     A. No.
16     Q. Were you shown any drawings that
17     related to any of the various tubes that were
18     manufactured by Raytheon that employed
19     components sold to it by Brush?
20     A. No.
21     Q. You'd mentioned before to me, Mr.
22     Kolanz, that you may have looked at some
23     documents from this case, as you referred to it.
24     Did you read any depositions that were taken

1  safety data sheets.
2  Q. And is it true that the only warnings
3  that Brush would have given, if any, would have
4  been reflected in the MSDS sheets?
5  ATTORNEY FAXON:
6  Object to form.
7  A. No. There are a variety of warnings
8  that were given over the years. There are
9  warnings on labels that would go with all
10  materials that would be shipped to all
11  customers, which contained various types of
12  warnings. Again, without looking at them, I
13  can't be specific as to what all was on the
14  warnings for what years. I believe there was
15  also some warning information provided in the
16  letters that were sent --- that I authored some
17  of them --- going to Raytheon Waltham. So that
18  would be another source of kind of warnings
19  information.
20  BY ATTORNEY HONIK:
21  Q. What did Brush do to ensure that any
22  warnings that might have been given with respect
23  to hand filing or similar abrading would have
24  reached the employees at the Waltham plant

1  during the 1980s?
2  A. Well, provided the information to the
3  people, such as the health and safety people,
4  people making requests, who are required to pass
5  along that kind of information. For example,
6  under the Hazard Communication Standard, they're
7  required to pass that information on to
8  employees and provide it to them. I believe
9  they also were sent various --- other documents
10  that would go to people asking the question
11  about health and safety issues, so it'd be
12  certainly my expectation that it making its
13  way through to appropriate employees, that
14  people would be informed of that kind of
15  information.
16  But like I said, I've never been to
17  that facility, and I know our sales and
18  marketing people have been there. It's not
19  oftentimes typical for them to be given free
20  reign to see a facility, most times due to
21  confidentiality issues that people --- they just
22  don't typically allow the salespeople to go into
23  the facilities in where the employees are
24  working. That does happen on occasion, but I

1  would say it's not typical.
2  Q. Apart from Brush's hope or assumption
3  or expectation that the communicated information
4  would be passed along to the employees, what did
5  Brush specifically do to ensure that the
6  information that you claimed to have imparted
7  was, in fact, given or relayed to the employees
8  at the Waltham plant?
9  ATTORNEY FAXON:
10  Object to form, argumentative.
11  A. Brush Wellman, as I said, has to depend
12  on providing information to the facility, and
13  it's their responsibility to pass that onto
14  their workers in whatever way they deem it
15  appropriate. I don't know what all Raytheon may
16  have done to ascertain beryllium health and
17  safety informational needs for its workers
18  beyond anything Brush Wellman may have provided
19  them.
20  BY ATTORNEY HONIK:
21  Q. I understand your answer. Did anyone
22  at Brush ask anybody in management or health and
23  safety at Raytheon during the 1980s in
24  connection with the Waltham operation whether

1  it, in fact, was imparting any of the
2  information that you claim Brush gave to it
3  regarding the health risks associated with
4  abrading Brush BeO product?
5  A. I'm not aware that a question like
6  that was asked. I don't know that it was or
7  wasn't. I'm not aware of any type of question
8  like that being asked.
9  Q. Can you tell me why Brush didn't ask
10  such a question?
11  ATTORNEY FAXON:
12  Object to form.
13  A. Because we don't have contact with the
14  workers directly. We only have contact with the
15  management of the facility, and we provide them
16  relevant health and safety information, both
17  prior to it being required under the Hazard
18  Communication Standard, and after that. And by
19  law, they are required to pass on relevant
20  information to the workers, and in fact, train
21  workers under the Hazard Communication Standard.
22  BY ATTORNEY HONIK:
23  Q. That's precisely my question, Mr.
24  Kolanz. Did anyone at Brush ask any manager of

Page 134

1  was supposed to go to a specific place in
2  Raytheon.  And there was reference to that, I
3  believe, also in some of the procedures that I
4  had read that indicated they did that because
5  these parts might contain some dust on them when
6  they handled parts, so they wanted to make sure
7  they were having them opened by a knowledgeable
8  person.
9  ATTORNEY HONIK:
10  Mark that as Kolanz One,
11  please.
12  (Kolanz Exhibit One marked for identification.)
13  BY ATTORNEY HONIK:
14  Q. Mr. Kolanz, I've placed in front of you
15  the exhibit marked One now.  Do you recognize
16  that?
17  A. Yes.
18  Q. And it's been previously Bates stamped
19  Brush Wellman Genereux 01274. Do you recognize
20  this as the label that Raytheon asked Brush to
21  affix to beryllia ceramics that it sold to the
22  Waltham facility in the 1980s?
23  A. Yes, that's my understanding.
24  Q. Would you agree that this is not a

Page 135

1  warnings label?
2  ATTORNEY FAXON:
3  Object to the extent it calls
4  for a legal conclusion.
5  A. Yes, it's a warning label in some
6  regard as to just directing as to where this
7  material might go.  It does say caution on it,
8  so it would be unusual to not have the word
9  caution on some kind of a warning label.
10  Usually that's the type of term --- that is a
11  standardized term for use on warning labels.  So
12  it's kind of a directive label of some sort, but
13  I don't --- it's hard to define it as a warning
14  label, but it's hard to say it's not providing
15  some cautionary information, knowing how they
16  were using this based on my reading of the
17  document that says they wanted to make sure that
18  persons who were knowledgeable of BeO would open
19  this package.  So that was the purpose of it.
20  So in that respect, it would be kind of a
21  warning label.  So it doesn't allow someone on a
22  shipping dock to just simply open the package.
23  BY ATTORNEY HONIK:
24  Q. Apart from its function as a label

