**Exhibit 8 to Statement of Undisputed Facts Filed in Support of Motion of American Beryllia, Inc. For Summary Judgment**

**CERTIFIED COPY OF AMENDED DISCLOSURE STATEMENT FOR AMENDED PLAN OF ORDERLY LIQUIDATION OF GENERAL CERAMICS, INC. AND EXHIBITS**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

*I hereby certify that the foregoing is a TRUE COPY of the original on file in the office of the Clerk of the United States Bankruptcy Court.*
*Deputy*

FILED
JAMES J. WALDRON
JUN 4 2001
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

In re:                                          :    Chapter 11

General Ceramics, Inc.,              :    Case No. 99-33403 (RG)

          Debtor.                           :

-------------------------------------------------X

---

**AMENDED DISCLOSURE STATEMENT FOR
AMENDED PLAN OF ORDERLY LIQUIDATION
OF GENERAL CERAMICS, INC.**

---

McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for General Ceramics, Inc.
RWH 2033

389

# TABLE OF CONTENTS

**Page No.**

INTRODUCTION ..................................................................................................1

    A.    NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS .......1

    B.    VOTING ..................................................................................................2

    C.    CONFIRMATION HEARING................................................................4

ARTICLE I

    A.    HISTORY OF THE DEBTOR - PREPETITION........................................6
    B.    HISTORY OF THE DEBTOR - POSTPETITION ..................................10

           i.    The Raytheon Agreement ...........................................10
           ii.    Sale of the California Site .............................................11
           iii.    Sale of the New Jersey Site..........................................12
           iv.    Pending Litigation.......................................................15
           v.    Employment Agreement Between General Ceramics, Inc.
               and Krishna Agnihotri.................................................16
           vi.    Pending Settlements of Claims Filed Against the Estate...............17
               (a) The EPA Claim.....................................................17
               (b) The PRP Claims....................................................18
               (c) The Claims of the Tennessee Plaintiffs ....................18
               (d) The Claims of the Parent........................................19
            vii.    The Claim of The Pension Benefit Guaranty Corporation ...........20
           viii.    The Claims of the Supplemental Savings Plan Participants ..........21
           ix.    Pay to Stay Bonuses....................................................22
           x.    Preferential and Fraudulent Transfers............................22

ARTICLE II
SUMMARY OF THE AMENDED PLAN.........................................................23

ARTICLE III
TREATMENT OF CLASSES UNDER THE AMENDED PLAN ...................24
    A.    The Classes ...............................................................................25
           Class I.    Priority Creditors ...........................................25
           Class II.    Claims of Tennessee Plaintiffs.............................25
           Class III.    EPA Claim ...................................................25
           Class IV.    Unsecured Claims and Claims of the Supplemental
                      Savings Plan Participants.....................................25
           Class V.    Tokuyama Subrogation Claim ...........................26
           Class VI.    Tokuyama Note Claim .....................................26
           Class VII.    Equity Holders ..............................................27
    B.    Statement Pursuant to Local Rule 3016-2(b)............................27

ARTICLE IV
MEANS FOR IMPLEMENTATION OF THE AMENDED PLAN................................28

ARTICLE V
PROVISIONS REGARDING CORPORATE
GOVERNANCE AND MANAGEMENT OF THE DEBTOR........................................30
    A.    Continued Corporate Existence; Dissolution of the Debtor ....................30
    B.    Certificate of Incorporation and By-laws ..................................................30
    C.    Directors and Officers; Effectuating Documents;
            Further Transactions ................................................................................31
    D.    Insurance ..................................................................................................31
    E.    Securities to be Issued or Canceled Pursuant to This Plan ......................31
          1.    New Equity Interests......................................................................31
          2.    Cancellation and Surrender of Existing Securities and
              Agreements ....................................................................................32
    F.    Plan Supplement .......................................................................................32

ARTICLE VI
EXECUTORY CONTRACTS AND UNEXPIRED LEASES..........................................33

ARTICLE VII
CONFIRMATION PROCEDURE ..................................................................................33

    A.    Confirmation Hearing ...............................................................................33
    B.    Acceptance.................................................................................................34
    C.    Non-Acceptance and Cramdown ..............................................................34
    D.    Fair and Equitable Tests............................................................................34
    E.    Feasibility and Best Interest Tests ...........................................................35
    F.    Objections to Confirmation......................................................................36

ARTICLE VIII
LIQUIDATION ANALYSIS...........................................................................................37

    Class I:    Priority Creditors .........................................................................37
    Class II:    Claims of Tennessee Plaintiffs.....................................................37
    Class III:    EPA Claim ...................................................................................37
    Class IV:    Unsecured Claims and Claims of the Supplemental Savings Plan
              Participants...................................................................................37
    Class V:    Tokuyama Subrogation Claim .....................................................37
    Class VI:    Tokuyama Note Claim ..................................................................38
    Class VII:    Equity Holders .............................................................................38

ARTICLE IX
TAX CONSEQUENCES OF CONFIRMATION ...........................................................39

     Federal Income Tax Consequences of the Debtor ................................................40

ARTICLE X
DISCHARGE AND INJUNCTION .................................................................................41

    A.      Discharge of the Debtor ........................................................................41
    B.      Injunction .................................................................................................41

ARTICLE X1
RECOMMENDATION ....................................................................................................43

# I.  **INTRODUCTION**

General Ceramics, Inc. (the "Debtor") hereby submits this Amended Disclosure

Statement (the "Amended Disclosure Statement"), pursuant to the provisions of Chapter 11 of

Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Code"), with respect to its

Amended Plan of Orderly Liquidation (the "Amended Plan") for the orderly liquidation of the

Debtor.  Attached as Exhibit A is a copy of the Amended Plan.  Unless otherwise defined herein,

all capitalized terms used herein have the meaning ascribed to them in the Amended Plan.

