**Exhibit 9 to Statement of Undisputed Facts Filed in Support of Motion of American Beryllia, Inc. For Summary Judgment**

**CERTIFIED COPY OF ORDER (A) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE ESTATE TO HASKELL PROPERTIES, LLC FREE AND CLEAR OF ALL LIENS, ENCUMBRANCES, CLAIMS AND ADVERSE INTERESTS AND (B) APPROVING THE ASSET PURCHASE AGREEMENT AND EXHIBITS**

IT IS THE DIRECTION OF THIS COURT THAT THE
SUCCESSFUL PARTY SERVE A FILED COPY OF THIS
ORDER UPON ALL PARTIES TO THIS ACTION.



McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for General Ceramics, Inc.

I hereby certify that the foregoing
is a true copy of the original on
file in my office as of the Clerk of
the United States Bankruptcy Court.
RWH 2031                              Deputy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| General Ceramics, Inc., | : | Case No. 99-33403 (RG) |
| Debtor. | : | Hon. Rosemary Gambardella |
|  | : | Hearing Date:  July 20, 2000<br>at 2:00 P.M. |
|  | X | Oral Argument Requested |

## ORDER (A) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE ESTATE TO HASKELL PROPERTIES, LLC FREE AND CLEAR OF ALL LIENS, ENCUMBRANCES, CLAIMS AND ADVERSE INTERESTS AND (B) APPROVING THE ASSET PURCHASE AGREEMENT

**THIS MATTER** having been opened to the Court by Application of General

Ceramics, Inc. (the "Debtor"), by and through its counsel, McCarter & English, LLP, for entry of

an Order:  (i) authorizing and approving an Asset Purchase Agreement dated June 28, 2000 (the

"Asset Purchase Agreement") between the Debtor and Haskell Properties, LLC ("Haskell

Properties" or the "Purchaser") and (ii) authorizing the sale of certain assets (the "Assets") of the

estate as identified in the Asset Purchase Agreement, free and clear of all liens, claims,

encumbrances and other interests, pursuant to and in compliance with Sections 105 and 363 of

Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); and the Purchaser

having presented a bid (the "Bid") to the Debtor; and the Purchaser desiring to purchase the

Assets pursuant to and in compliance with the terms and provisions of the Asset Purchase

Agreement; and the Purchaser having the authorization to execute, deliver, observe and perform

under the Asset Purchase Agreement; and the substantially final form of the Asset Purchase

Agreement having been filed with the Court as Exhibit "A" to the Application for Entry of an

Order Authorizing the Sale of Assets of the Estate to Haskell Properties Pursuant to 11 U.S.C.

§363(b) and (f); and the Court having conducted the final hearing relating to the Bid on July 20,

2000; and the Court having considered the Bid on the record, the statements of counsel, the

evidence presented, any objections interposed, the pleadings, and the record in this proceeding;

the Court hereby makes the following findings of fact and conclusions of law pursuant to

Rule 7052, made applicable to this proceeding pursuant to Rule 9014, and, pursuant thereto,

enters the Order set forth below.

## Findings of Fact

1.      On March 26, 1999 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the District of New Jersey.

2.      The Debtor proposes the enter into the Asset Purchase Agreement

substantially in the form attached hereto as Exhibit "A." The Asset Purchase Agreement

provides, among other things, that Haskell Properties, LLC shall purchase the Assets for the

purchase price calculated as set forth in the Asset Purchase Agreement.

3.      On July 5, 2000, the Court entered a Consent Order (1) Approving

Bidding Procedures; (2) Setting Hearing to Consider Higher and Better Offers, if any, and to

Approve the Sale of Certain Assets of the Estate; and (3) Setting Dates for Filing of Competing Bids, if any, and Objections Thereto. The Consent Order Approving Bidding Procedures was served on the Office of the United States Trustee, the Creditors' Committee and certain other parties, including all persons who have requested notice in this case, and a Notice of Motion of Sale in the form prescribed by the Court was served on all of the foregoing parties, as well as all creditors identified in the lists of creditors filed with the Court by the Debtor, individually or through their respective counsel. In addition, Notice of Motion of Sale was published in the Star Ledger and Electronic News on July 10, 2000.

4.      The Debtor is a good faith seller and the Purchaser a good faith purchaser of the Assets within the meaning of the Bankruptcy Code and the Debtor and the Purchaser are entitled to the protections afforded by Section 363(m) of the Bankruptcy Code. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement or any transfer, assignment or conveyance thereunder to be avoided under §363(n) of the Bankruptcy Code.

5.      Approval by the Court of the Asset Purchase Agreement and consummation of the sale of the Assets contemplated thereby is in the best interest of the Estate. The Debtor has articulated sound and sufficient business reasons that justify the sale of the Assets pursuant to Section 363 of the Bankruptcy Code. Those sound and sufficient business reasons are, among others, (a) the Assets are unnecessary to the proposal of a plan of reorganization; (b) the Assets are not generating income for the Estate, and in fact, are forcing the Debtor to incur losses; (c) the Bid and the Asset Purchase Agreement constitute the highest and best bid for the Assets; and (d) sale of the Assets in accordance with the Asset Purchase Agreement is in the best interest of the Debtor's Creditors and the Estate.

6.    All findings of fact made herein or announced by the Court in connection herewith are incorporated by reference herein.

7.    All findings of fact which are later determined to be conclusions of law shall be deemed to be conclusions of law.

### Conclusions of Law

8.    The Court has jurisdiction over the case and of the Assets of the Debtor and the Estate pursuant to 28 U.S.C. §§ 1334 and 157. The sale of the Estate's assets under Section 363 of the Bankruptcy Code concerns the administration of the Estate and, therefore, is a core proceeding under 28 U.S.C. §157(b)(2)(A), (N) and (O).

9.    Good and sufficient notice of the sale contemplated by the Bid has been given in accordance with the requirements of the Consent Order Approving Bidding Procedures, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of New Jersey, and no other or further notice is required. A reasonable opportunity to object or to be heard regarding the sale of the Assets was afforded to all interested parties.

10.    All requirements of the Bankruptcy Code under Section 363 of the Bankruptcy Code and any other applicable law relating to the sale of the Assets under the provisions of Section 363 of the Bankruptcy Code have been satisfied.

11.    The purchase and sale of the Assets constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any applicable nonbankruptcy laws.

12.    The Asset Purchase Agreement represents the highest or otherwise best offer received for the Assets following the conduct of an open and complete sales process reasonably calculated to yield the highest or otherwise best offer for the Assets.

13.    All conclusions of law made or announced by the Court in connection herewith are incorporated by reference herein.

14.    All conclusions of law that are later determined to be findings of fact shall be deemed to be findings of fact.

**IN ACCORDANCE WITH AND BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW,**

It is on this____20ᵗʰ_____ day of July, 2000

**ORDERED** that:

1.    The purchase and sale of the Assets of the Estate that is contemplated by the Bid and the Asset Purchase Agreement is hereby authorized and approved in all respects.

2.    All objections, responses and requests for continuance concerning the Bid, not otherwise withdrawn, waived or settled, are overruled and denied.

