**Exhibit 12 to Statement of Undisputed Facts Filed in Support of Motion of American Beryllia, Inc. For Summary Judgment**

KOLANZ DEPOSITION EXCERPTS

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF MASSACHUSETTS
 3    SUZANNE GENEREUX and BARRY       *
 4    GENEREUX, wife and husband,      *
 5    individually and as parents      *
 6    and natural guardians of         *
 7    their minor children,            *
 8    ANGELA GENEREUX and KRISTA       *
 9    GENEREUX,                        *
10         Plaintiffs                  *   Case No.
11         vs.                         *   04CV12137JLT
12    AMERICAN BERYLLIA CORP.,         *
13    BRUSH WELLMAN, INC., BRUSH       *
14    WELLMAN CERAMICS, INC.,          *
15    BRUSH WELLMAN CERAMIC            *
16    PRODUCTS, INC., HARDRIC          *
17    LABORATORIES, INC., KYOCERA      *
18    AMERICA, INC., KYOCERA           *
19    INDUSTRIAL CERAMICS CORP.        *
20    and RAYTHEON COMPANY,            *
21         Defendants                  *
22             VIDEOTAPED DEPOSITION OF
23                MARC EDWARD KOLANZ
24                  June 6, 2006
```

Page 138

1  aware that Exhibit One would not necessarily
2  stay with this product so that its end user
3  would see it; correct?
4  A. I don't know that to be the case.
5  Q. Now, the product warning label that was
6  used by Brush on its beryllium ceramics sold to
7  Raytheon in the 1980s, did that change over
8  time?
9  A. Yes. It has changed over time based on
10 our knowledge and on advice of the warnings
11 experts over the years.
12 Q. You had told me earlier, Mr. Kolanz,
13 that prior to 1985, you couldn't tell me with
14 any degree of certainty whether the MSDS sheets
15 that were used for beryllium ceramic necessarily
16 accompanied the sale of such ceramics to
17 Raytheon before 1985; is that correct?
18 ATTORNEY FAXON:
19 Object to form,
20 mischaracterized his testimony.
21 A. You said that the MSDS would accompany
22 the part?
23 BY ATTORNEY HONIK:
24 Q. You couldn't tell me, could you,

Page 139

1  whether Brush sent MSDS sheets with each and
2  every beryllium ceramic part that it sold to
3  Raytheon prior to 1985; can you?
4  A. No, I can't tell you that, and I don't
5  think you asked me that specific question
6  earlier.
7  Q. Well, I have now, and the answer is you
8  can't tell me; can you?
9  A. Right. What we did include is warning
10 --- our warning labels on each and every package
11 that was sent.
12 Q. How do you know that?
13 A. Because that has been the practice
14 within Brush Wellman for ---since the '50s, the
15 early '50s. And that's something that I would,
16 at times, check on myself, to make sure that
17 people were following that direction, making
18 sure they're using the right labels and such.
19 Q. What would you do to satisfy yourself
20 that those warning labels accompanies the
21 products containing BeO that were sold to
22 Raytheon's Waltham facility prior to 1985?
23 A. Typically, when I would visit a
24 facility or area, I would make it a practice on

Page 140

1  occasion, to check into the shipping department
2  and make sure they have the proper labels in
3  place, they had the current labels, and that
4  upon inquiry of people there, that they were
5  being used.
6  Q. Do you know what the label that was in
7  use prior to 1985 on beryllium ceramic looked
8  like?
9  A. I have some idea of it, but it would be
10 hard to describe it without a copy of it here.
11 Q. Well, did you look at it prior to
12 coming here today?
13 A. The pre-'85 label?
14 Q. Yes.
15 A. At some point in the past I've looked
16 at it, not recently.
17 ATTORNEY HONIK:
18 May we have this marked as Two?
19 (Kolanz Exhibit Two marked for identification.)
20 BY ATTORNEY HONIK:
21 Q. Mr. Kolanz, this document now marked
22 Two, do you recognize it?
23 A. I recognize it as one of Brush
24 Wellman's product warning labels.

Page 141

1  Q. Okay. And when was this product
2  warning label in use by Brush?
3  A. I'm not specifically sure when this
4  version of the label was put into use by Brush.
