UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Suzanne Genereux, et al. | ) |
|     Plaintiffs, | ) |
| v. | ) Case No. 04-CV-12137 JLT |
| American Beryllia Corp., et al. | ) |
|     Defendants. | ) |

**PLAINTIFFS' RESPONSE AND OPPOSITION TO THE DEFENDANT
HARDRIC LABORATORIES, INC.'S MOTION FOR RULE 11 SANCTIONS**

Plaintiffs, by their undersigned attorneys, hereby oppose defendant Hardric Laboratories, Inc.'s ("Hardric") Motion for Sanctions and in support thereof aver the following:

**I.   INTRODUCTION**

The plaintiff, Suzanne Genereux, was diagnosed with chronic beryllium disease ("CBD"), a chronic, irreversible, and largely untreatable scarring of the lungs, as the result of working with beryllium between 1982 and 1990 at the Raytheon Company's Waltham, Massachusetts plant. Ms. Genereux, who is 51 years old and the mother of two minor children, is completely disabled from employment as a result of her CBD and is confined to a wheelchair -- because of her CBD and other health problems -- and uses portable assistive oxygen during most of every day of her life.

Ms. Genereux, together with her husband and minor children, brought this action for damages as a product liability action against the manufacturers of the beryllium containing products with which she came in regular contact during her employment at Raytheon. Those manufacturers failed to adequately warn her about the risks to which she was exposed and caused her to contract CBD from those exposures. CBD results from breathing in beryllium fumes,

particulate, or dust in exceedingly small quantities. Scientists have known since at least the 1930's that beryllium poses serious health risks to humans. *Any* action that disturbs the surface layer of beryllium ceramic or metal can produce respirable particles which in turn can produce CBD. Ms. Genereux was exposed to beryllium dust and particulate matter from both beryllium ceramic and metal, the former having been routinely sandblasted without adequate controls, and the latter having been hand filed in the ordinary course of Mrs. Genereux's work day. No warnings of any kind regarding the health risks associated with beryllium ever reached Ms. Genereux as an end user of these products. American Beryllia Corp. and Brush Wellman, Inc. sold beryllium ceramic to Raytheon's Waltham plant. Hardric sold beryllium metal to that same facility.

The narrow question presented by Hardric's Motion is whether counsel for plaintiffs made a reasonable pre-filing inquiry into whether Hardric was a proper party in this product liability action.

**II.    ARGUMENT**

The object of Rule 11's inquiry requirement is to avoid filings that are baseless. Navarro-Ayala v. Hernandez-Colon, 3 F.3d 464 (1st Cir.1993). Rule 11 operates by requiring attorneys to take responsibility for the claims and defenses they present and to do so by making reasonable inquiry to assure that such claims are well grounded in both law and fact. Lilia Pol-Sella v. SER Jobs for Progress National, Inc., 11 F. Supp. 2d 170, 176 (1st Cir. 1998). Courts in the First Circuit have ruled that "to determine whether a litigant [has] made a reasonable inquiry into the facts, the district court should examine all the circumstances, including the complexity of the subject matter, the party's familiarity with it, the time available for inquiry, and the ease (or

difficulty) of access to the requisite information." Id. at 176, 177.  The District of Massachusetts, perhaps in particular, takes a conservative view in applying the Rule and suggests that wrongdoing to the point of falsehood and intentional misstatements or deception are required. Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts, Inc., 753 F. Supp. 1007 (D. Mass. 1990) ("Having examined the transcripts, affidavits, [etc.] ... the Court finds that plaintiff has not stepped beyond the bounds set by Rule 11.  Notwithstanding defendants' protestations to the contrary, plaintiff has convinced the Court that its motion to amend the complaint contained *no falsehoods*.  Plaintiff's statement that many registrations had not issued from the U.S. Copyright Office as quickly as planned *does not constitute an intentional misstatement or deception*.") (emphasis supplied).

Twelve (12) years after Ms. Genereux last worked at Raytheon's Waltham plant, and nine (9) years after the plant was sold, she was diagnosed with CBD.  Because CBD is a signature injury that can only be contracted by exposure to beryllium, the undersigned counsels' principal pre-filing inquiry was to identify the beryllium containing products that Ms. Genereux came in contact with at Raytheon which she, or anyone else, had occasion to abrade in any way such as to create dust and potential exposures that could have been responsible for causing her CBD. Because Ms. Genereux worked as a laborer, the identity of the beryllium suppliers were never revealed to her during the course of her employment and, just as obviously, she had no present access to records at Raytheon which would reveal the identity of those suppliers.  In addition, Raytheon performed most or all of its work for U.S. and foreign governments which held it to strict secrecy and confidentiality as it concerned the materials and projects that Raytheon worked upon.  Thus, inquiry by counsel was limited by the considerable passage of time between

exposure and diagnosis, and the unavailability of specific product identification from a facility which worked under secrecy and had been sold by Raytheon some nine (9) years earlier. Nonetheless, counsel proceeded to conduct product identification research with great care and diligence.