Page 136

1  directing someone's attention to content, would
2  you agree that Exhibit One is an inadequate
3  warning label from the standpoint of what Brush
4  knows from an industrial hygiene and safety
5  standpoint for its BeO product?
6  ATTORNEY FAXON:
7  Object to form.
8  A. Well, I guess I would say I wouldn't
9  consider it a product warning label.
10  BY ATTORNEY HONIK:
11  Q. Thank you.  Would you consider any of
12  the language reflected on Exhibit One as an
13  adequate product warning label, such that Brush
14  would use it to accompany it or affix it to its
15  BeO ceramic?
16  A. Brush Wellman wouldn't use it as a
17  warning label because we had our own warning
18  label that went with each package.
19  Q. And do you agree in terms of the
20  content of the warning label that Brush used in
21  contrast to Exhibit One, that Exhibit One does
22  not have adequate language in it to
23  appropriately and adequately warn as far as
24  Brush was concerned?

Page 137

1  A. Well, I wouldn't deem this a product
2  warning label.
3  Q. Okay.  And therefore, no language on it
4  or combination of language on Exhibit One could
5  suffice as a product warning that Brush would
6  ever use on its beryllium ceramic; correct?
7  A. That Brush Wellman would use as a
8  warning label?
9  Q. Yes.
10  A. Well, I believe we use the term caution
11  on some of our warning labels, so that is a
12  similarity, but that is about the only
13  similarity.
14  Q. And is it true that Brush didn't intend
15  for the Raytheon label marked Kolanz One now to
16  serve as a product warning on Brush's product?
17  A. No, we did not ---.
18  ATTORNEY FAXON:
19  Object to form.
20  A. We did not intend that that label would
21  serve as our product warning on any materials we
22  shipped to Raytheon.
23  BY ATTORNEY HONIK:
24  Q. Fair enough.  And in fact, Brush was

Page 138

1    aware that Exhibit One would not necessarily
2    stay with this product so that its end user
3    would see it; correct?
4    A. I don't know that to be the case.
5    Q. Now, the product warning label that was
6    used by Brush on its beryllium ceramics sold to
7    Raytheon in the 1980s, did that change over
8    time?
9    A. Yes.  It has changed over time based on
10    our knowledge and on advice of the warnings
11    experts over the years.
12    Q. You had told me earlier, Mr. Kolanz,
13    that prior to 1985, you couldn't tell me with
14    any degree of certainty whether the MSDS sheets
15    that were used for beryllium ceramic necessarily
16    accompanied the sale of such ceramics to
17    Raytheon before 1985; is that correct?
18    ATTORNEY FAXON:
19    Object to form,
20    mischaracterized his testimony.
21    A. You said that the MSDS would accompany
22    the part?
23    BY ATTORNEY HONIK:
24    Q. You couldn't tell me, could you,

Page 139

1    whether Brush sent MSDS sheets with each and
2    every beryllium ceramic part that it sold to
3    Raytheon prior to 1985; can you?
4    A. No, I can't tell you that, and I don't
5    think you asked me that specific question
6    earlier.
7    Q. Well, I have now, and the answer is you
8    can't tell me; can you?
9    A. Right.  What we did include is warning
10    --- our warning labels on each and every package
11    that was sent.
12    Q. How do you know that?
13    A. Because that has been the practice
14    within Brush Wellman for ---since the '50s, the
15    early '50s.  And that's something that I would,
16    at times, check on myself, to make sure that
17    people were following that direction, making
18    sure they're using the right labels and such.
19    Q. What would you do to satisfy yourself
20    that those warning labels accompanies the
21    products containing BeO that were sold to
22    Raytheon's Waltham facility prior to 1985?
23    A. Typically, when I would visit a
24    facility or area, I would make it a practice on

Page 140

1    occasion, to check into the shipping department
2    and make sure they have the proper labels in
3    place, they had the current labels, and that
4    upon inquiry of people there, that they were
5    being used.
6    Q. Do you know what the label that was in
7    use prior to 1985 on beryllium ceramic looked
8    like?
9    A. I have some idea of it, but it would be
10    hard to describe it without a copy of it here.
11    Q. Well, did you look at it prior to
12    coming here today?
13    A. The pre-'85 label?
14    Q. Yes.
15    A. At some point in the past I've looked
16    at it, not recently.
17    ATTORNEY HONIK:
18    May we have this marked as Two?
19    (Kolanz Exhibit Two marked for identification.)
20    BY ATTORNEY HONIK:
21    Q. Mr. Kolanz, this document now marked
22    Two, do you recognize it?
23    A. I recognize it as one of Brush
24    Wellman's product warning labels.

Page 141

1    Q. Okay.  And when was this product
2    warning label in use by Brush?
3    A. I'm not specifically sure when this
4    version of the label was put into use by Brush.
5    I'd have to go back and check and compare as to
6    when that might have been to be able to
7    determine when this version was put into use.
8    Q. Was it ever the case that you would put
9    the revision or revised date on the labels
10    themselves so that one could know when the label
11    came into use?
12    A. I don't recall that we ever did that,
13    because we usually made a big deal out of making
14    sure we captured back all the old labels and got
15    facilities to get rid of those labels, and then
16    gave them the new labels.  So I'd have to look -
17    --.  I don't recall us putting a date on the
18    warning labels.
19    Q. Well, looking at Kolanz Two and the
20    language that's reflected there, can you tell me
21    whether or not the language employed in this
22    label was identical or similar in any respect to
23    the one you used prior to 1985?
24    A. I don't specifically recall.  I'd have

Page 158

1    Three is a representation by Brush of the safety
2    of that standard; is it not?
3    ATTORNEY FAXON:
4    Object to form.
5    A. It's certainly represented --- a
6    representation of what the standard is. I mean,
7    that's a compliant standard.
8    BY ATTORNEY HONIK:
9    Q. And the compliant standard was
10   specifically chosen to be reflected in Kolanz
11   Three, which is Brush's warning label, because
12   Brush had a belief that that was a safe exposure
13   standard; correct?
14   A. Yes, that's correct. We believed that
15   that standard did provide a safe margin of
16   safety based on our own history, experience and
17   our review of literature.
18   Q. Okay. And because you believed
19   Raytheon to be sophisticated, did you believe
20   that their sophistication extended to a
21   knowledge and recognition of the two microgram
22   OSHA standard as being safe?
23   ATTORNEY FAXON:
24   Object to form.