**The Debtor believes that the Amended Plan provides the best possible recovery to**

**creditors.  The Debtor therefore believes that acceptance of the Amended Plan is in the best**

**interests of each and every class of creditors.  The Debtor, therefore, recommends that you**

**vote to accept the Amended Plan.**

A.      **NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS**

**THE DEBTOR RESERVES THE RIGHT TO FILE A SECOND AMENDED
DISCLOSURE STATEMENT AND SECOND AMENDED PLAN AND TO WITHDRAW
ANY AND ALL PLANS.  ALL CLAIMANTS AND EQUITY INTEREST HOLDERS
ARE HEREBY ADVISED AND ENCOURAGED TO READ THE AMENDED PLAN
AND AMENDED DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE
VOTING TO ACCEPT OR REJECT THE AMENDED PLAN.**

**THIS AMENDED DISCLOSURE STATEMENT IS NOT INTENDED TO
REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE
AMENDED PLAN BY EACH CREDITOR OR EQUITY INTEREST HOLDER
ENTITLED TO VOTE THEREON, BUT ONLY TO FACILITATE AND SUPPLEMENT
SUCH A REVIEW.  THE DESCRIPTION HEREIN OF THE AMENDED PLAN IS A
BRIEF SUMMARY ONLY AND CREDITORS, EQUITY INTEREST HOLDERS AND
OTHER PARTIES-IN-INTEREST ARE CAUTIONED TO REVIEW THE AMENDED
PLAN ITSELF (WHICH IS ANNEXED HERETO AS EXHIBIT A) FOR A FULL
RECITATION AND UNDERSTANDING OF THE AMENDED PLAN'S PROVISIONS.
THIS AMENDED DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY
REFERENCE TO THE MORE DETAILED AND SPECIFIC PROVISIONS
CONTAINED IN THE AMENDED PLAN.  THE TERMS OF THE AMENDED PLAN
AND ITS RELATED AGREEMENTS ARE CONTROLLING IF ANY INCONSISTENCY
EXISTS BETWEEN THEM AND THIS AMENDED DISCLOSURE STATEMENT.**

THE AMENDED PLAN AND AMENDED DISCLOSURE STATEMENT HAVE NOT BEEN AND ARE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  ALL PERSONS SHOULD EVALUATE THE AMENDED PLAN AND AMENDED DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION.  THE FINANCIAL INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE DEBTOR WITHOUT AUDIT.  EACH HOLDER OF A CLAIM SHOULD CAREFULLY REVIEW THE AMENDED PLAN IN ITS ENTIRETY BEFORE CASTING A BALLOT.

## B.    <u>VOTING</u>

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims which are "impaired" are entitled to vote to accept or reject the Amended Plan.  As set forth in Section 1124 of the Bankruptcy Code, a Class is "impaired" by the Amended Plan unless the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are left unaltered.

Any unimpaired Class of Claims or Interests shall not be entitled to vote to accept or reject the Amended Plan.

The Claims and Old Equity Interests in Classes 4, 5, 6 and 7 are considered impaired under the Amended Plan, and the holders of Allowed Claims in Classes 4, 5 and 6 are entitled to vote on the Amended Plan.  As the holders of Old Equity Interests in Class 7 shall receive no distribution under the Amended Plan, the holders of such interests are presumed to have voted to reject the Amended Plan, and the solicitation of acceptances with respect to such Class is, therefore, not required under Section 1129(g) of the Bankruptcy Code.  Under Section 1126 of the Bankruptcy Code, Holders of Administrative Claims and Allowed Tax Claims are not entitled to vote on this Amended Plan.

Your vote on the Amended Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under such plan vote to "accept" such plan, unless the "cram down" provisions of the Bankruptcy Code are employed. The Debtor reserves its right to seek to "cram down" the Amended Plan on any non-accepting class. See infra, ARTICLE VII, Confirmation Procedure. The Bankruptcy Code defines "Acceptance" as acceptance by Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in each Class whose Holders cast Ballots. Any Voting Class that fails to accept the Amended Plan will be deemed to have rejected the Amended Plan. Section 1129(b) of the Bankruptcy Code permits Confirmation of the Amended Plan notwithstanding rejection by one or more Voting Class if the Court finds that the Amended Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the rejecting Class or Classes ("Cramdown"). For a more detailed description of the requirements for acceptance of the Amended Plan and of Cramdown, see infra, ARTICLE VII, Confirmation Procedure.

After carefully reviewing the Amended Plan and Amended Disclosure Statement, including the Exhibits, each Person holding a Claim in Classes 4, 5, and 6 should vote by completing the attached Ballot and returning the Ballot in the envelope provided. If you have a Claim or Interest in more than one such Voting Class, you should obtain a separate Ballot for each Claim or Interest and vote on each Claim or Interest separately.

**TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED AND RECEIVED BY 5:00 P.M. EASTERN STANDARD TIME ON _____. ANY BALLOT RECEIVED WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE AMENDED PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE AMENDED PLAN WILL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE AMENDED PLAN. BALLOTS SUBMITTED BY TELECOPIER WILL NOT BE ACCEPTED. ONLY ORIGINALLY SIGNED BALLOTS WILL BE COUNTED. THE BALLOT FOR ACCEPTANCE OR REJECTION OF THE AMENDED PLAN IS ATTACHED HERETO AS EXHIBIT B.**

Subject to the next sentence, please complete and sign your Ballot and return it in the

enclosed pre-addressed envelope to:

> Patricia A. Celano, Esq.
> McCarter & English, LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, New Jersey 07102

If you have any questions about the procedure for voting, or if you did not receive a

Ballot, or if you received a damaged Ballot or have lost your Ballot, please call (973) 622-4444,

attention:  Patricia A. Celano, Esq. between 9 a.m. and 5 p.m., EST.

**C.**    **CONFIRMATION HEARING**

The Bankruptcy Court has scheduled the Confirmation Hearing for the Amended Plan for

_____ at __ o'clock in the __ noon, before the Honorable Rosemary Gambardella, C.J.

U.S.B.C., at the United States Bankruptcy Court, M.L. King, Jr. Federal Bldg & Courthouse, 50

Walnut Street, Newark, New Jersey 07102.  Your attendance is welcomed but not required

unless you object to confirmation of the Amended Plan.  The Bankruptcy Court has directed that

objections, if any, to confirmation of the Amended Plan be filed with the Bankruptcy Court and

served upon each of the following so that it is received by them on or before 4:00 P.M. on or

before _____ :

> Patricia A. Celano, Esq.
> McCarter & English, LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, New Jersey 07102
>
> Robert K. Malone, Esq.
> Drinker Biddle & Shanley LLP
> 500 Campus Drive
> Florham Park, New Jersey  07932

Donald McMaster, Esq.
Office of the United States Trustee
United States Department of Justice
One Newark Center
Suite 2100
Newark, New Jersey 07102

Alan W. Kornberg, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, New York 10019-6064

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without

further notice except for the announcement of the adjournment date made at the Confirmation

Hearing or at any subsequently adjourned Confirmation Hearing.

## ARTICLE I

A.    <u>HISTORY OF THE DEBTOR – PREPETITION</u>

The Debtor commenced operations in Haskell, New Jersey in 1956 under the name
National Beryllia.  It subsequently changed its name to General Ceramics, Inc.  The Debtor was
engaged in designing, developing and manufacturing various ceramic products in metal packages
used by manufacturers in the electronics, telecommunications, electrical and aerospace
industries.  The Debtor was consistently a pioneer in the development of ceramic technology,
particularly high purity Beryllia products.  Beryllia is an important technical material because of
its outstanding ability to transmit or conduct heat while remaining a virtually perfect electrical
insulator.

The Debtor's stock was publicly traded until 1989 when Tokuyama Corporation (the
"Parent") acquired the stock for approximately $60,000,000.  The Debtor operated out of two
facilities, both of which it owned.  The Haskell, New Jersey facility (the "New Jersey Site")
housed the Beryllia production operations as well as its related technology, customer service and
other administrative functions.  It consisted of two buildings (each partially two stories) with a
total of 81,665 square feet of floor space on 2.7 acres of land in the rural town of Haskell (which
is approximately 25 miles north of Newark).  The plant was built in 1956 and was well
maintained.  However, for eleven years the Debtor had remediated the New Jersey Site pursuant
to a proceeding under the Environmental Cleanup Responsibility Act and then the Industrial Site
Recovery Act ("ISRA"). The Debtor's compliance with ISRA included an extensive, site-wide
groundwater quality assessment which included twenty-one (21) groundwater monitoring wells
at the New Jersey Site.

6

The Anaheim, California facility (the "California Site") produced all of the Debtor's non-Beryllia products. In addition to housing the ceramic/metal manufacturing and technical staff, Anaheim also served as a location for sales, customer service, accounting and other administrative functions. Located on 3.2 acres in an industrial area of Anaheim, the plant consisted of two single story buildings totaling 53,708 sq. ft. The property was purchased in 1984. The buildings were built in 1964 and 1972, respectively.

During calendar year 1998, the Debtor had a total of 189 employees. The Haskell Plant employed approximately 97 individuals. Approximately 76 employees were located at the Anaheim operation. Sixteen corporate staff personnel were located between the two facilities. The production workers at Haskell were unionized. All other employees were non-unionized. The Debtor's customer base included approximately 100 customers in the commercial sector as well as most of the major defense-related contractors. Haskell and Anaheim generally had different customers, but approximately 80% to 90% of their respective sales in a given year were attributable to their top 20 customers.

The Debtor had sales of $25,000,000 for the twelve months ending June 30, 1989. The Debtor's subsequent efforts to obtain industry acceptance of Beryllia substitutes met with limited success due to technological difficulties and cost disadvantages causing the Debtor to incur significant expenses and negatively affecting sales. In addition, dramatic reductions in United States defense spending in the early 1990's had a negative impact on the business. Prior to 1989, approximately 60% of the Debtor's $25,000,000 in total sales were defense related. By 1997, defense related sales were down to 28% of total sales (an $11.5 million reduction from 1989 levels) which primarily accounted for the decrease in annual sales, which totaled just $14,000,000 in 1997.