3.    The Debtor shall be deemed to have the legal right and authority to execute and deliver the Asset Purchase Agreement, and all other documents intended to be executed and delivered in connection therewith (the Asset Purchase Agreement together with all documents, instruments, records and papers that are intended to be executed and delivered in connection with the Closing contemplated by the Asset Purchase Agreement are collectively hereinafter referred to as the "Transaction Documents"), and to sell the Assets contemplated by the Asset Purchase Agreement.

4.    The terms and conditions of the Bid are approved in all respects and the purchase and sale of the Assets pursuant to the Asset Purchase Agreement and the other Transaction Documents is hereby authorized and approved pursuant to Sections 363(b) and (f) of the Bankruptcy Code.

5.    The transfer of the Assets by the Debtor to the Purchaser (a) is or will be legal, valid, binding and enforceable, (b) vests or will vest the Purchaser with all right, title and interest of the Debtor and the Estate in, to and under the Assets, free and clear of all liens, encumbrances, claims and interests, pursuant to the Bankruptcy Code.

6.    The Debtor is authorized and directed to execute, deliver, observe and perform the Transaction Documents and to consummate the sale of the Assets to the Purchaser pursuant to the Asset Purchase Agreement, which sale is hereby approved, and to execute such other documents as are necessary or appropriate to carry out the intention of, facilitate the observance and performance of, and implement and consummate the Asset Purchase Agreement.

7.    The Debtor and its officers, directors, managers, agents, representatives and attorneys, and successors and assigns are authorized and hereby directed to carry out all of the provisions of the Asset Purchase Agreement deemed necessary by the Debtor and the other Transaction Documents and to issue, execute, deliver, file and record, as appropriate, the Transaction Documents all without further application to, or order of, the Court or further action by the foregoing persons.

8.    At the closing contemplated by the Asset Purchase Agreement (the "Closing"), all right, title and interest of the Debtor and the Estate in, to and under the Assets shall be immediately vested in the Purchaser, free and clear of all liens, encumbrances, claims and interests of any nature whatsoever.

9.    From and after the Closing Date, Purchaser shall assume, satisfy and discharge all liabilities assumed by Purchaser pursuant to the terms of the Asset Purchase Agreement.

10.    On the date of the Closing, to the extent applicable, any of the Debtor's creditors are authorized and directed to execute and deliver such documents, instruments, records and papers as may be necessary or appropriate to release its liens, encumbrances, claims or interests against the Assets, if any, as such liens, encumbrances, claims and interests may have been filed, recorded or otherwise exist.

11.    This Order shall be binding upon and govern the acts of all persons and entities, including, among others, all filing agents, recorders, filing officers, registers, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law, the duties of their office, contract or otherwise to accept, file, register or otherwise record or release any documents, instruments, records or papers.

12.    Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents, instruments, records and papers necessary or appropriate to consummate the transactions contemplated by the Transaction Documents.  The sale of the Assets to Purchaser will maximize the value of the Debtor's Estate and is in contemplation of the implementation of a plan of reorganization and necessary to the confirmation and consummation of any plan of reorganization.

13.    The Transaction Documents shall be binding upon and inure to the benefit of the Debtor, the Creditors' Committee, the Purchaser, and their respective successors and assigns.

14.    The Transaction Documents, including the Asset Purchase Agreement, may be modified, amended or otherwise changed by agreement between the Debtor and the Purchaser without further action of the Court so long as any such modification, amendment or other change is not materially adverse to the Estate or is in the furtherance and consistent with the spirit and intent of this Order.

15.    All of the provisions of this Order are non-severable and mutually dependent.

16.    This Order shall be effective and enforceable immediately upon entry hereof, and shall continue to be valid, binding and enforceable notwithstanding the dismissal, conversion or closing of this case.

17.    The Court shall retain exclusive jurisdiction to interpret and enforce and provisions of the Asset Purchase Agreement, the Transaction Documents and this Order.

_____
HONORABLE ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE

8

**Exhibit A to Certified Copy of Order (A) Authorizing the Sale of Certain Assets of the Estate to Haskell Properties, LLC Free and Clear of All Liens, Encumbrances, Claims and Adverse Interests and (B) Approving the Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of May 25, 2000 between Haskell Properties, LLC, a New Jersey limited liability corporation ("Buyer"), and General Ceramics, Inc., a New Jersey corporation ("Seller").

WHEREAS on March 26, 1999 Seller filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey under Case No. 99-33403 (the "Chapter 11 Proceeding"); and

WHEREAS, Seller was in the business of manufacturing beryllia and metalized ceramics for use in micro-electronic packages and insulators for electronics, telecommunications, microwave and electrical industries (the "Business"); and

WHEREAS, the Business was conducted at a site in Wanaque (Haskell), NJ; and

WHEREAS, Buyer wishes to purchase or acquire from Seller and Seller wishes to sell, assign and transfer to Buyer, substantially all of the assets held in connection with, necessary for, or material to the Business located in Wanaque (Haskell), New Jersey, for the purchase price and upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby, the parties hereto agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF THE ASSETS; ASSUMPTION OF LIABILITIES

1.1.   New Jersey Assets.  Subject to and upon the terms and conditions set forth in this Agreement, on the Closing Date, Seller will sell, transfer, convey, assign and deliver to Buyer, and Buyer will purchase or acquire from Seller, all right, title and interest of Seller in and to the assets listed below (collectively, the "New Jersey Assets"):

(a) the real property set forth on Schedule 1.1 hereto (the "New Jersey Site") and all interests of Seller in and related to the buildings, structures, fixtures and improvements thereon and all other appurtenances thereto;

(b) all items of inventory, including, but not limited to, raw materials, work in process and finished products which were used or held for use at, or relate to, the New Jersey Site;

(c) all machinery, equipment, furniture, computers, furnishings, parts, replacement and component parts, tooling, patterns and office and other supplies which were used or held and

**EXHIBIT A**

owned by Seller for use at, or relate to, the New Jersey Site, a schedule of which will be provided to Buyer within five (5) days after execution of this Agreement;

(d) any and all United States and foreign

(i) patents and patent applications and patent disclosures awaiting filing determination; and patentable property, a schedule of which will be provided to Buyer within five (5) days after execution of this Agreement;

(ii) trademarks, service marks, trade names, trade dress, logos, business and product names, slogans, and registrations and applications for registration thereof and copyrightable property or materials;

(iii) copyrights and registrations thereof;

(iv) inventions, processes, designs, formulae, trade secrets, know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications and confidential business information; and

(v) customer, vendor and representative lists;

in each case which were used or held for use at, or relate to, the New Jersey Site.

(e) all of the rights of the Seller under all contracts, leases, commitments and other agreements which are used or held for use at, or relate to, the New Jersey Site, including, but not limited to, confidentiality agreements with respect to the Business, the New Jersey Assets or the New Jersey Liabilities (as hereinafter defined);

(f) to the extent transferable by applicable law, all governmental licenses, permits and approvals which are used or held for use at, or relate to, the New Jersey Site, including all applications therefor; and

(g) all rights in and to products sold by Seller and shipped from or at the direction of the New Jersey Site (including, but not limited to, products hereafter returned or repossessed and unpaid, and Seller's rights of rescission, replevin, reclamation and rights to stoppage in transit).