5  I'd have to go back and check and compare as to
6  when that might have been to be able to
7  determine when this version was put into use.
8  Q. Was it ever the case that you would put
9  the revision or revised date on the labels
10 themselves so that one could know when the label
11 came into use?
12 A. I don't recall that we ever did that,
13 because we usually made a big deal out of making
14 sure we captured back all the old labels and got
15 facilities to get rid of those labels, and then
16 gave them the new labels. So I'd have to look -
17 --. I don't recall us putting a date on the
18 warning labels.
19 Q. Well, looking at Kolanz Two and the
20 language that's reflected there, can you tell me
21 whether or not the language employed in this
22 label was identical or similar in any respect to
23 the one you used prior to 1985?
24 A. I don't specifically recall. I'd have

Page 314

1  they said.
2  VIDEOGRAPHER:
3  5:35 p.m., off record.
4    OFF VIDEO
5    SHORT BREAK TAKEN
6    ON VIDEO
7  VIDEOGRAPHER:
8  5:37 p.m., back on record.
9    BY ATTORNEY FAXON:
10   Q. Mr. Kolanz, you were asked some
11   questions today about CBD, both today and in the
12   1980s. How, if at all, have the diagnostic
13   criteria for chronic beryllium disease changed
14   since the 1980s?
15 ATTORNEY HONIK:
16 Objection, calls for an expert
17   opinion this witness is incompetent to give.
18   A. The difference in diagnostic criteria
19   started to change in about 1989 as part of a
20   study conducted by K. Kreiss, where she proposed
21   the concept of a subclinical form of CBD. Prior
22   to that time, CBD was defined mostly upon
23   persons who were experiencing clinical symptoms
24   of a health effect, which could include cough

Page 315

1  and loss of weight, and could be discernable
2  changes in
3  x-ray, or pulmonary function changes along with
4  a confirmed exposure to beryllium.
5  After the years subsequent to '89, the
6  criteria for defining chronic beryllium disease
7  and the creation of, kind of the term
8  subclinical disease, started including --- or
9  included persons who would be found to have
10 granuloma in their lung. And actually, it's ---
11 well, it's a type of granuloma in the lung that
12 would be found upon biopsy along with a finding
13 of beryllium sensitized based on either a blood
14 test or a lung fluid test.
15 BY ATTORNEY FAXON:
16   Q. How, if at all, have the change in
17   diagnostic criteria that you've just described
18   affected the rate of instance of chronic
19   beryllium disease that you have seen in Brush
20   Wellman's plants?
21 ATTORNEY HONIK:
22 Object to the form of the
23   question and to the extent that this calls for
24   an opinion outside of this witness' competency.

Page 316

1
2   A. In general, using the new diagnostic
3   criteria, the prevalence of CBD has gone up
4   sharply when you go to include subclinical cases
5   of chronic beryllium disease.
6  BY ATTORNEY FAXON:
7   Q. Are statements about the incidence of
8   chronic beryllium disease from the 1980s then
9   comparable to statements about the incidence of
10  chronic beryllium disease today?
11 ATTORNEY HONIK:
12 Same objection.
13   A. Not typically, because most of the
14   studies in the '80s would be only looking at
15   clinical chronic beryllium disease, where the
16   vast majority of the studies in the 1990s and
17   beyond include subclinical CBD, oftentimes not
18   even describe the subclinical CBD in with any
19   clinical cases of CBD.
20 BY ATTORNEY FAXON:
21   Q. Mr. Kolanz, earlier today, you
22   described Raytheon as sophisticated. Why did
23   you describe Raytheon as sophisticated?
24   A. That was based primarily on looking at

Page 317

1  the types of documents they were producing,
2  which indicated some real expertise in health
3  and safety, and the procedures that they had
4  created for beryllium, in addition to their ---
5  even their use of that little caution label, to
6  me, was well above and beyond the typical
7  company. And they were an aerospace company,
8  which aerospace companies tended to be moreso
9  leaders in health and safety practices and
10 procedures overall. They were oftentimes very
11 much like some other high-end, very
12 sophisticated health and safety groups.
13   Q. When you were dealing with Raytheon in
14   the 1980s, did you develop a belief as to
15   whether or not they were sophisticated?