The undersigned counsel have had considerable experience in bringing beryllium products liability litigation on behalf of many dozens of individuals in a variety of jurisdictions throughout the United States. As such, counsel for Ms. Genereux had the opportunity to consult Brush Wellman's document depository -- first created as the result of litigation that arose in Federal Court and subsequently maintained and updated by Brush as the result of on-going litigation elsewhere -- in order to attempt to confirm specific sales of beryllium products to Raytheon's Waltham facility. Counsel was able to readily confirm the extensive sale of beryllium ceramic products by Brush and, later, by American Beryllia but was also able to confirm sale of beryllium metal to Raytheon, by way of drop shipment and intermediate fabrication by Hardric Laboratories. At least twelve (12) separate purchase orders and "acknowledgment of field sales", copies of which are attached hereto as Exhibit "A", confirm the sale, fabrication and shipment of beryllium containing tube material by Hardric to Raytheon at its Waltham facility. A review of each of the purchase orders shows the specific "shipped to" address as the Waltham facility where Ms. Genereux worked. The sales occurred during Ms. Genereux's period of employment at Waltham. Indeed, Peter N. Richard, the owner of Hardric until his retirement about five (5) years ago, confirmed under oath what the purchase orders made clear:

> Q. Do you know if Brush Wellman drop shipped material to you for machining or processing or fabrication to be forwarded on to Raytheon?
> A. Do I know that, sir?
> Q. Yes.
> A. I know what it says in these pieces of paper.
> Q. And did the paper suggest to you that that very thing took place, that is, that material was drop shipped to your company for machining or fabrication or processing with the intent of it making its way to Raytheon?
> A. Okay, say that again.
> MR. HONIK: I'll have the reporter read it to you
> (The reporter read the requested testimony.)
> A. It suggests that, yes.

Deposition of 5/25/06, Peter N. Richard, 77:1-16. Mr. Richard also confirmed that both beryllium tube and beryllium rod were sent to the Microwave and Power Tube Division at Waltham where Ms. Genereux was employed in the 1980's:

> Q. Turn, if you would, to the next document, 364682. This now has a product description of both Beryllium tube and Beryllium rod; do you see that?
> A. Yes, I do.
> Q. And there's a difference, is there not, between tube and rod?
> A. Yes.
> Q. Tell us the difference.
> A. The tube has a hole in it, and the rod doesn't.
> Q. Have you worked with Beryllium rod over the years --
> A. Yes.
> Q. -- at Hardric Labs?
> A. Yes.
> Q. Does this refresh your recollection about whether you might have machined Beryllium rod for Raytheon in the 1980's?
> A. No.
> Q. Do you agree that all of the purchase orders we've been looking for relate to the Microwave and Power Tube Division at Waltham?
> A. That's what it says.

Deposition, Peter N. Richard, 111:21-112:19. In addition to confirming sales of beryllium metal

to the Waltham facility, Suzanne Genereux separately confirmed that she worked with such metal and that she abraded it, creating dust, by use of both sandpaper and a Drommel tool. Counsel for Ms. Genereux confirmed these facts before filing the Complaint and they are reflected in Ms. Genereux's discovery deposition testimony as well:

> Q. (BY MR. UBERSAX) Ms. Genereux, you talked earlier about using a -- a file on some -- some of the parts you worked with. Did you also use sandpaper on any of these parts?
> A. Occasionally.
> Q. Okay. And can you tell us what you did with the sandpaper?
> A. The same thing; you --
> Q. Same thing you did with the file?
> A. Right.
> Q. Okay. Would you actually be sandpapering beryllium oxide ceramic, or some metal that was covering the ceramic?
> A. I don't believe that you sandbla-- that you filed or sanded the ceramic. I believe that it was whatever needed to be done on the diameter to fit it.
> Q. And the diameter that you filed or sandpapered was made of a -- of some kind of a metal; is that right?
> A. I believe so.
> Q. And do you know what the metal was?
> A. I really don't recall at which time, you know, which piece I'm doing.
> Q. *Did you sometimes have to sand or file beryllium copper?*
> A. *Occasionally.*
> Q. But never beryllium oxide?
> A. I wouldn't know.
> Q. Well, as I understand it, you never actually filed or sandpapered a ceramic material; only metals?
> A. Right. We sandblasted the ceramic.
> Q. All right. Did you use something called a Drommel tool?
> A. On occasion.
> Q. Okay. What kind of tool is that?
> A. It's like a little drill with a hard piece on the end.
> Q. And what did you use that for?
> A. If -- if it called for it being used to remove an excess burr or something on the material. It was tools used to bring them in tolerance.
> Q. Did you use the Drommel tool on any ceramic material, or

> was that only on metals?
> A.   On metals.
> Q.   *Did you sometimes use the Drommel tool on beryllium copper?*
> A.   *Could have been, yes.*
> Q.   *Okay. When you did that, would that create any -- any dust?*
> A.   *It always created something. Whenever you're using something, it would create some kind of dust.*

Deposition, Suzanne Genereux, 2/15/05, 63:15-65:20 (emphasis supplied). Thus, counsel's pre-filing inquiry more than reasonably established that Hardric had sold beryllium metal parts to the Waltham facility and that Ms. Genereux came in contact with the dust from the abrasion of beryllium metal parts created by both tools and sandpaper.