Page 159

1    A. I guess I don't know how I would know
2    what they would believe was --- what their
3    opinion was of the two microgram standard.
4    BY ATTORNEY HONIK:
5    Q. Let me ask you this. You had a belief,
6    did you not, that companies like Raytheon
7    employed their own industrial hygienists;
8    correct?
9    A. Yes.
10   Q. And you've already told me on the basis
11   of certain documents that you looked at, that
12   you believed Raytheon had at least some level of
13   sophistication based on the detail of their
14   beryllium handling procedures and other
15   documents that you looked at; correct?
16   A. Yes.
17   Q. And I gather you shared that with me
18   out of a belief that Raytheon could make some
19   degree of independent judgment about how best to
20   protect their own employees; correct?
21   A. It appears that they were making
22   independent judgments of how to protect their
23   employees.
24   Q. That's how it appeared to you; correct?

Page 160

1    A. Yes.
2    Q. And so you believed that the mere
3    imparting of accurate and known information by
4    Brush, in this case to its customer, Raytheon,
5    would allow Raytheon to make appropriate choices
6    for the health and safety of its employees when
7    they were working with Brush product; correct?
8    ATTORNEY FAXON:
9    May I have that read back,
10   please?
11   COURT REPORTER READS BACK PREVIOUS QUESTION
12   ATTORNEY FAXON:
13   Object to form.
14   A. I'm not sure I understand the question.
15   BY ATTORNEY HONIK:
16   Q. But that's actually not the question as
17   I phrased it, so I'll try again; okay? In
18   employing the warnings language that we've been
19   looking at, and specifically in Kolanz Three, is
20   it correct that Brush was attempting to inform
21   its customers, in this case, Raytheon, about
22   appropriate standards so that it, in turn, could
23   make judgments about how best to protect their
24   own employees when they were using Brush

Page 161

1    products?
2    A. Yes. And we would --- as it says on
3    the bottom of these labels, we also would offer
4    assistance if they wanted in establishing safe
5    procedures by contacting Brush Wellman. So if
6    they felt they needed help in doing something,
7    that we were ready to help our customers.
8    Q. And part of the representation and
9    information imparted in Kolanz Three to
10   customers like Raytheon who purchased beryllium
11   ceramic from Brush, was that the two microgram
12   standard was safe; correct?
13   ATTORNEY FAXON:
14   Object to form.
15   A. Well, we were imparting in here that
16   that is the Occupational Safety and Health
17   Administration mandatory limit. In other words,
18   there's a legal reason that they need to comply
19   with this number.
20   BY ATTORNEY HONIK:
21   Q. But more than that, Mr. Kolanz, there
22   was information reflected here and in other
23   material, wouldn't you agree, that reinforced
24   and reconfirmed to customers like Raytheon that

Page 162

1  the two microgram standard was a safe standard
2  for Raytheon's employees; correct?
3  ATTORNEY FAXON:
4  Object to form.
5  A. I'm not sure what you mean about --- we
6  looked at it here.
7  BY ATTORNEY HONIK:
8  Q. Brush sent letters and other literature
9  and material to Raytheon, among other customers,
10 that reconfirmed the safety of the two microgram
11 standard; did it not?
12 A. We had shared our experience with the
13 two microgram standard and stated that we
14 believe that standard is safe and that our
15 experience with that standard has shown it to be
16 protective and preventative of chronic beryllium
17 disease.
18 Q. Precisely. And you did so in the case
19 of Raytheon, like other customers who purchased
20 beryllium ceramic throughout the 1980s; did you
21 not?
22 A. I believe we made statements like that
23 on and off throughout the 1980s.
24 Q. And you knew such statements would be,

Page 163

1  at least in part, weighed and incorporated by
2  your customers in formulating their own health
3  and safety policies for their employees;
4  correct?
5  A. Well, I believe our customers could
6  trust that Brush Wellman was accurately relaying
7  its experience with the two microgram standard
8  and its review of the relevant scientific
9  literature.
10 Q. And you knew that your customers would
11 rely upon those representations; did you not?
12 ATTORNEY FAXON:
13 Object to form and foundation.
14 A. Well, I'm not sure what all they might
15 have relied upon. They could certainly take
16 what we had given them as an accurate
17 representation of Brush Wellman's experience
18 with the occupational standard.
19 BY ATTORNEY HONIK:
20 Q. Did Brush want its customers to be as
21 well-informed as could reasonably be for the
22 customer to ultimately make the best judgment
23 about what was safe for their employees?
24 A. Of course we wanted them to be