The reduction in sales and increase in expenses created a need for borrowings from the Parent. As of the March 26, 1999 commencement date of these bankruptcy proceedings, the Parent had loaned the Debtor approximately $14,118,108 on an unsecured basis. Without such funding, the Debtor would have been unable to operate. As indicated in the Amended Plan, the Parent will subordinate this claim for repayment of these loans to claims of other creditors. The Sanwa Bank Limited ("Sanwa Bank") also loaned the Debtor prior to the petition date approximately $11,300,000 on an unsecured basis. The Parent guaranteed the Debtor's repayment of the loan to Sanwa Bank and based on its obligation under its guaranty, the Parent repaid the Debtor's loan to Sanwa Bank after the petition date. As described below and as indicated in the Amended Plan, the Parent has agreed to subordinate its claim arising from its payment to Sanwa Bank to the claims of other creditors (except interest) under a settlement reached with the Debtor. As indicated in the Amended Plan and herein, the Debtor anticipates that unsecured creditors will be paid in full, but without interest, within ten (10) calendar days following the Effective Date.

Faced with substantial, continuing losses, the Debtor attempted to sell its business. In 1998 an Offering Memorandum was prepared and was widely distributed. Despite the efforts of the Debtor and its business broker, a transaction could not be structured.

In early 1998, the Debtor became aware that it could be named a defendant in litigation to be commenced by the United States Environmental Protection Agency (the "EPA") seeking reimbursement for clean up costs at the Boarhead Farms, Bucks County, Pennsylvania Superfund Site. The EPA would allege that product shipped from the Haskell Plant was environmentally sensitive and the Debtor should be held liable for clean up costs at the site. Although no litigation had been commenced as of the petition date, it appeared probable. The Debtor disputes liability.

There are approximately six (6) companies (collectively, the "Potentially Responsible Parties" or the "PRPs"), including the Debtor, that the Debtor was informed were to be named as defendants in the contemplated litigation by the EPA to recover clean up costs. Clean up costs were estimated by the EPA at $30,000,000, and under federal environmental law, the Debtor and the Potentially Responsible Parties could be jointly and severally liable for these costs. Although the EPA had not specifically quantified the claim that would be made directly against the Debtor prior to the petition date, the Debtor assumed that such claim would be substantial.[1]

Recognizing that it had funded substantial sums of money to the Debtor, with the prospects of a continuation of weak sales and the prospect of multi-million dollar environmental litigation against the Debtor, the Parent notified the Debtor by letter dated March 3, 1999, that it would no longer advance funds for use in the Debtor's operations. On March 22, 1999, the Debtor notified the employees at its California Site in accordance with 29 U.S.C. §2101 et seq. (the Worker Adjustment and Restraining Notification Act ("WARN Act")) that, effective upon the close of business, Friday, March 22, 1999, the California Site would be permanently closed, all production ceased, and all employees subject to immediate layoff. The Debtor terminated most manufacturing and fabrication operations at the California Site on or about March 22, 1999. On March 22, 1999, the Debtor also notified the employees at its New Jersey Site in accordance with the WARN Act that effective upon the close of business, Tuesday, March 23, 1999, the New Jersey Site would be permanently closed, all production ceased, and all employees subject to immediate layoff. The Debtor terminated most manufacturing and fabrication operations at the Haskell Facility on or about March 23, 1999.

---

[1] In fact, on or about September 3, 1999, the United States, on behalf of the EPA, filed a proof of claim (the "EPA Claim") against the estate for at least $27,142,442 for purported unreimbursed environmental response costs incurred and to be incurred by the United States at the Boarhead Farms Superfund Site. See infra, ARTICLE I, B. History of the Debtor-Postpetition, vi. Pending Settlements of Claims Filed Against the Estate.

Faced with a projected critical depletion in cash as a result of the Parent's decision not to advance further funds, the Debtor had no alternative but to commence these proceedings and attempt to achieve an orderly liquidation.

**B.    HISTORY OF THE DEBTOR - POSTPETITION**

i.    The Raytheon Agreement

The Debtor terminated most employees at both the California and New Jersey Sites on or about March 31, 1999. However, on April 7, 1999, the Debtor and Raytheon Company ("Raytheon") executed, and the Bankruptcy Court approved, a Management Agreement (the "Raytheon Agreement") whereby the Debtor granted to Raytheon the right to manage the California Site to manufacture Raytheon Product, as that term is defined in the Raytheon Agreement, for an initial period of up to four (4) months commencing on April 8, 1999 and terminating on August 6, 1999, with a conditional option to manage the California Site for an additional two (2) months. Pursuant to the Raytheon Agreement, the Debtor recalled many of its employees at the California Site to work to manufacture Raytheon Product.  Beginning on April 8, 1999, Raytheon was required to pay a monthly management fee of $163,500, any and all payroll and benefits expenses of the Debtor's employees and the direct operating costs of the Debtor, including property taxes and insurance costs.  Pursuant to the Raytheon Agreement, the Debtor retained the right to cancel Raytheon's two month option to manage the California Site if the parties failed to enter into a letter of intent to sell and purchase the California Site on or before July 8, 1999.  Although a letter of intent was not executed between the Debtor and Raytheon, Raytheon managed the California Site until October 8, 1999 when the California Site was permanently closed, all production halted, and most employees terminated.

ii.    Sale of the California Site

Despite its unsuccessful efforts prepetition to sell its business, immediately after the filing of its bankruptcy petition and concurrent with the term of the Raytheon Agreement, the Debtor reinitiated the marketing process for the sale of the California and New Jersey Sites. The Debtor contacted potential parties in similar businesses and/or parties who had expressed an interest in purchasing the Debtor's assets. Immediate interest was expressed in purchasing the Debtor's assets but only at the California Site. Therefore, in order to maximize the benefit to the estate, the Debtor concentrated first on selling the assets at the California Site. At least twenty (20) interested parties entered into confidentiality agreements with the Debtor and received detailed information packages.