1.2. _Transfers Free and Clear, etc._ Subject to the terms and conditions hereof, including without limitation Section 4.1.2(b)(iv) hereof, on the Closing Date, the New Jersey Assets shall be transferred or otherwise conveyed to Buyer free and clear of all liabilities, obligations, liens and encumbrances excepting only (i) permitted liens and encumbrances listed on Schedule 1.2 hereof and (ii) items shown as exceptions or exclusions from coverage in Buyer's policy of title insurance for the New Jersey Site.

1.3. _Excluded Assets._ Seller will retain and not transfer, and Buyer will not purchase or acquire, (a) the assets described on Schedule 1.3, or (ii) any assets, properties or business of

Seller of any kind or description, real, personal and mixed, tangible and intangible, that are not described in Section 1.1 (collectively, the "Excluded Assets").

    1.4. <u>Assumption of Environmental Liabilities</u>. Subject to the terms and conditions set forth herein, at the Closing Buyer shall assume and agree to pay, honor and discharge any and all liabilities, obligations and commitments of Seller relating to or arising out of any Environmental Conditions (as such term is defined in Section 4.1.1 hereof) on, at, under or emanating from the New Jersey Site (the "<u>New Jersey Liabilities</u>"). At the Closing, Buyer shall execute and deliver to Seller an assumption agreement relating to the New Jersey Liabilities in a form reasonably satisfactory to Seller. Nothing in this Agreement, however, shall be construed as an assumption by the Buyer of any liability of Seller arising from: (i) workers' compensation claims; (ii) personal injury claims; or (iii) claims arising from the removal of Hazardous Substances by the Seller from the New Jersey Site and transportation and disposal of such substances at a location other than the New Jersey Site. The migration of Hazardous Substances from the New Jersey Site does not constitute an exclusion under clause (iii).

    1.5. <u>Assignment of Contracts</u>. If an attempted assignment of any claim, contract, license, franchise, lease, commitment, sales order, sales contract, supply contract, service agreement, purchase order or purchase commitment (collectively, "<u>Contracts</u>"), without the consent of a third party thereto, would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder, Seller shall nonetheless assign such Contract to Buyer at the Closing, as the case may be , and any loss, liability, damage or expense caused by such attempted assignment shall be the sole responsibility of Buyer, a schedule of which will be provided to Buyer within five (5) days after execution of this Agreement.

ARTICLE II
THE CLOSING

    2.1. <u>Place and Date</u>. The closing of the sale and purchase of the New Jersey Assets shall take place at 10:00 a.m. local time on the first business day after the tenth day after Bankruptcy Court Approval (as hereinafter defined) at the offices of McCarter & English, LLP, Four Gateway Center, 100 Mulberry Street, Newark, NJ 07101, or such other time and place upon which the parties may agree (the "Closing Date").

    2.2. <u>Purchase Price</u>. On the terms and subject to the conditions set forth in this Agreement,

        (a) Buyer agrees to pay or cause to be paid to Seller an aggregate of $400,000 (the "<u>Purchase Price</u>") for and in consideration of the sale, transfer, conveyance, assignment and delivery of the New Jersey Assets to Buyer, payable as follows:

        · (i) on the date hereof, the sum of $40,000 (the "<u>Deposit</u>") in immediately available funds as an installment against the Purchase Price to be held in a segregated interest-bearing trust account at McCarter & English, LLP; and

-3-

(ii) on the Closing Date, the sum of $360,000 in immediately available funds, being the balance of the Purchase Price less any interest accrued on the Deposit.

2.3.  Deliveries at the Closing.  At the Closing, Seller shall deliver to Buyer such deeds, bills of sale, endorsements, consents, assignments and other good and sufficient instruments of conveyance, transfer and assignment as shall be effective to vest in Buyer title to the New Jersey Assets and Business as contemplated by Section 1.1 hereof.  In the case of computer software, if any, included within the New Jersey Assets, delivery shall be made by electronic transmission, and no transfer of disks or other tangible medium in which any such software is recorded shall be necessary to or constitute any part of such delivery or the sale of such software pursuant to this Agreement. At the Closing, Seller shall deliver to Buyer a customary New Jersey form of bargain and sale deed, with covenant against grantor's acts, duly executed by Seller in form for recordation, an affidavit of title, duly executed by Seller, a certified copy of a resolution adopted by the board of directors of Seller authorizing the transaction contemplated by this Agreement, a closing statement showing the applicable closing adjustments, duly executed by Seller and such other documents and instruments as Buyer's title insurance company may reasonably request.  At the Closing, Buyer shall deliver to Seller the balance of the Purchase Price and a closing statement showing the applicable closing adjustments, duly executed by the Buyer.

2.4.  Adjustments.  At the Closing, Seller and Buyer shall adjust for third-party tenant rents and security deposits (if any), real estate taxes and assessments on the New Jersey Site, municipal water and sewer charges, and/or fuel, if any, such adjustments to be calculated as of 11:59 p.m. as of the day immediately preceding the Closing Date.  Any errors or omissions in computing adjustments at the Closing shall be corrected; this Section 2.4 shall survive the Closing.  If required, Seller shall pay the New Jersey realty transfer fee in connection with the conveyance of the New Jersey Site or, alternatively, Buyer shall pay same and deduct that amount from the Seller's gross sales proceeds.  All charges for Buyer's title insurance policy and ALTA/ACSM location survey for the New Jersey Site shall be paid by the Buyer at the Closing. Each party shall bear all other fees, charges and expenses incurred by it, without contribution from the other.

~~2.5. Brokerage.  The parties represent and warrant to each other that they have dealt with~~ TC Northeast Metro, Inc. ("TC") as broker in connection with the transaction contemplated by this Agreement, and that Seller will be responsible for any broker's, finder's or other fee or commission being due or payable to TC.

ARTICLE III
EXCLUSION OF REPRESENTATIONS AND WARRANTIES

3.1. BUYER ACKNOWLEDGES AND AGREES THAT IT IS BUYING THE NEW JERSEY ASSETS "AS IS" AND "WHERE IS."  SELLER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF SELLER OR ANY ENVIRONMENTAL CONDITION OR ANY OF THE NEW JERSEY ASSETS INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE CONDITION,

MECHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE NEW JERSEY ASSETS, AND BUYER EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY.

## ARTICLE IV
### COVENANTS OF BUYER AND SELLER

4.1. <u>Environmental Matters</u>

4.1.1. <u>Definitions</u>. For the purposes of this Agreement, the terms listed below shall have the meanings set forth in this Section 4.1.1.

"<u>ACO</u>" means the Administrative Consent Order dated July 6, 1989 executed by General Ceramics, Inc., National Beryllia, Inc. and the NJDEP in connection with ISRA Case No. 89208 with respect to the New Jersey Site.