16   A. Yes, I believe I had some reason to
17   believe they were sophisticated then, simply
18   because they had industrial hygienists on staff,
19   plus I was getting questions from people that
20   were, like, engineers that worked for Raytheon,
21   and that isn't always typical to get it from
22   actually kind of production-related personnel.
23   So that shows to me a greater understanding of
24   health and safety by non-health and safety

Page 318

1  personnel at the Raytheon company.
2  Q. Did you form a belief in the 1980s as
3  to whether or not Raytheon was likely to pass
4  industrial hygiene information about beryllium
5  or health and safety information about beryllium
6  on to its production workers?
7  ATTORNEY HONIK:
8  Object to form.
9  A. Well, I would certainly expect, with
10  the type of company it appeared to be, that
11  training --- and plus it is required by Hazard
12  Communication Standard that they pass on
13  information, so I certainly would have expected
14  them to have done that and passed it on to
15  employees. And I believe there were some ---
16  records of some kind of beryllium training, but
17  I don't remember the time frame in which those
18  were conducted.
19  BY ATTORNEY FAXON:
20  Q. Mr. Kolanz, Mr. Honik asked you a
21  number of questions that were essentially, why
22  didn't you put X or why didn't you put Y on the
23  product beryllium warning label. Why didn't you
24  put the statements that Mr. Honik asked you

Page 319

1  about on the beryllium warning label?
2  ATTORNEY HONIK:
3  Object to the form of the
4  question.
5  A. The types of specifics that Mr. Honik
6  had mentioned are something that ---. A warning
7  label is designed to be a primary means of
8  giving warning to the recipient of the label.
9  And we were advised by our warning experts that
10  you shouldn't be including a lot of specifics in
11  there, and you had to try to provide a means for
12  getting those specifics in another venue. So
13  you stick to the very primary warnings so the
14  initial recipient of the label understands the
15  basic message, and it isn't confused by other
16  information that's provided.
17  BY ATTORNEY FAXON:
18  Q. And what is the primary hazard
19  associated with beryllium oxide?
20  A. The primary hazard would be the
21  inhalation of beryllium oxide particulate,
22  having the potential to cause serious chronic
23  lung disease.
24  Q. Did Brush's warning labels to Raytheon

Page 320

1  in the 1980s warn of inhalation of beryllium
2  particulate?
3  A. I believe they did.
4  Q. You were asked some questions about
5  Exhibit Eight, if you have that before you, sir.
6  I believe you have it right in front of you,
7  sir.
8  A. Oh.
9  Q. Does that document deal with beryllium
10  oxide?
11  A. No. This document refers to beryllium
12  metal.
13  Q. You were asked some questions about
14  Exhibits Kolanz 15 and Kolanz 17, two letters
15  from 1989. In the course of your
16  responsibilities at Brush, did you review those
17  letters at or about the time that they were sent
18  to customers?
19  A. Did I review these letters?
20  Q. Yes.
21  A. I actually don't recall if I did or did
22  not review these. It would not be unusual for
23  me to not have reviewed something like that
24  during that time frame.

Page 321

1  Q. Did you have an opportunity to review
2  them today at the deposition?
3  A. Yes.
4  Q. Were there any statements in either of
5  the two letters that you felt were inaccurate as
6  of 1989?
7  A. No. I don't think there's anything in
8  here that was really inaccurate. I might choose
9  to word them differently, but I'm not sure how I
10  might have chosen to word them differently in
11  1989 versus today.
12  Q. Mr. Kolanz, finally, you used the
13  phrase evaluation sales in connection with two
14  entries on what has been marked as Exhibit 20,
15  the sales spreadsheet. Can you describe for the
16  jury what you mean by evaluation sales?
17  A. Well, evaluation sales are samples, or
18  samples of parts that would be provided to the
19  customer in an attempt, as I see it, to win the
20  business to try to sell to the customer those
21  parts.