Hardric also makes much of the fact that plaintiff alleged in her Complaint that Hardric was a world leader in the manufacture of beryllium containing products, including optics, ceramics and unusual metals. See Hardric's Memorandum of Law at Page 7. Indeed, plaintiff made such an allegation based entirely upon the website of Hardric which claims that since 1980 Hardric's Metal Optics Group was, and is, a "world leader" in beryllium optics. A copy of that website home page is attached hereto as Exhibit "B". The portrayal of Hardric as a "Mom and Pop" operation is simply incorrect in that Mr. Richard, Hardric's owner, confirmed that the company employed thirty (30) employees in two different locations. See Richard deposition at 14:12-15:20 attached hereto as Exhibit "C".

Although largely irrelevant for purposes of determining whether counsel's pre-filing inquiry was reasonable, Hardric selectively relies upon testimony from one or two deponents who were unfamiliar with the use of beryllium metal at the Waltham facility. See Hardric Brief at 5-6. And yet, two other Raytheon employees confirmed the use of beryllium metal and

beryllium alloy at the Waltham facility during the mid-1980's precisely when Hardric manufactured and sold its beryllium containing parts to Raytheon. See Broadbent deposition 46, 113, 114 and deposition of John Chartier at pages 187 through 189, excerpts of which are attached hereto as Exhibits "D" and "E".

### III.   CONCLUSION

Counsel for the Genereuxs' undertook a thoroughly reasonable inquiry which confirmed the presence of Hardric beryllium containing products in the plaintiff's workplace which underwent some degree of abrading that contributed to the concentration of beryllium dust that, in turn, caused Suzanne Genereux's CBD. It is of no consequence whether the amount of dust contributed from metal operation was small or large in relation to the use of beryllium ceramic in the workplace. Both dust from ceramic and metal contributed to Suzanne Genereux contracting CBD. See report of John Martyny attached hereto as Exhibit "F".

### IV.   APPLICATION FOR ATTORNEYS' FEES UNDER RULE 11(c)(1)(A)

Under Rule 11, if warranted, "the Court may award to the party prevailing on the Motion the reasonable expenses and attorneys' fees incurred in presenting or opposing the Motion." F.R.C.P. 11(c)(1)(A). Should this Honorable Court decline to grant Hardric's Rule 11 Motion for Sanctions, it is respectfully requested that plaintiffs' counsel be granted reasonable attorneys' fees as the prevailing party for having had to research, draft and file a responsive pleading to Hardric's Motion. To that end, the undersigned counsel performed four (4) hours of work in opposing the Motion at his customary hourly rate of $500.00 per hour. A proposed Order is attached.

Respectfully Submitted, this 28th day of November, 2006

**MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.**

*/s/ Leo V. Boyle*

Leo V. Boyle, (B.B.O. 052700)
Two Center Plaza, Suite 600
Boston, Massachusetts 02108
617-523-8300

**GOLOMB & HONIK, P.C.**
Ruben Honik
Stephan Matanovic
121 S. Broad Street, Ninth Floor
Philadelphia, PA 19107

**CERTIFICATE OF SERVICE**

I, Bradley M. Henry, certify that on November 28, 2006, I served the foregoing Opposition to Defendant Hardric Laboratories, Inc.'s Motion for Rule 11 Sanctions by electronic filing and by follow-up mailing, via first class postage prepaid on November 29, 2006, an exact copy postage prepaid to counsel of record.

*/s/ Bradley M. Henry*
_____
Bradley M. Henry

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Suzanne Genereux, et al. | ) |
|     Plaintiffs, | ) ) ) |
| | )   Case No. 04-CV-12137 JLT |
| v. | ) ) |
| American Beryllia Corp., et al. | ) ) |
|     Defendants. | ) |

**O R D E R**

AND NOW, this _____ day of _____, 2006, upon consideration of defendant Hardric Laboratories, Inc.'s Rule 11 Motion for Sanctions it is hereby ORDERED and DECREED that said Motion is DENIED. It is further ORDERED and DECREED that plaintiffs' counsel shall be awarded $_____ in counsel fees as the prevailing party pursuant to F.R.C.P. 11(c)(1)(A).

BY THE COURT:

_____

J.