Page 164

1  reasonably well-informed on the beryllium --- on
2  the health and safety aspects of handling our
3  products.
4  Q. And I don't want to make too fine a
5  point about this, but it's because Brush was
6  aware that the ultimate responsibility, if you
7  will, was for proper industrial hygiene practice
8  and procedure to be executed by the employers to
9  whom you were imparting this information;
10 correct?
11 ATTORNEY FAXON:
12 Object to form. Object to the
13 extent it's outside the notice.
14 BY ATTORNEY HONIK:
15 Q. Do you understand the question?
16 A. I'm not sure I do.
17 Q. Okay. Let me get at it a little more
18 simply. Brush couldn't go into the Waltham
19 plant and employ its own sensibility in
20 execution of industrial hygiene because you
21 didn't operate the plant; correct?
22 A. That's correct.
23 Q. You knew that it was being left to
24 Raytheon to make the judgments about how to

Page 165

1  protect its own employees; correct?
2  A. That's correct.
3  Q. And Brush was imparting some knowledge,
4  in this case, significant knowledge about its
5  own products that it was selling to Raytheon;
6  correct?
7  A. Significant health and safety
8  --- beryllium health and safety knowledge, yes.
9  Q. But that ultimately, Raytheon had to
10 make the judgment about how best to protect
11 their own employees; correct?
12 A. That is correct. Then we would offer
13 assistance if they would ask.
14 Q. So can you explain to me why it is that
15 Brush didn't tell Raytheon that it was aware of
16 literature that reported an incidence of disease
17 at levels below two micrograms?
18 ATTORNEY FAXON:
19 Object to form.
20 A. What literature are you referring to?
21 BY ATTORNEY HONIK:
22 Q. Are you on --- is Brush unaware of
23 literature that was generated by Dr. Shima in
24 Japan?

1  our warning experts warn us about putting too
2  much information on a warning label, because
3  that's not the appropriate place. You're
4  supposed to convey the primary warnings
5  associated with the material. In some instances
6  in the past, we've actually taken stuff off of
7  our warning labels at the advice of a warnings
8  expert.
9  Q. What warnings experts has Brush used --
10  - or did it use in the 1980s with respect to its
11  beryllia ceramic and metallized beryllia
12  ceramic?
13  A. I really don't remember the names.
14  Q. Are they to be found somewhere in
15  Brush's records?
16  A. In the '80s, I wasn't involved with
17  dealing with the warnings expert myself
18  directly. That would have been handled by
19  others. It was later on that I dealt with
20  dealing with warnings experts directly. And
21  there was, I know, one woman who came out of
22  Texas, and then I can't remember where the other
23  one ---. There's only been two that I know of
24  since that time that I have dealt with.

1  Q. Do you know why, Mr. Kolanz, in Kolanz
2  Two, the warning label for the metallized
3  beryllia ceramic that you've told us was in use
4  from '85 forward, the label references the use
5  of ventilation and other controls, but not
6  specifically clothing --- protective clothing?
7  A. In Two?
8  Q. Yes, sir.
9  A. This is the pre-'85?
10  Q. Well, you can correct me, but I thought
11  you had identified this as the post-'85, and the
12  generic beryllium product one, marked Three, as
13  the
14  pre-'85.
15  A. Yes.
16  Q. Is that correct?
17  A. (Indicates yes.)
18  Q. So the question is why, in the post-'85
19  warning label, did Brush elect to make specific
20  reference to controls involving exhaust
21  ventilation and other controls designed to meet
22  OSHA's standards, but no specific reference to
23  protective clothing?
24  A. In the post-'85 one?

1  Q. Yes, sir.
2  A. Again, this was at the advice of the
3  warnings expert, as I recollect that, to stick
4  with the primary warnings. If you notice at the
5  bottom, we have the statement to say, see
6  material safety data sheets on file with your
7  employer for further details concerning OSHA
8  standards and precautionary measures. So you
9  had a place where people could go to get more
10  detailed information, and the label instructed
11  people to go there.
12  Q. What did Brush do after preparation and
13  dissemination of Kolanz 5A, the '85 MSDS sheet,
14  to ensure that purchasers of its beryllium oxide
15  were, in fact, providing full-body protective
16  clothing that was to be specially laundered?
17  A. That is a situation that needed to be
18  evaluated by whoever was receiving this
19  material. Could there be instances where it may
20  or may not apply? And with a place like
21  Raytheon, they were certainly --- showed the
22  expertise to be capable of making that kind of
23  decision.
24  Q. Well, did Raytheon --- excuse me, did

1  Brush ever verify whether, in fact, protective
2  clothing was ever used at the Waltham facility
3  in connection with the machining of beryllium
4  oxide?
5  A. I'm not aware that we would ever verify
6  that. I'm not aware that we were ever even
7  allowed into the facility to see their
8  operations. I was not able to determine that in
9  any of the questioning that I've given to other
10  people, and I know I haven't been there.
11  Q. Well, putting aside seeing it, did
12  anyone at Brush ever ask anyone at Raytheon
13  whether they employed special clothing or
14  provided special full-body protective clothing,
15  sealed the clothing --- contaminated clothing,
16  and then specially laundered it? Did you so
17  much as ask?
18  A. I didn't ask because I didn't even know
19  if they had a situation that would have required
20  it. That's why it would explain this type of
21  stuff in the material safety data sheet. And as
22  I said before, I always invite people. I
23  believe the MSDS does it, also. It says,
24  assistance in establishing safe procedures may

Page 222

1  be obtained by contacting Brush Wellman,
2  Incorporated, environmental control department,
3  it gives an address that they can write to and a
4  phone number they can call.
5  Q. Well, surely Brush was aware that
6  Raytheon was sandblasting or grit blasting the
7  beryllium oxide; wasn't it?
8  A. All I know is that they had sent ---
9  had called with a question asking about that,
10 and I had advised them to use a chemical method.
11 Other than that, I don't know.
12 Q. You don't know? You've never seen any
13 document that suggested to Brush, indeed, to
14 you, that Raytheon was routinely sandblasting
15 beryllium oxide sent to it, sold to it by Brush?
16 ATTORNEY FAXON:
17 Object to form and foundation.
18 A. I don't know that they were abrasive
19 blasting Brush Wellman's products. I just read
20 parts of the deposition of Mrs. Genereux, which
21 referred to sandblasting or abrasive blasting of
22 aluminum oxide, and also the other woman also
23 referred to performing the same type of task to
24 do --- I believe they described it as