Thereafter, the Debtor received offers from $2,500,000 to $3,500,000. After comprehensive review and negotiations by the Debtor, the Debtor concluded that a bid submitted by General Ceramics, LLC ("Aero") was the highest and best offer because all other offers were for significantly less money and/or contained financial and/or environmental due diligence contingencies. Aero sought to purchase all of the Debtor's assets (the "California Assets") used or held for use at, or related to the California Site, for $3,500,000 (the "California Purchase Price"), as set forth more fully in the Asset Purchase Agreement for the California Assets.

On November 12, 1999, the Court entered a Consent Order approving bidding procedures, setting dates for filing of competing bids, if any, and objections thereto and setting a hearing on November 30, 1999 to consider higher and better offers and to approve the sale to Aero pursuant to 11 U.S.C. §363. Although substantial interest in the purchase of the California Assets was generated, no competing bids were submitted. On November 30, 1999, the Court entered an Order (the "California Sale Order") approving the sale of the California Assets to

Aero. The Parent asserted an ownership interest in certain equipment (the "Equipment") sold to Aero. Pursuant to the California Sale Order, the Parent waived any ownership interest in the equipment as against Aero, and the Debtor escrowed $60,000 (the "Equipment Escrow") of the California Purchase Price pending resolution between the Debtor and the Parent of ownership of the Equipment. On December 10, 1999, the Debtor sold the California Assets to Aero. The Debtor and the Parent have since agreed, as part of a total settlement, that Tokuyama owned the Equipment, and the Debtor will release the Equipment Escrow to the Parent as provided herein.

      iii.    <u>Sale of the New Jersey Site</u>

While the Debtor's initial sale efforts concentrated on the sale of the California Assets, the Debtor retained TC Northeast Metro, Inc. ("TC") as Real Estate Broker for the sale of its New Jersey Site. On November 29, 1999, the Court authorized the retention of TC. Realizing the importance of preventing a diminution in the value of estate assets, the Debtor, through TC, encouraged and sought inquiries from various potential purchasers. Between December 1, 1999 and June 15, 2000, TC maximized the market exposure of the New Jersey Site by forwarding notice that the New Jersey Site was available for sale to over 1,000 commercial brokers in the New York City Region, buyers of environmentally contaminated property and major buyers of and investors in commercial real estate.

In addition to the efforts of TC, the Debtor itself communicated with other potential purchasers of the Assets. However, unlike its California Site, the sale of the New Jersey Site did not generate a high level of interest from many interested parties because of the ongoing ISRA proceeding and any potential additional remediation costs. The Debtor's environmental consultant estimated further remediation costs at $199,000 over a two year period. Moreover, the Debtor had recorded a Deed Notice on February 28, 2000 with respect to soil contamination beneath one of the buildings at the New Jersey Site. This Deed Notice ran with title to the real

property, which decreased the Debtor's chances of selling the New Jersey Site. With respect to

the equipment and beryllium materials at the New Jersey Site, the Debtor had also obtained one

estimate of $193,000 to decontaminate the equipment, package chemicals at the New Jersey Site

and to dispose of beryllium-based decontamination materials and air debris.

Although some parties had expressed some interest in purchasing the equipment, none

had provided the Debtor with a written offer for same and none had provided an offer to the

Debtor for the purchase of the equipment and the real property. Thus, if the Debtor were to

accept an offer to purchase assets which excluded the real estate, the estate would remain saddled

with the environmental remediation costs and liabilities.

Despite TC's exhaustive efforts, the Debtor received only one written letter of intent (the

"Letter of Intent") and an offer (the "Haskell Properties Offer") to purchase all of the Debtor's

assets (the "New Jersey Assets") used, or held for use at, or related to the New Jersey Site, for

$400,000 (the "New Jersey Purchase Price"), from Haskell Properties, LLC ("Haskell

Properties") as set forth more fully in the Asset Purchase Agreement (the "New Jersey Asset

Purchase Agreement") for the New Jersey Assets. The Letter of Intent expressly excluded any

environmental liabilities. Moreover, the Letter of Intent also provided that the Debtor would be

responsible for any and all start-up costs at the New Jersey Site.

The Haskell Properties Offer represented the highest and best offer. The Haskell

Properties Offer provided for a cash payment in the sum of $400,000 for the New Jersey Assets.

More importantly, Haskell Properties assumed and will indemnify the Debtor from

environmental liabilities at the New Jersey Site, and any losses for which the Debtor is or may be

liable relating to any environmental liabilities, including any obligation of the Debtor to comply

with ISRA, thereby eliminating any further expenses incurred by the Debtor for remediation in

compliance with ISRA. Because of the remediation costs and the potential unknown costs and

liabilities to the Debtor from the New Jersey Site, the value to the estate of the assumption of

liabilities and the indemnification by Haskell Properties alone was significant.  Despite the

assumption and indemnification by Haskell Properties of the environmental liabilities, the Debtor

is  primarily liable under ISRA.

On June 29, 2000, the Court entered a Consent Order approving bidding procedures,

setting a hearing on July 20, 2000 to consider higher and better offers and to approve the sale of

certain assets of the estate and setting dates for filing of competing bids, if any, and objections

thereto pursuant to 11 U.S.C. §363.  No competing bids were submitted.  On July 20, 2000, the

Court approved the sale of the New Jersey Assets to Haskell Properties.  On October 3, 2000,

the Debtor sold the New Jersey Assets to Haskell Properties.