"<u>Compliance with ISRA</u>" means, with respect to (i) the ISRA proceeding to be commenced by Buyer pursuant to Section 4.1.2 (a) hereof, and (ii) the ISRA Compliance Proceedings with respect to the New Jersey Site, the receipt of a letter or letters from the NJDEP approving a Negative Declaration (as such term is defined under ISRA), a no further action letter (as such term is defined under ISRA) or other written determination by the NJDEP that such ISRA proceedings with respect to the New Jersey Site have been completed to the satisfaction of the NJDEP.

"<u>Environmental Conditions</u>" means any environmental contamination or pollution or threatened contamination or pollution of, or the Release or threatened Release of Hazardous Substances into, surface soils, subsurface soils, surface water, groundwater, sewage systems, air or land, whether known or unknown and regardless of when such conditions first existed or arose.

"<u>Environmental Laws</u>" means all federal, regional, state, county or local laws, statutes, ordinances, decisional law, rules, regulations, codes, orders, decrees, directives and judgments relating to public health or safety, pollution, damage to or protection of the environment, Environmental Conditions, Releases or threatened Releases of Hazardous Substances into the environment or the use, manufacture, processing, distribution, treatment, storage, generation, disposal, transport or handling of sewage, solid waste or Hazardous Substances, as the same are in effect on the Closing Date, together with any amendments to the same and any new enactments adopted, promulgated or enacted after the Closing Date of this Agreement including, but not limited to, the Federal Water Pollution Control Act, 33 U.S.C. §§ 1231-1387; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6991; the Clean Air Act, 42 U.S.C. §§7401-7642; the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601-9675; the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2629; ISRA; the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 <u>et seq.</u>; the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 <u>et seq.</u>; the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1 <u>et seq.</u>; and the New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1 <u>et seq.</u>; and any and all rules and regulations promulgated thereunder.

"Hazardous Substances" shall mean any pollutants, toxic substances, hazardous wastes or hazardous substances defined in or regulated under any Environmental Law.

"ISRA Compliance Proceedings" mean the administrative proceeding: (i) commenced by Seller with respect to the New Jersey Site under the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 et seq. ("ECRA"), which was amended in 1993 by the enactment of the Industrial Site Recovery Act, L. 1993, c. 139 ("ISRA"), in connection with the sale of the stock of General Ceramics, Inc. to Tokuyama Acquisition Corporation in 1989 (ISRA Case No. 89208), and in connection therewith Seller is in the course of remediating the New Jersey Site pursuant to ISRA; and (ii) commenced by Seller pursuant to ISRA with respect to the New Jersey Site in connection with the cessation of Seller's operations at the New Jersey Site in March 1999 (ISRA Case No. 99178).

"Losses" shall mean all fines, penalties, losses, liabilities, settlements, judgments, fees, costs, damages or expenses (including, without limitation, sampling, monitoring or remediation costs, reasonable attorneys', consultants' and engineering fees and disbursements, costs of suit and interest).

"NJDEP" shall mean the New Jersey Department of Environmental Protection, its divisions, subdivisions and bureaus.

"Release" shall mean any intentional or unintentional release, discharge, spill, leaking, pumping, pouring, emitting, emptying, injection, disposal or dumping into the environment.

4.1.2.  Compliance with ISRA

(a)    With Respect to the Contemplated Transaction.

(i)    Prior to the Closing Date, Buyer shall obtain from the NJDEP and execute a Remediation Agreement ("RA") permitting the consummation of the transactions contemplated by this Agreement.  Buyer shall prepare and file all documents required by the NJDEP to obtain the RA.  Buyer shall be the lead ordered party on the RA.  As reasonably requested by Buyer, Seller shall cooperate with Buyer in the preparation of the documents required to obtain the RA.

(ii)    In connection with the Closing, and subject to Section 4.1.5 hereof, Buyer shall put in place any remediation funding source required by the NJDEP in connection with the RA in form and amount satisfactory to the NJDEP and shall thereafter maintain such remediation funding source as required by ISRA.

(iii)    To the extent necessary to achieve Compliance with ISRA after the Closing Date, Buyer shall take all actions required under the RA or ISRA, including the preparation and filing of any Preliminary Assessment, Site Investigation, Remedial Investigation or Remedial Action Workplan or any other documents or information required by the NJDEP under the RA and the implementation of remedial actions.

(iv)    Buyer shall pay all ISRA Compliance Expenses (as such term is defined in Section 4.1.4 hereof) incurred by Buyer to achieve Compliance with ISRA with respect to the New Jersey Site.

(b)    <u>With Respect to the ISRA Compliance Proceedings</u>.  Upon the Closing, Buyer shall assume, undertake and be solely responsible for, the performance, completion and satisfaction of all requirements of the NJDEP in connection with the ISRA Compliance Proceedings or otherwise necessary to achieve Compliance with ISRA with respect to the New Jersey Site, including without limitation, the following obligations:

(i)    The preparation and submission of all documents, reports, proposals, data, plans and information, including without limitation, any Remedial Investigation ("RI") Workplans or RI Report and any Remedial Action Workplans ("RAW") (as such terms are defined under ISRA) required or approved by the NJDEP;

(ii)    The performance and completion of all investigatory and remedial actions required or approved by the NJDEP with respect to any and all Environmental Conditions on, at, under or emanating from the New Jersey Site;

(iii)    The implementation, installation and maintenance and repair and replacement of any Engineering Controls (as such term is defined under N.J.S.A. 58:10B-1 et seg.) required or approved by the NJDEP;

(iv)    The preparation, execution and proper recording of any document or documents required or approved by the NJDEP restricting the use of the New Jersey Site or any portion thereof or placing of record the existence of elevated concentrations of Hazardous Substances in the soil or groundwater at the New Jersey Site or the existence of an Engineering Control or other non-permanent remedy, including without limitation, any deed notice required or approved by the NJDEP and any documents required or approved by the NJDEP with respect to any Classification Exception Area established by the NJDEP at or in respect of the New Jersey Site in connection with any remedial actions with respect to groundwater.  Without in any way limiting the generality of the foregoing, Buyer consents to the Deed Notice recorded by Seller on February 28, 2000 (a copy of which has been delivered to Buyer) under ISRA Case No. 89208, and the Engineering Control and use restrictions described and included therein, with respect to the soil contamination beneath the Western Building at the New Jersey Site and Buyer hereby agrees to abide by the terms of such Deed Notice.

(v)    Subject to Section 4.1.5 hereof, the posting in a form and amount acceptable to the NJDEP of any remediation funding source and payment of any remediation funding source surcharge required by the NJDEP after the Closing Date to secure Buyer's obligation to achieve Compliance with ISRA or implementation of any RAW required or approved by the NJDEP;

(vi)    The execution of a RA, RA Amendment, Memorandum of Agreement or other document or documents required by the NJDEP to memorialize Buyer's obligation to

undertake and complete the ISRA Compliance Proceedings or to implement any RAW required or approved by the NJDEP; and

(vii)  The payment of any NJDEP oversight fees and costs accrued or incurred on or after the Closing Date.