22  Q. And with respect to those parts that
23  were sold as evaluation sales, I believe you
24  described them as something on the order of

| Pg./Line | Change | Reason |
|---|---|---|
| 16:2 | "them" to "the . . ." | transcription error |
| 22:2 | Youngblot to Youngblut | spelling error |
| 39:1 | Freemont to Fremont | spelling error |
| 40:7 | add "what" "understand _what_ it" | transcription error |
| 41:15 | add "beginning in 1984," so that the answer reads "Sell beryllium oxide to Raytheon _beginning in 1984_." | more precise answer |
| 49:13-17 | Change to "Yes. Brush's records indicate MSDS were sent before HAZCOM went into effect." | correct answer |
| 52:6 | Teresa Helman to Theresa Haumann | spelling error |
| 56:19 | "on a" to "zone" | transcription error |
| 59:2-4 | change to "The ceramic study was sent to Raytheon." | correct answer, as reflected in later testimony |
| 62:18 | "there's" to "there are" | grammar |
| 71:4 | "here" should be "there" | grammar/transcription |
| 73:5-6 | change "what they did with these parts, I don't know" – "we didn't have access to see what processes were being performed" | more precise response |
| 88-89 | Newbery Port to Newburyport | spelling |
| 93:22 | "white" to "while" | transcription error |
| 94:22 | "filmmaking" to "pillmaking" | transcription error |
| 103:14 | Add to end of answer "As I understand that term was used to describe the products Mrs. Genereux worked with – no." | Clarify answer depending on counsel's intended use of the word "window." |

| Pg./Line | Change | Reason |
|---|---|---|
| 106:21-23 | Add to end of answer "As I understand that term was used to describe the products Mrs. Genereux worked with – no." | Clarify answer depending on counsel's intended use of the word "window." |
| 109:12 | Change to "I don't know." | Reviewed many drawing and sales records, but don't know whether they were exhibits or not. |
| 109:15 | Change to "I don't know." | Reviewed many drawing and sales records, but don't know whether they were exhibits or not. |
| 117 | Add at end "As I understand that term was used to describe the products Mrs. Genereux worked with – no." | Clarify answer depending on counsel's intended use of the term "window." |
| 117:18-21 | Add at end, "There were evaluation samples which were apparently tested as windows on microwave tubes, but the records indicate that Raytheon rejected those parts and returned them, and that they were never sold in production quantities." | Clarify answer consistent with testimony later in my deposition. |
| 118:2 | Change to "Not with respect to the sheet. I did review sales documents and speak to current and former Brush employees." | correct answer |
| 118:24 | Change "Over the break" to "Before the break" | transcription error or mistake |
| 120:17-20 | Insert "whole." "I didn't read the whole deposition." | As the rest of the answer reflects, I did review parts of it. |
| 122:11-16 | "Sales documents indicate that small quantities of three inch disks and one-and-a-half inch disks were sent as evaluation samples to Raytheon. These evaluation samples failed to pass inspections by Raytheon and were generally | clarify and correct answer |

- 2 -

| Pg./Line | Change | Reason |
|---|---|---|
| | returned. They were never sold in production quantities." | |
| 122:21-24 | Change "the one woman" to "Clare Balient" and add at end "but the parts she was describing were not sold by Brush Wellman." | |
| 123:7 | Add "it," "putting <u>it</u> in there" | add word, grammar/transcription |
| 127:2 | Change "Well" to "We" | transcription/grammar error |
| 133:3 | Add "an" - "was <u>an</u>" | transcription/grammar error |
| 158:7 | "compliant" to "compliance" | transcription error |
| 168:17 | "bedding" to "vetting" | transcription error |
| 170:15 | Add "I was aware of Shima's papers but concluded that the information was not credible" after "Yes." | Clarify question that I was answering. |
| 182:18 | delete "thus" | extra word |
| 182:24 | Add "for subclinical disease" after "Yes." | clarify answer |
| 210:5 | Add "that's when we learned of and relayed the results of Kriess's study" after "Yes." | Clarify question was answering. |
| 226:2 | Add "1985 document" after "this" | Clarify what document is being discussed. |
| 245:13 | Add "in production quantities. I did see a memo that described evaluation samples that were returned after testing by Raytheon when Brush was attempting to qualify as a supplier." | clarify answer |
| 250:19 | "pool" to "pull" | transcription error |
| 255:17 | Delete "and its use" | transcription/grammar error |

| Pg./Line | Change | Reason |
|---|---|---|
| 286:9 | "I" to "It" | transcription error |

The foregoing reflect my changes and corrections to my deposition in *Genereux, et al. v. America Beryllia Corp., et al.*

_____
Marc E. Kolanz