Page 223

1  metallization. But prior to that time, no.
2  BY ATTORNEY HONIK:
3  Q. If you look at section eight of the
4  same exhibit, 5A, the '85 MSDS sheet, this talks
5  about needing to provide adequate local exhaust
6  ventilation when performing operations such as
7  machining, grinding, laser trimming,
8  sandblasting, chemical etching, et cetera, where
9  respirable dust, mists or fumes are generated;
10 did I read that correctly?
11 A. Yes.
12 Q. What did Brush do to ensure that
13 adequate local exhaust ventilation was being
14 employed by Raytheon at its Waltham plant in
15 connection with any of the processes that we
16 just looked at together in section eight of the
17 1985 MSDS sheet?
18 A. We instructed them via the MSDS that
19 they needed to provide adequate local exhaust
20 ventilation if they are performing those types
21 of activities.
22 Q. What did Brush do to ensure that
23 adequate local exhaust was being used?
24 A. We didn't have any means to determine

Page 224

1  whether they had adequate local exhaust. As you
2  said earlier, we weren't in running or managing
3  their operation.
4  Q. Well, did you so much as ask them if
5  they were employing ventilation?
6  A. Other than the correspondence we had, I
7  don't know that we had any specific information
8  as to the way they processed their material.
9  Q. I haven't asked you that. I asked you
10 if you asked Raytheon if they employed local
11 exhaust ventilation in connection with any
12 operations in which they machined, ground,
13 trimmed, sandblasted, chemically etched or
14 otherwise abraded Brush's BeO product?
15 ATTORNEY FAXON:
16 Object to form and foundation.
17 A. I don't recall, without going back and
18 reviewing, the letters that I had back and forth
19 --- or that I sent to them whether or not
20 there's anything in those letters that would
21 indicate whether I would have asked them that
22 type of question. I may have. I don't know.
23 BY ATTORNEY HONIK:
24 Q. What did Brush mean in its MSDS sheet

Page 225

1  when it used the term, to provide adequate local
2  exhaust ventilation?
3  A. Well, providing adequate local exhaust
4  ventilation would be to be in compliance --- the
5  idea there is to identify the types of
6  operations that would require local exhaust
7  ventilation, give examples of them, and that
8  those are the types of operations that they
9  should be looking at with regard to potentials
10 for exposure. And of course, you have the OSHA
11 exposure standard then, which would have to be
12 met utilizing adequate local exhaust ventilation
13 or whatever means they choose to control,
14 because you can choose to control things in a
15 variety of ways. For example, you mentioned
16 earlier the filing of a disc on the edge. That
17 could be controlled by using local exhaust
18 ventilation. It could be done by doing the task
19 underwater and cleanly rinsing the parts. So
20 there's different ways to accomplish the same
21 thing. I usually like to see people use the
22 simpler way to do it, is what I typically
23 recommended in the past.
24 Q. What does the term adequate mean in the

1  what information you gave to them regarding
2  health and safety of beryllium?
3  A. No, that really didn't affect the type
4  of information that we would provide.
5  Q. So did you give them less information
6  or provide them with less information because
7  they were a sophisticated user?
8  A. No, I wouldn't say that. We would
9  provide information based on what they would
10  request. Certainly a smaller user, a less
11  sophisticated customer tends to ask more
12  questions because they want some help, and
13  that's where we would provide more help. If
14  they tended not to do that, we would provide
15  initial information with the offer of providing
16  more afterwards, and they typically did not come
17  back asking for more assistance because, from my
18  estimation, they would pretty much know what to
19  do with it since they had industrial hygiene
20  staff.
21  Q. So the follow-up questions that they
22  never asked after you provided all of the
23  initial information, did that give you the
24  impression that Raytheon knew how to protect its

1  workers from beryllia hazards?
2  ATTORNEY HONIK:
3  Objection, calls for conjecture
4  and speculation on the witness' part.
5  A. Well, certainly in looking at their
6  procedure and protocols that they wrote up for
7  beryllium, certainly I would say that they had a
8  greater than typical knowledge of beryllium
9  health and safety, or be on the high end of that
10  understanding compared to other
11  ---. And that's why I would refer to them as
12  more of a sophisticated user.
13  BY ATTORNEY HANNEKE:
14  Q. Were their procedures and protocols
15  produced to you as part of
16  --- or to Brush Wellman as part of the plans and
17  specifications?
18  A. Not that I'm aware of. The first time
19  I saw them was associated with reviewing
20  materials for this, other than the fact that
21  their little caution label was on past purchase
22  orders. It would be listed right on Brush
23  Wellman's purchase orders that we were to put
24  that on material being shipped to them.