As set forth more fully in §7.21 of the New Jersey Asset Purchase Agreement,

McCarter & English, LLP as escrow agent (the "Escrow Agent") will hold in escrow (the

"Escrow Fund") the New Jersey Purchase Price, as adjusted pursuant to §2.4 of the New Jersey

Asset Purchase Agreement, for thirteen (13) months (the "Escrow Period") from October 3, 2000

to November 3, 2001.  The Escrow Fund is divided into two separate escrow accounts: the

Cleanup Costs Account and the ISRA Costs Account.  The Escrow Agent placed 57.5% or

$228,911.55 of the Escrow Fund into the Cleanup Costs Account and 42.5% or $169,195.50 of

the Escrow Fund into the ISRA Costs Account.  These funds are invested in short term

certificates of deposit.

Upon presentation of proper documentation to the Escrow Agent, the Escrow Agent shall

pay to Haskell Properties from the Cleanup Costs Account certain reasonable expenses

exceeding $230,000 and paid by Haskell Properties for cleanup, treatment or removal of any

beryllium dust or residue from the equipment located at the New Jersey Site or the actual

removal of the equipment from the New Jersey Site or expenses incurred for cleanup, treatment

or removal of any beryllium dust or residue from the ductwork or any ventilation or heating system of the buildings at the New Jersey Site. Similarly, upon presentation of proper documentation to the Escrow Agent, the Escrow Agent shall pay to Haskell Properties from the ISRA Costs Account certain reasonable expenses exceeding $170,000 and paid by Haskell Properties to satisfy certain obligations of Haskell Properties as more defined in Sections 4.1.2 and 4.1.4 of the New Jersey Asset Purchase Agreement.

At the time of the filing of the Amended Plan and Amended Disclosure Statement, Haskell Properties has not demanded any payments from the Escrow Agent from either the ISRA or Cleanup Costs Accounts. Pursuant to the Amended Plan, at the end of the Escrow Period, the Debtor will remit to the Parent any remaining funds in the Escrow Fund.

     iv.    Pending Litigation

On October 7, 1999, the Debtor commenced adversary proceedings against American Laser Corporation, Laser Physics, Inc., and McMahan Lasers Corporation bearing Adversary Proceeding Nos. 99-3957, 99-3958 and 99-3959, respectively, for sums owed to the Debtor for product shipped by the Debtor. The Debtor settled with American Laser Corporation for payment of $132,000 which the Debtor has received. In its complaint against Laser Physics, the Debtor asserted that Laser Physics owed the Debtor $52,900.63. Laser Physics, Inc. filed an Answer to the Debtor's Complaint disputing any debt to the Debtor. McMahan Lasers Corporation failed to file an answer to the Debtor's Complaint. On February 23, 2000, the Debtor obtained a default judgment against McMahan Lasers Corporation in the amount of $70,822.96. Assuming all other creditors are paid in full on their allowed claims, the Debtor will assign any rights, title and interest the Debtor may have under the McMahan adversary proceeding (the "Laser Company Lawsuit") to the Parent.

v.    Employment Agreement between General Ceramics, Inc. and Krishna Agnihotri

On April 29, 1993, the Debtor and Krishna Agnihotri executed an Employment Agreement (the "Employment Agreement"). Mr. Agnihotri is a member of the Board of Directors and the Executive Vice President of the Debtor. The Employment Agreement provides for a term of one year commencing June 30, 1993 until Midnight on June 30, 1994 with successive one year extensions unless the Debtor terminates the Employment Agreement.

On October 3, 1994, the Debtor and Mr. Agnihotri executed an Amendment to the Employment Agreement (the "Amendment") which provides, among other things, that the Debtor was to provide notice of termination to Mr. Agnihotri by April 30 if the Debtor declines to extend the Employment Agreement for another one (1) year term. The Amendment also permits the Debtor to terminate the Employment Agreement without cause at any time on sixty (60) days notice. If the Debtor terminates the Employment Agreement without cause, the Employment Agreement states that Mr. Agnihotri is entitled to severance of his base salary for twelve (12) months following termination.

At present, the Debtor intends to reject the Employment Agreement by terminating the Employment Agreement without cause effective as of the date of the entry of the Confirmation Order.[2] Thus, under the Employment Agreement, Mr. Agnihotri may have an administrative claim for severance for twelve (12) months. As of June, 2000, in an effort to minimize costs to the estate, Mr. Agnihotri voluntarily reduced his weekly work hours from forty (40) hours to twenty-four (24) hours and his yearly salary from $156,000 to $93,600. The Debtor intends to use $156,000 as Mr. Agnihotri's base salary under the Employment Agreement. Because the Amended Plan already provides for payment in full (without interest) on Allowed Unsecured

---

[2] See infra, Article VI.

Claims, the Debtor's decision should not affect the Debtor's proposed <u>pro rata</u> distribution under the Amended Plan.

vi.     <u>Pending Settlements of Claims Filed Against the Estate</u>

(a)     The EPA Claim

The Debtor and the EPA have settled the EPA Claim of $27,142,442. The EPA will be provided an allowed claim of $275,000 which will be paid in full on the Effective Date. The Debtor and the EPA are in the process of finalizing their settlement agreement (the "EPA Settlement Agreement"). The EPA Settlement Agreement also requires the subordination of any claims of the Parent to payment to all other unsecured creditors and affords protection to the Debtor from claims or actions for contribution as provided by the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") Section 113(f)(2), 42 U.S.C. §9613(f)(2) for response costs incurred and to be incurred by the United States and by any private party at the Boarhead Farms Superfund Site. The EPA Settlement Agreement is conditioned upon the Parent's agreement to subordinate its claims against the Debtor in accordance with the Amended Plan. As described below, the Parent's agreement to subordinate is conditioned on Court approval of the EPA Settlement Agreement and confirmation of the Amended Plan. If the EPA Settlement Agreement is not approved by the Court, it is likely that the Parent will not subordinate its claims aggregating $25,000,000. Because of the size of the EPA Claim and the Parent's claims, if the EPA Claim is not settled, the Debtor will be unable to confirm a plan and make a distribution to creditors and the case will be converted.