4.1.3. Effectuate Transfer of ISRA Compliance Proceedings. Prior to the Closing Date, Buyer shall take all actions and execute and deliver to Seller or the NJDEP any documents reasonably requested by Seller or requested or required by the NJDEP in order to effectuate the administrative transfer of the responsibility for the ISRA Compliance Proceedings from Seller to Buyer, including without limitation, any documents necessary to secure the release, cancellation or transfer by the NJDEP of the financial assurance previously posted by Seller. Seller shall execute any documents reasonably requested by Buyer or requested or required by the NJDEP in order to effectuate the administrative transfer of the responsibility for the ISRA Compliance Proceedings from Seller to Buyer.

4.1.4. Payment of ISRA Compliance Expenses. Buyer shall pay and be responsible for any and all fines, penalties, fees, costs, damages or expenses (including without limitation, sampling, monitoring or remediation costs, attorneys', consultants', and engineering fees and disbursements, governmental filing fees, surcharges and oversight costs, financial assurance costs, costs of defense and interest) incurred or associated with the performance of its obligations pursuant to Sections 4.1.2 and 4.1.3 of this Agreement ("ISRA Compliance Expenses").

4.1.5.  Transfer of Existing Remediation Funding Source. The parties acknowledge that the NJDEP currently maintains a remediation funding source (as such term is defined under ISRA) in the amount of $102,750.70 in connection with ISRA Case No. 89208. The remediation funding source amount is currently held in a Standby Trust Account maintained by the NJDEP. In connection with Buyer's obligations under Sections 4.1.2(a)(ii) and 4.1.2(b)(v) hereof, Seller shall petition the NJDEP to effect a transfer of such remediation funding source to Buyer (if Buyer satisfies its remediation funding source obligations under this Agreement by means of a self-guarantee), or to a remediation funding source instrument established by Buyer pursuant to ISRA in form satisfactory to the NJDEP.

4.1.6.  Waiver and Release; Indemnification.

(a)    Waiver and Release of Claims by Buyer. Except for actions to enforce its rights under this Agreement, Buyer hereby waives and releases and covenants not to sue Seller with respect to, any claims, rights, remedies or causes of action against Seller that Buyer ever had, may have now or that may arise in the future, whether known or unknown, absolute, contingent or otherwise, arising from or relating to the New Jersey Site, including without limitation, any claims, rights, remedies or causes of action under Environmental Laws, or any other legal theory or right of action (including indemnification or contribution), with respect to any Environmental Conditions on, at, under or emanating from the New Jersey Site or any other environmental matters of any kind or nature whatsoever respecting the New Jersey Site. Without in any way limiting the generality of the foregoing, Buyer hereby waives, releases and covenants not to sue Seller with respect to any and all claims that Seller was at any time the "owner" or "operator" of

the New Jersey Site or that Seller was a "discharger" or a "person in any way responsible for a discharge" of any Hazardous Substance on, at, under or emanating from the New Jersey Site (as such terms are used in or defined under Environmental Laws) or that Seller bears any liability under any Environmental Laws or any other statutes, laws, rules, regulations or ordinances or under the common law for the matters covered by this release and waiver.

(b)    Buyer's Indemnification of Seller.  Buyer shall defend, indemnify and hold harmless Seller from and against any and all Losses imposed on, incurred by or asserted against Seller or for which Seller may be liable or obligated arising from or relating in any way to (i) any Environmental Conditions on, at, under or emanating from the New Jersey Site or any other environmental matters of any kind or nature whatsoever respecting the New Jersey Site, (ii) the obligation of Seller to comply with ISRA in connection with the ISRA Compliance Proceedings or the transaction contemplated pursuant to this Agreement or any other transaction or event respecting the New Jersey Site, whether occurring in the past, present or future, to which ISRA is applicable, or (iii) Buyer's failure to comply with any of its obligations under this Section 4.

4.2.  Consents.  Buyer shall promptly file or submit and diligently prosecute any and all applications or notices with public authorities, federal, state or local, domestic or foreign, and all other requests for approvals to any private persons, the filing or granting of which is necessary, or is deemed necessary or appropriate by any of the parties hereto, for the consummation of the transactions contemplated hereby or for the preventing of any termination of any material right, privilege, license, agreement of or any material loss or disadvantage to Buyer upon the consummation of the transactions contemplated hereby.

4.3.  Access; Office Space.  (a) From and after the date of the Closing, Buyer will provide Seller with reasonable access to the books and records of the Business which are included within the New Jersey Assets, as the case may be, for any lawful purpose of Seller including, without limitation, tax reporting.

(b) From and after the date of the Closing, Buyer will provide Seller with one (1) executive office at the New Jersey Site, for occupancy by management officials of Seller during regular business hours, at no expense to Seller for the period through the earlier of (i) completion of the Chapter 11 Proceeding; and (ii) for two (2) years from the Closing.

ARTICLE V
CONDITIONS TO CLOSING

5.1.  The Closing.  The obligations of Seller and Buyer to complete the transactions contemplated by this Agreement to be completed on the Closing Date shall be subject to the following conditions:

(a) There shall have been entered an order of the Bankruptcy Court pursuant to 11 U.S.C. § 363 approving the transaction contemplated by this Agreement (the "Bankruptcy Court Approval") in a form reasonably acceptable to Buyer and Seller;

-9-

(b) All approvals of applications to public authorities, federal, state or local, domestic or foreign (including, without limitation, ISRA), the granting of which is necessary for the consummation of the transactions contemplated hereby, shall have been obtained. Any notice period or waiting period required by law to be fulfilled after the filing of any notice or other document with any such public authority shall have been fulfilled; and

(c) Payment of the Purchase Price as required herein.

## ARTICLE VI
## INDEMNIFICATION; REMEDIES UPON DEFAULT

6.1. Buyer's Indemnification. (a) Buyer covenants and agrees to defend, indemnify and hold harmless Seller and its officers, directors, employees, agents, advisers and representatives (collectively, the "Seller Indemnitees") from and against any and all claims, liabilities, obligations, losses, fines, costs, royalties, proceedings, deficiencies or damages (whether absolute, accrued, conditional or otherwise and whether or not resulting from third party claims), including out-of-pocket expenses and reasonable attorneys' and accountants' fees incurred in the investigation or defense of any of the same or in asserting any of their respective rights hereunder resulting from or arising out of:

(i) any failure of Buyer to perform any covenant or agreement made or contained in this Agreement or fulfill any other obligation in respect thereof;

(ii) the New Jersey Liabilities; or

(iii) Buyer's ownership, operation or use of the New Jersey Assets following the Closing Date; or

(iv) Buyer's actions following the Closing which give rise to COBRA or WARN Act obligations of the Seller.

(b) In the case of any claim asserted by a third party against Seller, notice shall be given by Seller to the party required to provide indemnification promptly after Seller has actual knowledge of any claim as to which indemnity may be sought, and Seller shall permit Buyer (at the expense of Buyer) to assume the defense of any claim or any litigation resulting therefrom, provided that (i) the counsel for Buyer who shall conduct the defense of such claim or litigation shall be reasonably satisfactory to Seller, (ii) Seller may participate in such defense at Seller's expense, and (iii) the omission by Seller to give notice as provided herein shall not relieve Buyer of its indemnification obligation under the Agreement unless failure to give notice prejudices the interests of the Buyer or its ability to defend.