1  Q. What impression ---?
2  A. It would be a procedure, certainly, if
3  they're requiring us to do something.
4  Q. What impression did that requirement to
5  put that little label on from Raytheon give
6  Brush Wellman regarding Raytheon's knowledge of
7  the beryllia hazards?
8  ATTORNEY HONIK:
9  bjection, form, calls for
10  conjecture.
11  A. Well, certainly, that kind of
12  requirement to have a caution, to have something
13  specific --- to have a label specifically put on
14  by a customer, I would say is highly unusual.
15  That did not happen very often. So again, that
16  would not be a typical procedure. They were
17  trying to make sure it went to a specific group
18  or person within their organization. Again,
19  that is not --- that's a rarity in what I've
20  seen as far as purchase orders.
21  ATTORNEY HANNEKE:
22  Okay. I don't have anything
23  further.
24  ATTORNEY HONIK:

1  A couple follow-up, if I may,
2  and then we'll conclude for today.
3  ATTORNEY FAXON:
4  Well, I have a few questions
5  after that.
6  ATTORNEY HONIK:
7  Okay.
8  RE-EXAMINATION
9  BY ATTORNEY HONIK:
10  Q. Mr. Kolanz, it's been a long day, but
11  we've looked at MSDS sheets and labels. Do you
12  know of any other warnings or cautions, either
13  in the form of labels or MSDS sheets, that
14  accompanied any sale of beryllia from Brush to
15  Raytheon?
16  A. I'm not sure what you mean by
17  accompanying the sale. Shipped with the
18  product?
19  Q. Correct.
20  A. No. We would only have our labels,
21  typically, that go with it, and material safety
22  data sheets, with the advent of the Hazard
23  Communication Standard, were typically sent with
24  the first --- the protocol was to send the MSDS

Page 314

1  they said.
2  VIDEOGRAPHER:
3  5:35 p.m., off record.
4      OFF VIDEO
5      SHORT BREAK TAKEN
6      ON VIDEO
7  VIDEOGRAPHER:
8  5:37 p.m., back on record.
9      BY ATTORNEY FAXON:
10  Q. Mr. Kolanz, you were asked some
11  questions today about CBD, both today and in the
12  1980s.  How, if at all, have the diagnostic
13  criteria for chronic beryllium disease changed
14  since the 1980s?
15  ATTORNEY HONIK:
16  Objection, calls for an expert
17  opinion this witness is incompetent to give.
18  A. The difference in diagnostic criteria
19  started to change in about 1989 as part of a
20  study conducted by K. Kreiss, where she proposed
21  the concept of a subclinical form of CBD.  Prior
22  to that time, CBD was defined mostly upon
23  persons who were experiencing clinical symptoms
24  of a health effect, which could include cough

Page 315

1  and loss of weight, and could be discernable
2  changes in
3  x-ray, or pulmonary function changes along with
4  a confirmed exposure to beryllium.
5  After the years subsequent to '89, the
6  criteria for defining chronic beryllium disease
7  and the creation of, kind of the term
8  subclinical disease, started including --- or
9  included persons who would be found to have
10  granuloma in their lung. And actually, it's ---
11  well, it's a type of granuloma in the lung that
12  would be found upon biopsy along with a finding
13  of beryllium sensitized based on either a blood
14  test or a lung fluid test.
15      BY ATTORNEY FAXON:
16  Q. How, if at all, have the change in
17  diagnostic criteria that you've just described
18  affected the rate of instance of chronic
19  beryllium disease that you have seen in Brush
20  Wellman's plants?
21  ATTORNEY HONIK:
22  Object to the form of the
23  question and to the extent that this calls for
24  an opinion outside of this witness' competency.

Page 316

1
2  A. In general, using the new diagnostic
3  criteria, the prevalence of CBD has gone up
4  sharply when you go to include subclinical cases
5  of chronic beryllium disease.
6      BY ATTORNEY FAXON:
7  Q. Are statements about the incidence of
8  chronic beryllium disease from the 1980s then
9  comparable to statements about the incidence of
10  chronic beryllium disease today?
11  ATTORNEY HONIK:
12  Same objection.
13  A. Not typically, because most of the
14  studies in the '80s would be only looking at
15  clinical chronic beryllium disease, where the
16  vast majority of the studies in the 1990s and
17  beyond include subclinical CBD, oftentimes not
18  even describe the subclinical CBD in with any
19  clinical cases of CBD.
20      BY ATTORNEY FAXON:
21  Q. Mr. Kolanz, earlier today, you
22  described Raytheon as sophisticated.  Why did
23  you describe Raytheon as sophisticated?
24  A. That was based primarily on looking at

Page 317

1  the types of documents they were producing,
2  which indicated some real expertise in health
3  and safety, and the procedures that they had
4  created for beryllium, in addition to their ---
5  even their use of that little caution label, to
6  me, was well above and beyond the typical
7  company.  And they were an aerospace company,
8  which aerospace companies tended to be moreso
9  leaders in health and safety practices and
10  procedures overall.  They were oftentimes very
11  much like some other high-end, very
12  sophisticated health and safety groups.
13  Q. When you were dealing with Raytheon in
14  the 1980s, did you develop a belief as to
15  whether or not they were sophisticated?
16  A. Yes, I believe I had some reason to
17  believe they were sophisticated then, simply
18  because they had industrial hygienists on staff,
19  plus I was getting questions from people that
20  were, like, engineers that worked for Raytheon,
21  and that isn't always typical to get it from
22  actually kind of production-related personnel.
23  So that shows to me a greater understanding of
24  health and safety by non-health and safety

Page 318

1    personnel at the Raytheon company.
2    Q. Did you form a belief in the 1980s as
3    to whether or not Raytheon was likely to pass
4    industrial hygiene information about beryllium
5    or health and safety information about beryllium
6    on to its production workers?
7    ATTORNEY HONIK:
8    Object to form.
9    A. Well, I would certainly expect, with
10   the type of company it appeared to be, that
11   training --- and plus it is required by Hazard
12   Communication Standard that they pass on
13   information, so I certainly would have expected
14   them to have done that and passed it on to
15   employees.  And I believe there were some ---
16   records of some kind of beryllium training, but
17   I don't remember the time frame in which those
18   were conducted.
19   BY ATTORNEY FAXON:
20   Q. Mr. Kolanz, Mr. Honik asked you a
21   number of questions that were essentially, why
22   didn't you put X or why didn't you put Y on the
23   product beryllium warning label.  Why didn't you
24   put the statements that Mr. Honik asked you