On May 14, 2001, the Debtor filed the EPA Settlement Agreement with the Court. In accordance with Paragraph 11 of the EPA Settlement Agreement, the Debtor requested in its May 14, 2001 filing letter that the Court not approve and enter the EPA Settlement Agreement. Rather, prior to seeking Court approval, notice of the filing of the EPA Settlement Agreement

17

will be published by the United States Department of Justice in the <u>Federal Register</u>, following

which the Department of Justice will receive public comments on the EPA Settlement

Agreement for a seventeen (17) day period. Pursuant to 28 C.F.R. §50.7, the comment period is

necessary prior to approval of the EPA Settlement Agreement by the Court. Accordingly, at the

conclusion of the comment period, the Debtor intends to request that the Court to approve and

enter the EPA Settlement Agreement.

(b)   The PRP Claims

The PRPs filed contingent claims (the "PRP Claims") against the Debtor aggregating

$135,734,000 and seeking contribution with respect to the response costs at Boarhead Farms. On

August 8, 2000, counsel to the Official Committee of Unsecured Creditors filed a Motion (the

"PRP Motion") to expunge the PRP Claims. The PRP Motion is returnable July 17, 2001. By

letter dated January 3, 2001, the PRPs offered to withdraw the PRP Claims in exchange for an

assignment from the Debtor to the PRPs of insurance proceeds, if any, to which the Debtor may

be entitled for Superfund liability. If the parties are unable to finalize a settlement with the

PRPs, the Official Committee of Unsecured Creditors will prosecute the PRP Motion.

(c)   The Claims of the Tennessee Plaintiffs

On or about September 3, 1999, seventeen (17) individuals (collectively, the "Tennessee

Plaintiffs") filed unsecured and unliquidated claims against the estate aggregating $49,000,000

for alleged damages for injuries from chronic beryllium disease.[3] Prepetition the Tennessee

---

[3] On or about December 3, 2000, the Debtor was sued by plaintiffs Wayne Leach and Joann Leach in the United States District Court for the Eastern District of Tennessee. Similar to the Tennessee Plaintiffs, Plaintiffs alleged damages for injuries from chronic beryllium disease. On May 11, 2001, Wayne Leach and Joann Leach submitted a Notice of Voluntary Dismissal without prejudice pursuant to Federal Rule of Civil Procedure 41. The Debtor and the Leaches are currently negotiating a settlement of any claim the Leaches may possess against the estate. These Plaintiffs are not included in the Tennessee Plaintiffs Settlement Agreement. The Debtor does not anticipate that any such settlement with plaintiffs Wayne Leach and Joann Leach will affect the proposed distribution under the Amended Plan.

Plaintiffs sued the Debtor in the United States District Court for the Eastern District of Tennessee. These claims were settled for an aggregate amount of $200,000 (the "Tennessee Plaintiffs Settlement Sum") and the Tennessee Plaintiffs will be provided an Allowed Claim in the aggregate amount of $200,000. The Debtor will consent to relief from the automatic stay pursuant to 11 U.S.C. §362 of the Bankruptcy Code to permit the Tennessee Plaintiffs to pursue their claims against the Debtor in the United States District Court for the Eastern District of Tennessee, with recovery limited to any available insurance proceeds. Counsel (the "Tennessee Counsel") representing the Tennessee Plaintiffs is currently preparing a Settlement Agreement (the "Tennessee Plaintiffs Settlement Agreement") which will authorize the Tennessee Counsel to distribute specific sums from the Tennessee Plaintiffs Settlement Sum to each of the Tennessee Plaintiffs.

     (d)    The Claims of the Parent

An integral part of the Debtor's Amended Plan and a condition of the EPA Settlement Agreement is the Parent's agreement (the "Tokuyama Settlement") to the full subordination of its prepetition claims to the Allowed Unsecured Claims (without interest) and the Parent's agreement to assume sponsorship of the General Ceramics, Inc. Pension for Employees as set forth herein infra, in consideration for the Debtor's agreement to grant the Parent the releases set forth in the Amended Plan and described in further detail below.

The Tokuyama Settlement provides the Debtor and its creditors with direct benefits. If the Parent were not to subordinate its claims aggregating over $25,000,000, the Debtor's other general unsecured creditors would likely receive little to no recovery under the Debtor's Amended Plan because: (i) the relative size of the Parent's claims and its corresponding pro rata distribution would consume a large portion of the Debtor's estate reducing the amount available for distribution to other holders of allowed claims, (ii) the Debtor's estate and its creditors could

not realize the substantial benefits to be gained under the EPA Settlement Agreement given that

such agreement is contingent on the Parent's agreement to subordinate its claims under the

Amended Plan; and (iii) the Debtor could remain responsible for sponsorship of the General

Ceramics, Inc. Pension for Employees and for payment to participants thereunder.  As

consideration for agreeing to subordinate under the Tokuyama Settlement, the Parent will receive

certain releases pursuant to the Amended Plan, the assignment of the Debtor's rights in the

Escrow Fund and a pending adversary proceeding, and distribution of the Equipment Escrow.