(c) The remedies provided in this Section 6.1 will not be exclusive of or limit any other remedies that maybe available to Seller or any Seller Indemnitee.

6.2. Seller's Additional Remedy Upon Default. Upon the default of Seller or Buyer hereunder, the party alleging such default shall provide the other party written notice of such

default and opportunity to cure the alleged default within ten (10) days of receipt of such notice. In addition to any other remedies available to Seller hereunder or at law or in equity, in view of the difficulty of ascertaining Seller's damages which would be caused by Buyer's default, upon the occurrence of a default hereunder by Buyer, Seller may retain the Deposit as liquidated damages and not as a penalty, and the parties agree that such liquidated damages represent a reasonable estimate of actual damages under the circumstances existing as of the date of this Agreement.

6.3.  Buyer's Remedy Upon Default.  Upon any default of the Seller and tender of complete performance by the Buyer of all of its obligations under this Agreement, in addition to any other remedies available to Buyer hereunder or at law or in equity, Seller shall return the Deposit and any interest accrued thereon to Buyer.

6.4.  Termination by Seller.  Upon the occurrence of any of the following events and after Seller has complied with the notice provisions in Sections 6.2 and 7.3 hereof and providing Seller has performed all of its obligations under this Agreement, the Seller shall no longer be obligated to perform its obligations under this Agreement:

   (a) Failure of the Buyer to pay the Purchase Price pursuant to this Agreement;

   (b) Failure of the Buyer to provide reasonable evidence reasonably satisfactory to Seller of an ability to close on or before July 15, 2000; and

   (c) Failure to close on the purchase of the New Jersey Assets on the Closing Date.

## ARTICLE VII
## MISCELLANEOUS

7.1.  Expenses.  Except as provided in paragraph 7.19, Seller, on the one hand, and Buyer, on the other hand, shall bear their respective expenses, costs and fees (including attorneys', auditors' and financing commitment fees) in connection with the transaction contemplated hereby, including the preparation, execution and delivery of this Agreement and compliance herewith, whether or not the transactions contemplated hereby shall be consummated.

7.2.  Severability; Agreement Not Divisible.  If any provision of this Agreement, including any phrase, sentence, clause, Section or subsection is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever.  Notwithstanding the foregoing, the obligations of the Buyer to purchase, and the obligations of the Seller to sell, the New Jersey Assets are not divisible, and neither party shall be entitled to demand performance of the other party's obligations hereunder with respect to the New Jersey Assets if it is in default of, or has repudiated, its obligations with respect to the New Jersey Assets.

7.3. <u>Notices</u>. All notices, requests, demands, waivers and other communication required or permitted to be given under the Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or (c) sent by reputable, nationally recognized next-day or overnight mail or delivery or (d) sent by telecopy or telegram.

(i)    if to the Buyer to,

Mr. John Doyno
489 Essex Street
Hackensack, NJ 07601

Tel: 201-342-2206
Fax: 201-342-5656

with a copy to:

Harvey Anger
225 Pulis Avenue
Franklin Lakes, NJ 07417

Tel: 201-560-9892
Fax: 201-560-1771

(ii)    if to the Seller to,

General Ceramics, Inc.
2770 E. Coronado St.
Anaheim, CA 92806
Attn: Shunji Matsuura

Tel: 714-630-2340
Fax: 714-630-5730

with a copy to:

Richard W. Hill, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07101

Tel: 973-622-4444
Fax: 973-624-7070

-12-

or, in each case, at such other address as may be specified in writing to the other parties hereto. All such notices, requests, demands, waivers and other communications shall be deemed to have been received (e) if by personal delivery on the date of such delivery, (f) if by certified or registered mail, on the seventh day after the mailing thereof, (g) if by next-day or overnight mail or delivery, on the day delivered, (h) if by telecopy or telegram, on the next day following the day on which such telecopy or telegram was sent, provided that a copy is also sent by certified or registered mail.

7.4. <u>Headings</u>. The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

7.5. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

7.6. <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

7.7. <u>Governing Law, etc.</u> This Agreement shall be governed in all respects, including as to validity, under the laws of the State of New Jersey, without giving effect to the conflict of laws rules thereof. The Buyer and the Seller hereby agree that any disputes regarding the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, shall only be resolved by the United States Bankruptcy Court for the District of New Jersey unless said Court declines to exercise jurisdiction over the dispute in which case the dispute shall only be resolved by the United States District Court for the District of New Jersey. If the United States District Court for the District of New Jersey declines to exercise jurisdiction over the dispute, the Buyer and Seller agree that any disputes shall only be resolved by the Federal Courts. The Buyer and Seller shall not seek or otherwise request the United States Bankruptcy Court for the District of New Jersey or the United States District Court for the District of New Jersey to decline to exercise jurisdiction over the dispute. The Buyer and Seller hereby irrevocably submit to the jurisdiction of the United States Bankruptcy Court and the United States District Court for the District of New Jersey and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said court or that the venue thereof may not be appropriate or that this Agreement or any of such document may not be enforced in or by said court, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in said court. The Buyer and the Seller hereby consent to and grant any said court jurisdiction over the person of such parties and over the subject matter of any such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 7.3, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

7.8. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

7.9.  Assignment. This Agreement shall not be assignable by either Seller or Buyer without the prior written consent of the other party hereto.

7.10.  No Third Party Beneficiaries.  Except as provided in Section 6.1 with respect to indemnification of Indemnified Parties hereunder, nothing in this Agreement shall confer any rights upon any person or entity other than the parties hereto and their respective heirs, successors and permitted assigns.

7.11.  Amendment; Waivers, etc.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Neither the waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at law or in equity.

7.12.  Covenants.  For a period of three (3) years after the Closing, Seller agrees that Seller will not, either directly or indirectly, own, manage, control or participate in the ownership, management or control of, any other corporation, partnership, proprietorship, firm, association or other business entity, or otherwise engage in any business, which is engaged in any manner in, or otherwise competes with, the products which are produced by Seller at the New Jersey Site, except as provided in Sections 1.3 and 7.18 hereof.

7.13.  Confidential Information. Subject to the terms of this Agreement, Seller agrees not to disclose, divulge, discuss, copy or otherwise use or suffer to be used in any manner, in competition with, or contrary to the interests of, Buyer, the customer lists, business methods or other trade secrets of Seller included in the New Jersey Assets, it being acknowledged by Seller that all such information is confidential information and upon the Closing Buyer's exclusive property, except as provided in Section 1.3 hereof.

7.14.  Authorization of Transaction.  Subject to Bankruptcy Court Approval and approval by the Board of Directors of Seller, Seller and Buyer have the full power and authority to execute, deliver and perform this Agreement and to carry out the transactions contemplated hereby and thereby.  Subject to Bankruptcy Court Approval and approval by the Board of Directors of Seller, all necessary action, corporate or otherwise, have been taken by Seller and Buyer to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby and thereby, and the Agreement will be when duly executed and delivered the legal, valid and binding obligations of Seller and Buyer, enforceable against Seller and Buyer in accordance with its terms.