Page 319

1    about on the beryllium warning label?
2    ATTORNEY HONIK:
3    Object to the form of the
4    question.
5    A. The types of specifics that Mr. Honik
6    had mentioned are something that ---.  A warning
7    label is designed to be a primary means of
8    giving warning to the recipient of the label.
9    And we were advised by our warning experts that
10   you shouldn't be including a lot of specifics in
11   there, and you had to try to provide a means for
12   getting those specifics in another venue.  So
13   you stick to the very primary warnings so the
14   initial recipient of the label understands the
15   basic message, and it isn't confused by other
16   information that's provided.
17   BY ATTORNEY FAXON:
18   Q. And what is the primary hazard
19   associated with beryllium oxide?
20   A. The primary hazard would be the
21   inhalation of beryllium oxide particulate,
22   having the potential to cause serious chronic
23   lung disease.
24   Q. Did Brush's warning labels to Raytheon

Page 320

1    in the 1980s warn of inhalation of beryllium
2    particulate?
3    A. I believe they did.
4    Q. You were asked some questions about
5    Exhibit Eight, if you have that before you, sir.
6     I believe you have it right in front of you,
7    sir.
8    A. Oh.
9    Q. Does that document deal with beryllium
10   oxide?
11   A. No.  This document refers to beryllium
12   metal.
13   Q. You were asked some questions about
14   Exhibits Kolanz 15 and Kolanz 17, two letters
15   from 1989.  In the course of your
16   responsibilities at Brush, did you review those
17   letters at or about the time that they were sent
18   to customers?
19   A. Did I review these letters?
20   Q. Yes.
21   A. I actually don't recall if I did or did
22   not review these.  It would not be unusual for
23   me to not have reviewed something like that
24   during that time frame.

Page 321

1    Q. Did you have an opportunity to review
2    them today at the deposition?
3    A. Yes.
4    Q. Were there any statements in either of
5    the two letters that you felt were inaccurate as
6    of 1989?
7    A. No.  I don't think there's anything in
8    here that was really inaccurate.  I might choose
9    to word them differently, but I'm not sure how I
10   might have chosen to word them differently in
11   1989 versus today.
12   Q. Mr. Kolanz, finally, you used the
13   phrase evaluation sales in connection with two
14   entries on what has been marked as Exhibit 20,
15   the sales spreadsheet.  Can you describe for the
16   jury what you mean by evaluation sales?
17   A. Well, evaluation sales are samples, or
18   samples of parts that would be provided to the
19   customer in an attempt, as I see it, to win the
20   business to try to sell to the customer those
21   parts.
22   Q. And with respect to those parts that
23   were sold as evaluation sales, I believe you
24   described them as something on the order of

Page 322

1 three-inch discs; is that correct?
2 A. And looking at the spec for those, they
3 were a three-inch disc by about an eighth inch
4 thick.
5 Q. And is the spec you looked at, was that
6 the spec that was made an exhibit to the
7 Chartier deposition?
8 A. Yes.
9 Q. Other than the evaluation sales that
10 you --- well, strike that.
11 Based on your review of the records,
12 does it appear that the products sold as
13 evaluation sales were ever sold in production
14 quantities to Raytheon?
15 A. It does not appear --- I didn't find
16 anything in the record that indicated that that
17 material was sent --- or sold in production
18 quantities. In fact, that material appears to
19 have gone back and forth a few times in trying
20 to qualify itself, and failed to qualify as a
21 viable part.
22 ATTORNEY FAXON:
23 Okay. Thank you very much, Mr.
24 Kolanz.

Page 323

1 VIDEOGRAPHER:
2 5:48 p.m., off record.
3 OFF VIDEO
4 ATTORNEY FAXON:
5 To the extent that you change
6 your mind and close the deposition, we will
7 reserve signature.
8 ATTORNEY HONIK:
9 Okay.
10 * * * * * * * *
11 DEPOSITION CONCLUDED AT 5:48 P.M.
12 * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24

| Pg./Line | Change | Reason |
|---|---|---|
| 16:2 | "them" to "the . . ." | transcription error |
| 22:2 | Youngblot to Youngblut | spelling error |
| 39:1 | Freemont to Fremont | spelling error |
| 40:7 | add "what" "understand <u>what</u> it" | transcription error |
| 41:15 | add "beginning in 1984," so that the answer reads "Sell beryllium oxide to Raytheon <u>beginning in 1984</u>." | more precise answer |
| 49:13-17 | Change to "Yes.  Brush's records indicate MSDS were sent before HAZCOM went into effect." | correct answer |
| 52:6 | Teresa Helman to Theresa Haumann | spelling error |
| 56:19 | "on a" to "zone" | transcription error |
| 59:2-4 | change to "The ceramic study was sent to Raytheon." | correct answer, as reflected in later testimony |
| 62:18 | "there's" to "there are" | grammar |
| 71:4 | "here" should be "there" | grammar/transcription |
| 73:5-6 | change "what they did with these parts, I don't know" – "we didn't have access to see what processes were being performed" | more precise response |
| 88-89 | Newbery Port to Newburyport | spelling |
| 93:22 | "white" to "while" | transcription error |
| 94:22 | "filmmaking" to "pillmaking" | transcription error |
| 103:14 | Add to end of answer "As I understand that term was used to describe the products Mrs. Genereux worked with – no." | Clarify answer depending on counsel's intended use of the word "window." |