The Debtor has not yet finalized a settlement with the PRPs and the Court has not yet

heard the PRP Motion, if necessary, and the Debtor has not yet filed its Motion(s) to approve the

Tennessee Plaintiffs Settlement Agreement.  However, the Debtor did not want to delay the

filing of its Amended Disclosure Statement and Amended Plan pending Court approval of these

settlement agreement or Court disposition of the PRP Motion.

     vii.    The Claim of The Pension Benefit Guaranty Corporation

The Debtor is the contributing sponsor of the "General Ceramics, Inc. Pension Plan for

Employees" (the "Pension Plan").  The Pension Benefit Guaranty Corporation ("PBGC") is a

wholly-owned United States Government corporation created under Title IV of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1301-1461.  The

PBGC administers the mandatory pension plan termination insurance program established under

Title IV of ERISA.  On or about August 20, 1999, the PBGC filed a claim (the "PBGC Claim")

against the estate for $543,500.  The PBGC Claim was based on the assumption that upon the

termination of the Pension Plan, the Pension Plan assets would be insufficient to satisfy the

Pension Plan's benefits payable to participants and beneficiaries on the termination date.  The

PBGC Claim is an estimate of any shortfall in the assets of the Pension Plan available to pay benefit claims.

By letter dated August 29, 2000 (the "PBGC Letter "), the Parent informed the PBGC that it would assume sponsorship of the Pension Plan and agree to continue to maintain and fund the Pension Plan on an ongoing basis as a "frozen plan." According to the PBGC Letter, the Parent would not immediately contribute any amounts necessary to fund the Pension Plan's benefit liabilities on a termination basis. If the Parent assumes the sponsorship of the Pension Plan, the Debtor's responsibility for any "shortfall" of the assets of the Pension Plan would be eliminated. However, the Parent's assumption of the sponsorship is subject to the execution of certain agreements by the Debtor, the Parent, and/or the PBGC, confirmation of the Amended Plan, and obtaining any necessary governmental approvals. The Debtor has filed a Motion, returnable on June 4, 2001, seeking an Order authorizing the transfer of sponsorship and administration of the Debtor's Pension Plan to the Parent. As of the filing of this Amended Disclosure Statement and the Debtor's Amended Plan, neither the Debtor nor the Parent have obtained any necessary approvals with respect to such transfer. The classifications of claims and distributions of funds discussed herein are conditioned on the transfer of the sponsorship of the Pension Plan to the Parent and that the PBGC will withdraw its claim against the estate. If the PBGC does not withdraw its claim, the Debtor will seek Court approval to disallow its claim.

viii.    The Claims of the Supplemental Savings Plan Participants

Seven employees of the Debtor participated in a Supplemental Savings Plan of the Debtor. Participation in the Supplemental Savings Plan of the Debtor was in addition to participation in the Debtor's 401-K plan. These participants filed claims aggregating approximately $460,687 against the estate. The Debtor will allow these claims in full and pay

these claims on a <u>pro rata</u> basis with the Allowed Unsecured Claims until their claims are satisfied in full without interest. This treatment assumes Court approval of the EPA Settlement.

ix.    <u>Pay to Stay Bonuses</u>

On July 20, 1999, the Court approved a Consent Order (the "Pay to Stay Consent Order") between the Debtor and the Official Committee of Unsecured Creditors authorizing the Debtor to pay stay bonuses to certain employees. In accordance with the Pay to Stay Consent Order, the Debtor paid some of these bonuses, and the Debtor will pay the remaining bonuses only after unsecured trade creditors and wage claimants are paid 100% on their allowed claims. The remaining bonuses to be paid total approximately $138,000.

x.    <u>Preferential and Fraudulent Transfers</u>

Upon information and belief, there were no fraudulent transfers, and to the extent any payments were made by the Debtor within the ninety (90) days before the Debtor filed its bankruptcy petition, any such payments were made in the ordinary course of business.

## ARTICLE II

## SUMMARY OF THE AMENDED PLAN

Set forth in this Article is a description of the basic terms of the Amended Plan. This description is not intended, nor should it be relied upon, to substitute for a careful review of the actual terms of the Amended Plan, which is attached hereto as Exhibit A. The Amended Plan contemplates and is predicated on subordination of any claim of the Parent, Court approval of any settlement with the PRPs or the expungement of the PRP Claims, Court approval of the Tennessee Plaintiffs and EPA Settlement Agreements, the assumption by the Parent of sponsorship of the Pension Plan, and the withdrawal or disallowance of the PBGC Claim. After payment to Priority Creditors, the EPA, and the Tennessee Plaintiffs, with the exception of the Parent, the Debtor expects that all other creditors will be paid within ten (10) days after the Effective Date on a pro rata basis until their Allowed Claims are satisfied in full without interest. If the Debtor is unable to finalize a settlement with the PRPs and the PRP Claims are not voluntarily withdrawn by the PRPs or expunged by the Court and the PRP Claims are allowed in full, the payment to the remaining creditors will be significantly less. If the PRP Claims are not expunged or withdrawn, other creditors will be paid approximately only 2.9% on their claims.

The Bankruptcy Court established September 7, 1999 as the deadline for filing claims against the Debtor (the "Bar Date"). With the exception of any claims pursuant to Bankruptcy Rule 3005(a) and as set forth in Article III, infra, any Creditor that failed to file a Proof of Claim by the Bar Date shall be precluded from receiving any funds from the bankruptcy estate.