7.15.  Organization and Qualification of Buyer.  Buyer is a limited liability corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey,

with full power and authority to carry out the transactions contemplated by this Agreement and thereby, including ownership of the New Jersey Assets. A copy of Buyer's Certificate of Incorporation is attached as Schedule 1.5.

7.16. <u>No Conflict of Transaction with Obligations and Laws</u>. Neither the execution, delivery and performance of this Agreement or any of the agreements contemplated hereby, nor the performance of the transactions contemplated hereby, will: (i) constitute a breach or violation of the Buyer's charter or bylaws; (ii) conflict with or constitute (with or without the passage of time or the giving of notice) a breach of, or default under any material agreement, instrument or obligation to which Buyer is a party or by which it or its assets are bound which would materially affect the performance by Buyer of its obligations under this Agreement; (iii) result in a violation of any law or Court Order applicable to Buyer.

7.17. <u>Waiver of Right to Jury Trial</u>. ALL PARTIES TO THIS AGREEMENT HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH.

7.18. <u>Survival</u>. To the extent forward looking provisions are included in this Agreement such provisions shall survive the Closing; the parties agree to execute, at the Closing, any agreement necessary to effectuate this Paragraph 7.18.

7.19. <u>Buyer's Right to Request Reimbursement for Expenses.</u> Subject to each of the conditions set forth in this paragraph, Buyer and Seller agree that Buyer may seek reimbursement from the Seller, on application to the Bankruptcy Court, for its reasonable and verifiable out-of-pocket expenses incurred in the preparation and submission of this bid if Buyer is the unsuccessful bidder:

a) Buyer is the unsuccessful bidder because the Bankruptcy Court approved a sale to a higher bidder;

(b) Buyer did not withdraw its bid prior to the sale to a higher bidder and this Agreement was in full force and effect at the time of the sale.

(c) At the time of the sale, Buyer was in full compliance with the provisions of this Agreement and had the ability to close;

(d) Reimbursable expenses shall be capped at $50,000.

(e) Express approval by the Bankruptcy Court of such reimbursement.

7.20. <u>Buyer's Representation.</u> Buyer represents to Seller that it has had adequate opportunity to consult with counsel respecting this Agreement and the transaction described therein.

7.21.  <u>The Escrow Agreement.</u>  On the Closing Date, the Buyer shall deliver the Purchase Price, as adjusted pursuant to paragraph 2.4 hereof, but not more than $400,000 to McCarter & English, LLP to be held by McCarter & English, LLP (the "Escrow Agent") in escrow (the "Escrow Fund") pursuant to an escrow agreement (the "Escrow Agreement") to be executed by the Buyer, the Seller, and the Escrow Agent and delivered on the Closing Date, the material terms of which Escrow Agreement are set forth below:

(a)    <u>The Escrow Accounts</u>.  The Escrow Agent shall create 2 separate accounts:
        (1) the "Cleanup Costs Account" and
        (2) the "ISRA Costs Account"

The Escrow Agent shall place into the Cleanup Costs Account so much of the Escrow Fund as equals the proportion of 230 to 400 (57.5%) not to exceed $230,000. The Escrow Agent shall place into the ISRA Costs Account so much of the Escrow Fund as equals the proportion of 170 to 400 (42.5%) not to exceed $170,000 .  Each of the accounts shall be maintained in separate interest-bearing accounts at First Union National Bank.

(b)    <u>Release of Monies From Cleanup Costs Account</u>  The Escrow Agent shall release to the Buyer funds from the Cleanup Costs Account upon presentation of a Direction in a form to be annexed to the Escrow Agreement executed by a representative of both the Buyer and Seller and specifying the amount to be released.  The Buyer is entitled to payments as limited and specified below from the Cleanup Costs Account for Cleanup Eligible Expenses as hereinafter defined exceeding $230,000.

(1)    The Escrow Agent shall pay to Buyer from the Cleanup Costs Account 100 percent of Buyer's Cleanup Eligible Expenses which exceed $230,000.00 but do not exceed $330,000.  Any payment under this paragraph shall not exceed $100,000.00.

(2)    The Escrow Agent shall pay to Buyer 50 percent of the Buyer's Cleanup Eligible Expenses in excess of $330,000.00 but do not exceed $590,000.00.  Any payment under this paragraph shall not exceed $130,000.00.

(3)    In no event is the Buyer entitled to payments, nor shall the Escrow Agent release to the Buyer, more than $230,000.00 from the Cleanup Costs Account.

The Buyer may only be reimbursed from the Cleanup Costs Account for the following expenses all of which must actually be paid by the Buyer no later than one year from the Closing Date (the "Cleanup Eligible Expenses"):

except as provided in (iii), the reasonable expenses paid to a third-party for the cleanup, treatment or removal of any beryllium dust or residue from the

equipment located at the New Jersey Site or the actual removal of the equipment from the New Jersey Site;

except as provided in (iii) the reasonable expenses paid to a third-party of cleanup, treatment or removal of any beryllium dust or residue from the ductwork or any ventilation or heating system of the buildings at the New Jersey Site.

Cleanup Eligible Expenses shall not include fines or penalties, attorneys' fees or costs, expenses for services rendered by any officer, director, or employee of the Buyer or for services rendered by any affiliate or insider of the Buyer. For purposes of this definition, affiliate and insider shall have the same meanings as set forth in the Bankruptcy Code as if the Buyer were a debtor.

    (c)   <u>Release of Monies From ISRA Costs Account</u> The Escrow Agent shall release to the Buyer funds from the ISRA Costs Account upon presentation of a Direction in a form to be annexed to the Escrow Agreement executed by a representative of both the Buyer and Seller and specifying the amount to be released. The Buyer is entitled to payments as limited and specified below from the ISRA Costs Account for ISRA Eligible Expenses, as hereafter defined, exceeding $170,000.

        (1)   The Escrow Agent shall pay to the Buyer from the ISRA Costs Account 100 percent of Buyer's ISRA Eligible Expenses which exceed $170,000.00 but do not exceed $270,000.00. Any payment under this paragraph shall not exceed $100,000.00.

        (2)   The Escrow Agent shall pay to the Buyer from the ISRA Costs Account 50 percent of the Buyer's ISRA Eligible Expenses in excess of $270,000.00 but do not exceed $410,000.00. Any payment under this paragraph shall not exceed $70,000.00

        (3)   In no event is the Buyer entitled to payments, nor shall the Escrow Agent release to the Buyer, more than $170,000.00 from the ISRA Costs Account.

The Buyer may only be reimbursed from the ISRA Costs Account the following expenses all of which must actually be paid by the Buyer no later than one year from the Closing Date (the "ISRA Eligible Expenses"): except as provided in (ii), the reasonable expenses paid by the Buyer to a third-party to satisfy Buyer's obligations under Sections 4.1.2 and 4.1.4 of this Agreement.