| Pg./Line | Change | Reason |
|---|---|---|
| 106:21-23 | Add to end of answer "As I understand that term was used to describe the products Mrs. Genereux worked with – no." | Clarify answer depending on counsel's intended use of the word "window." |
| 109:12 | Change to "I don't know." | Reviewed many drawing and sales records, but don't know whether they were exhibits or not. |
| 109:15 | Change to "I don't know." | Reviewed many drawing and sales records, but don't know whether they were exhibits or not. |
| 117 | Add at end "As I understand that term was used to describe the products Mrs. Genereux worked with – no." | Clarify answer depending on counsel's intended use of the term "window." |
| 117:18-21 | Add at end, "There were evaluation samples which were apparently tested as windows on microwave tubes, but the records indicate that Raytheon rejected those parts and returned them, and that they were never sold in production quantities." | Clarify answer consistent with testimony later in my deposition. |
| 118:2 | Change to "Not with respect to the sheet. I did review sales documents and speak to current and former Brush employees." | correct answer |
| 118:24 | Change "Over the break" to "Before the break" | transcription error or mistake |
| 120:17-20 | Insert "whole." "I didn't read the whole deposition." | As the rest of the answer reflects, I did review parts of it. |
| 122:11-16 | "Sales documents indicate that small quantities of three inch disks and one-and-a-half inch disks were sent as evaluation samples to Raytheon. These evaluation samples failed to pass inspections by Raytheon and were generally | clarify and correct answer |

| Pg./Line | Change | Reason |
|---|---|---|
|  | returned.  They were never sold in production quantities." |  |
| 122:21-24 | Change "the one woman" to "Clare Balient" and add at end "but the parts she was describing were not sold by Brush Wellman." |  |
| 123:7 | Add "it," "putting <u>it</u> in there" | add word, grammar/transcription |
| 127:2 | Change "Well" to "We" | transcription/grammar error |
| 133:3 | Add "an" - "was <u>an</u>" | transcription/grammar error |
| 158:7 | "compliant" to "compliance" | transcription error |
| 168:17 | "bedding" to "vetting" | transcription error |
| 170:15 | Add "I was aware of Shima's papers but concluded that the information was not credible" after "Yes." | Clarify question that I was answering. |
| 182:18 | delete "thus" | extra word |
| 182:24 | Add "for subclinical disease" after "Yes." | clarify answer |
| 210:5 | Add "that's when we learned of and relayed the results of Kriess's study" after "Yes." | Clarify question was answering. |
| 226:2 | Add "1985 document" after "this" | Clarify what document is being discussed. |
| 245:13 | Add "in production quantities.  I did see a memo that described evaluation samples that were returned after testing by Raytheon when Brush was attempting to qualify as a supplier." | clarify answer |
| 250:19 | "pool" to "pull" | transcription error |
| 255:17 | Delete "and its use" | transcription/grammar error |

| Pg./Line | Change | Reason |
|---|---|---|
| 286:9 | "I" to "It" | transcription error |

The foregoing reflect my changes and corrections to my deposition in *Genereux, et al. v. America Beryllia Corp., et al.*

Marc E. Kolanz

MEMO TO FILE:              ██████████, Waltham, MA

FROM:                      Greg Chesmar

SUBJECT:                   Visit of November 18, 1987

PERSONNEL CONTACTED:       John Chartier, Purchasing Manager
                           Dr. Beverly Shaw, Manager, Materials Engineering
                           Dr. Peter Toch, Materials Engineer
                           Tony Fragala, Materials Engineer
                           Phyllis Grimaldi, B-W Tucson


We discussed a failure that occurred on the CFA windows that is a D-M02-3000-180.
We delivered 10 pieces to them about August, 1987.  They built 2 pieces into an
assembly and both pieces failed hermeticity.  At the present time, they do not
know the exact cause of failure or the exact location, except it is near the edge
of the disc and probably at the metalization ceramic interface.  They should have
the failure analysis complete by November 30, 1987.

I asked him to send either a piece of the disk from near the failure or a mounted
piece to the attention of Kirin Dilal at Cleveland.

They brazed the disc into the copper ring and the ring wall thickness is
approximately .010 inches thick where it contacts the ceramic.

This item was to have been made with the high strength ceramic and metalization
system.

Note to Phyllis:  Please advise me of the part numbers and the order numbers for
                  this item.  Also, request QC to verify that the ceramic and MZ
                  system was the high strength type.

If necessary, Shaw will give us an unused piece for analysis.

This item goes through various braze cycles.  The first braze cycle is 980 C, the
second is 820 C and the third is 780 C.  Time at temperature is approximately
5 minutes.  It then goes thru a 24-48 hour 500 C vacuum bake out.  Then an
electrical test where approximately 10 KW RF is passed through the window.

During this test, the part heats up to approximately 100° C. with the center of
the window being about 10 C warmer than the edges.

Shaw wants to know if the the dissipation factor or thermal conductivity will be
different for high strength material.  I advised him, to the best of our
knowledge, it will not.  I told him the electrical properties and the physical
properties will be the same.  He questioned if the grain boundary properties might
affect these two items.

Shaw is going to submit a small order, perhaps 25 to 50 pieces, for the AMRAM RF
windows.  These parts must be made with the high strength ceramic and
metalization.

EXHIBIT

*13*

RAYTHEON MPT
Page - 2 -


We discussed our order TU1586 with John Chartier, drawing #811570, R-75-2730.
He is becoming disgusted with our inability to ship. We are going to lose their
rod business very soon if we cannot ship on time. He is in the process of
qualifying a second source.  We should be able to do the grinding business if
nothing else, but this will affect our metalization business here also.


Shaw said the **Raytheon** VHISIC package will be AlN, 200 leads on 2 sides on .010
in. centers.

We are in the process of shooting ourselves in the foot by our inability to make a
simple rod.


GC/ab

cc:  Lyn Doran, Tucson, AZ
     Master File