ISRA Eligible Expenses shall not include fines or penalties, attorneys' fees or costs, expenses for services rendered by any officer, director, or employee of the Buyer or for services rendered by any affiliate or insider of the Buyer. For purposes of this definition, affiliate and insider shall have the same meanings as set forth in the Bankruptcy Code as if the Buyer were a debtor.

(d)  <u>Required Documentation</u>. To enable the Seller to determine whether the Buyer is entitled to withdraw money from either of the escrow accounts for each expense claimed by the Buyer to be an ISRA Eligible Expense or Cleanup Eligible Expense the Buyer shall provide the following documentation to Seller or to Seller's designated representative:

(1)  Invoice; and

(2)  Proof of payment in the form of a cancelled check or proof of wire transfer by the Buyer; and

(3)  Such other evidence as the Seller may reasonably request to establish that the expense is an ISRA Eligible Expense or Cleanup Eligible Expense.

(e)  <u>Termination of the Cleanup Costs and ISRA Costs Account</u>. All Directions requesting payment from the Cleanup Costs and/or ISRA Costs Account shall be submitted to the Escrow Agent no later than 13 months from the Closing Date. Provided that the Escrow Agent has paid to the Buyer all monies required, based on Directions actually received by the Escrow Agent within 13 months from the Closing Date, the Escrow shall be deemed terminated and the Escrow Agent is directed to pay to the Seller the balance in the Escrow Account.

The Escrow shall not terminate if, prior to the expiration of 13 months, the Escrow Agent receives a written notice of dispute from either party, in a form to be annexed to the Escrow Agreement, describing the dispute. In the event that the Escrow Agent receives such notice within 13 months of the Closing Date, the Escrow shall not be terminated until the dispute has been resolved and written instructions provided by both the Buyer and Seller to the Escrow Agent as to the disposition of the remaining funds in the Escrow Account. In the event that the parties do not resolve a dispute within a reasonable period of time the Escrow Agent may deposit any disputed monies into the United States Bankruptcy Court for the District of New Jersey.

(f)  <u>Return of Monies to Seller</u>  Buyer shall engage in diligent efforts to complete the remediation in connection with ISRA Case No. 89208 or any other ISRA or similar proceeding and to recover from the NJDEP any of the remediation funding source held in the Standby Trust Account maintained by the NJDEP as set forth in Section 4.1.5 of this Agreement. Upon receipt by the Buyer of any of the funds identified in Section 4.1.5 of this Agreement, such funds shall be immediately transferred to the Seller or its designated representative. To the extent Buyer receives funds from either the Cleanup Costs Account or the ISRA Costs Account based on the payment of Cleanup Eligible Expenses or ISRA Eligible Expenses and thereafter any such expenditures are returned or refunded to the Buyer, Buyer shall immediately return such funds to the Seller or its designated representative.

(g)  <u>Indemnification of Escrow Agent</u>. The Escrow Agent shall not be liable for any error in judgment or for any act done or omitted by it in good faith, or for any mistake of fact or law and is released and exculpated from all liability hereunder,

except for wilful misconduct. The Escrow Agent shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt, or other paper or document believed by the Escrow Agent to be genuine and the Escrow Agent may assume that any person purporting to give the Escrow Agent any notice or advice in accordance with the provisions hereof has been duly authorized to do so, and Seller and the Buyer each hereby jointly and severally indemnifies, defends, holds harmless the Escrow Agent from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, the Escrow Agent may suffer or incur as the Escrow Agent hereunder unless caused by the Escrow Agent's wilful refusal or wilful failure to act pursuant to the terms hereof.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

HASKELL PROPERTIES, L.L.C.

by_____

General Ceramics, Inc.

by_____

Sent by: MC CARTER & ENGLISH         201 624 7070;         06/26/00 12:44PM; JetFax #727; Page 20/46

except for wilful misconduct. The Escrow Agent shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt, or other paper or document believed by the Escrow Agent to be genuine and the Escrow Agent may assume that any person purporting to give the Escrow Agent any notice or advice in accordance with the provisions hereof has been duly authorized to do so, and Seller and the Buyer each hereby jointly and severally indemnifies, defends, holds harmless the Escrow Agent from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, the Escrow Agent may suffer or incur as the Escrow Agent hereunder unless caused by the Escrow Agent's wilful refusal or wilful failure to act pursuant to the terms hereof.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

HASKELL PROPERTIES, L.L.C.

by_____

General Ceramics, Inc.

by _Shunji Matsuura_____

6/28/00

-19-

SCHEDULE 1.1

New Jersey Site

16 First Avenue
Haskell, New Jersey  07420

SCHEDULE 1.2

Permitted Liens and Encumbrances

1. Any deed notice required and approved by the NJDEP under ISRA Case No. 89208 with respect to soil contamination beneath the Western Building at the New Jersey Site, including without limitation any restrictions imposed in such deed notice on the use of the Affected Area (as such term is defined in the deed notice) of the New Jersey Site and any requirements imposed in such deed notice for the maintenance of Engineering Controls.

2. The state of facts shown an on accurate survey of the New Jersey Site.

3. Zoning regulations, and municipal building restrictions, and all other laws, ordinances, regulations and restrictions of any duly constituted public authority enacted prior to the Closing Date.

4. Other covenants, easements and restrictions which do not materially and adversely affect the use of the New Jersey Site, as permitted by zoning and related ordinances and laws on the date hereof, as well as grants to utility and/or power companies, the rights of the public in sidewalks and abutting public rights-of-way, and easements given to the public for water course maintenance, slope rights or sight rights, provided same do not materially and adversely affect the current use of the New Jersey Site.

5. The lien of current taxes not yet due and payable.

6. Standard exceptions set forth in the form of title insurance policy of the title insurance company selected by the Buyer.

7. The fact that certain parking areas utilized by employees of the Seller are located on property not owned by the Seller and for which there is no agreement with the property owner with respect to such parking.

8. The fact that one or more rights-of-way exist across the New Jersey Site, which may not be written, and which provide access to adjoining property for the benefit of the owners and users of the adjoining property.

9. The fact that access to certain loading dock space on the New Jersey Site may require the utilization of land owned by one or more adjoining property owners and that such utilization has not been formalized with the owners of the adjoining property.

## SCHEDULE 1.3

### Excluded Assets

1.  All cash, certificates of deposit, bank accounts, brokerage accounts, securities, accounts receivable and notes receivable, ledger billings, bonds and other evidences of indebtedness and rights to receive payments from any person owing to the Seller, including, but not limited to, any rights with respect to third party collection procedures or any other actions, suits or proceedings which have been commenced in connection therewith.

2.  Seller's corporate franchise, stock record books, corporate record books containing minutes of meetings of directors and stockholders, original tax returns and financial statements and such other records as have to do exclusively with Seller's organization.

3.  All causes of action under the Bankruptcy Code.

4.  All employee benefit plans and the assets held by Seller thereunder.

5.  Extended Joint Development Agreement dated as of February 20, 1995 and Amendment thereto dated January 21, 1999 between Tokuyama Corporation and Seller.

6.  The General Ceramics and National Beryllia Names.

NWK2: 603733.10