# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| Suzanne Genereux, et al. | ) | Case No. 04-cv-12137 JLT |
| | ) | |
|     Plaintiffs, | ) | FILED UNDER SEAL |
| | ) | |
| v. | ) | CONTAINS CONFIDENTIAL |
| | ) | INFORMATION; SUBJECT TO |
| American Beryllia Corp., et al. | ) | PROTECTIVE ORDER |
| | ) | |
|     Defendants. | ) | |
| | ) | |
|_____| ) | |

_____

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT HARDRIC LABORATORIES, INC. FOR SUMMARY JUDGMENT

_____

**Table of Contents**

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF THE CASE............................................................................1

SUMMARY OF THE MATERIAL FACTS .........................................................2

    A.  Genereux's Employment at Raytheon ........................................2

    B.  Hardric did not Manufacture or Supply the Type of Products that Genereux Used at Raytheon........................................................4

    C.  Raytheon Knew of the Dangers of Beryllium and Had Internal Precautions..................................................................................5

    D.  Genereux's Alleged Injuries ......................................................7

STANDARD OF REVIEW .................................................................................8

ARGUMENT AND LAW....................................................................................8

    I.       Suzanne Genereux Never Worked with any Product Manufactured by Hardric ........................................................9

          1.  Hardric Did Not Manufacture the Materials that Genereux Alleges Caused Her Injuries ...........................................10

          2.  There is no Evidence Establishing Hardric Ever Supplied Materials to Raytheon Waltham .....................................11

    II.      The Plaintiffs' Claims against Hardric are Barred by the Statute of Limitations........................................................12

    III.    Hardric Reasonably Relied on Raytheon to Warn Genereux of the Dangers of Beryllium and Therefore is Relieved of any Duty under the Sophisticated User Doctrine...............12

    IV.    Even if Hardric had any Duty to Warn, Hardric is Relieved of Such Duty because Raytheon Removed Hardric's Warnings ..........................................................................13

    V.     Plaintiffs' Consumer Protection Claims Fail Because they Cannot Prove the Underlying Liability of Hardric ............14

    VI.    The Loss of Consortium Claims are Also Barred..............14

VII.    Massachusetts does not Recognize a Claim for Fear of Future
        Injury or Medical Monitoring ...........................................14

VIII.   Massachusetts does not Recognize Strict Liability for Ultra-
        Hazardous Materials in a Products Liability Claim...........15

CONCLUSION....................................................................................16

## Table of Authorities

**Cases:**

Carrel v. National Cord & Braid Corp.
447 Mass. 431, 440-1 (2006) ................................................................12

Garside v. Osco Drug, Inc.
895 F.2d 46 (1st Cir. 1990).................................................................8

Hodgkins v. New Eng. Tel. Co.
82 F.3d 1226, 1229 (1st Cir. 1996).....................................................8

Hoffman v. Houghton Chem. Corp.
434 Mass. 624, 629 (2001) .................................................................12

Hope Furnace Assocs.
71 F.3d 39, 42 (1st Cir. 2001).   .........................................................8

McClain, et al. v. Metabolife Int'l, Inc.
401 F.3d 1233, 1241 (11th Cir. 2003). ...............................................9

Mesnick v. General Electric Co.
950 F.2d 816, (1st Cir. 1991)...............................................................8

Mathers v. Midland-Ross Corp.
403 Mass. 688, 691 (1989) ...................................................................9

Mitchell v. Gencorp,
165 F.3d 778, 781 (10th Cir. 1999). ....................................................9

NASCO, Inc. v. Public Storage, Inc.
29 F.3d 28, 32 (1st Cir. 1994)..............................................................8

Piscitello v. Hobart Corp.
799 F. Supp. 224 (D. Mass. 1992). .....................................................9

Spencer v. Baxter Int'l., Inc.
163 F. Supp. 2d 74, 78 (D. Mass. 2001). ...........................................10

Wright v. Willamette Indus., Inc.
91 F.3d 1105, 1106 (8th Cir. 1996). .................................................10

**Rules:**

Fed. R. Civ. P. 10(c) ..........................................................12, 13, 14, 15

Fed. R. Civ. P. 54(b) ...............................................................................................16

Fed. R. Civ. P. 56(c) .................................................................................................8

Fed R. Civ. P. 56(e) ..................................................................................................8

## **STATEMENT OF THE CASE**

On June 22, 2004, the Plaintiffs filed this action against several defendants alleging that Plaintiffs suffered harm arising out of Suzanne Genereux's ("Genereux") exposure to beryllium-containing products during the years of her employment at the Waltham Plant of Raytheon Company ("Raytheon Waltham").  Hardric was not originally named as a Defendant to this action.  Plaintiffs amended their complaint on September 7, 2004, adding Hardric as a Defendant and asserting numerous claims against it.  Those allegations are negligence (Count I), breach of warranty (Count II), failure to warn (Count III), strict liability for ultrahazardous and/or abnormally dangerous activities (Count IV), breach of the Massachusetts consumer protection statute (Count V), and medical monitoring (Count VIII).  Barry Genereux and the Genereux children, Angela and Krista, through their parents, have asserted loss of consortium claims against Hardric on the same theories (Counts IX – XIII).

Hardric is entitled to summary judgment on all counts.  First and fatal to the Plaintiffs' case, there is no evidence that Genereux worked with any products produced by Hardric, nor can they prove that Hardric even supplied any products to Raytheon's Waltham Plant where Genereux worked.  Second, the statute of limitations bars Plaintiffs' claims.  Third, even if Hardric did supply any beryllium materials to Raytheon Waltham at all, Hardric reasonably relied on Raytheon Waltham to warn Genereux of the dangers of the product and is therefore relieved of any duty to her.  Moreover, any materials that Hardric supplied were stripped of necessary warnings by Raytheon.

The remainder of  Plaintiffs' claims fail, as well.  The Plaintiffs' consumer protection claims fail because they cannot prove the underlying liability of Hardric.

Because of the failure of the Genereux claims, the remaining Plaintiffs' loss of consortium claims must fail. Finally, in Massachusetts, there is no cause of action for fear of future injury or medical monitoring, nor does strict liability for ultra-hazardous materials apply in products liability claims.

<u>**SUMMARY OF THE MATERIAL FACTS OF THE CASE**</u>

The record clearly establishes that Mrs. Genereux alleges injuries caused by her extensive work with beryllium ceramic at Raytheon Waltham. The record further establishes that Hardric never worked with beryllium ceramic, but only manufactured custom products made of hard beryllium metal. Moreover, Genereux cannot identify a single manufacturer of any beryllium product with which she may have worked (SUF ¶ 79); Raytheon was fully informed and aware about the dangers of beryllium (SUF ¶¶ 26-65); Hardric did not manufacture or supply the type of products that Genereux used at Raytheon (SUF ¶¶ 5, 24); any products that Hardric did supply to Raytheon contained warnings (SUF ¶ 19); Raytheon, not Hardric, controlled the information and warnings that Genereux received about beryllium (SUF ¶¶ 63-65); and Genereux's asthma predated her exposure to beryllium. (SUF ¶ 91.)

**A. Genereux's Employment at Raytheon**

Between 1982 and 1990, Genereux was employed by Raytheon as a sub-assembler in its Waltham, Massachusetts facility. (SUF ¶¶ 1, 66, 67.) Genereux's duties at Raytheon included sandblasting, welding, filing, and brazing ceramic parts, some of which contained beryllium ceramic, also known as beryllia or beryllium oxide. (SUF ¶ 67.) She spent the majority of her time working on two products that she knew contained beryllium ceramic, the "ARCO window" and the "tall man." (SUF ¶ 68.) The ARCO

windows were discs approximately 3 inches in diameter, ¾ of an inch thick, and containing no holes. (SUF ¶ 70.)  The tall man subassemblies were approximately one and one-quarter inches wide by two and one-half inches long.  (SUF ¶ 73.)  The ARCO windows were used in certain missile systems.  (SUF ¶¶ 9-10, 13.)  Genereux produced approximately twenty ARCO windows in one day, and could sandblast approximately thirty assemblies in a week.  (SUF ¶ 69.)  Genereux occasionally worked with other ceramics but does not know if they contained beryllium. (SUF ¶ 74.)  Genereux's supervisor, Al Broadbent, testified that Genereux never worked with beryllium metals of any kind.  (SUF ¶ 74.)

Genereux cannot identify any manufacturer of any beryllium ceramic with which she worked and has no idea where Raytheon purchased the materials for the ARCO window or tall man. (SUF ¶ 80.)  Neither can her supervisor or her co-worker identify the manufacturers. (SUF ¶¶ 23, 80, 81.)  The only individuals who could identify the manufacturers of products located in the Waltham facility did not identify Hardric as a supplier of the ARCO window or tall man products. (SUF ¶¶ 81-83.)  One of the senior engineers on the project, Francis Balint, had never even heard of Hardric Laboratories. (SUF ¶ 23.)   John Chartier, Raytheon's purchasing agent in charge of beryllium ceramic, didn't recall the Hardric name, either.  (SUF ¶ 22.)   He said that the ARCO beryllium ceramic discs described by Genereux were purchased from Ceradyne, which has not even been joined as a party to this action. (SUF ¶ 24.)  Hardric was never an approved vendor for Raytheon. (SUF ¶ 22.)

Genereux claims that when she sandblasted parts, including beryllium ceramic, she was not required to wear special clothing or a respirator. (SUF ¶ 77.)  Several other

3

former employees have testified that special clothing was required for sandblasting beryllium ceramic. (SUF ¶¶ 50, 75.) Genereux claims that, somehow, through her nearly ten years at Raytheon, she was not aware of the dangers of beryllium ceramic, was never warned by management or her superiors of the dangers of beryllium ceramic, and never saw any warning labels provided by the suppliers of the beryllium ceramic parts with which she worked on a daily basis. (SUF ¶ 79.)

**B.  Hardric did not Manufacture or Supply the Types of Products that Genereux Used at Raytheon.**

Hardric Laboratories, Inc. ("Hardric") is a small specialty machining and optics company located in Massachusetts. (SUF ¶ 4.) The maximum number of employees that Hardric ever employed at one time is thirty. (SUF ¶ 4.) Hardric produced components made from beryllium metal. (SUF ¶ 5.) Hardric never machined beryllium ceramics until after the year 2000, if then, long after Suzanne Genereux had ceased employment at Raytheon. (SUF ¶ 6.)

Hardric specifically decided in the 1960s not to work with beryllium ceramic, also known as beryllium oxide, because "[t]he feeling at the time was that Beryllium Oxide was incredibly more dangerous than Beryllium metal, and nobody in our facility wanted to machine it." (SUF ¶ 6.) Hardric did, however, work with beryllium metals. (SUF ¶ 5.) When Hardric did work with beryllium metals, it took safety precautions in its own plants and placed warning labels on the outgoing shipments. (SUF ¶¶ 18-19.) One of these labels warned specifically about the dangers of chronic beryllium disease. (SUF ¶ 19.) Others warned about the general dangers of beryllium dust. (SUF ¶ 19.)

The only connection between Hardric and Raytheon is no more than three purchase orders billed to Raytheon and shipped to Hardric, but there is no indication that

4

Hardric ever shipped materials to Raytheon.[1] (SUF ¶ 24.) The beryllium products that Hardric machined during the time that Suzanne Genereux was employed by Raytheon were optics, gimbals, and components for holding optics, all from beryllium metals. (SUF ¶ 5.) ARCO windows required a round beryllium ceramic piece, not any optics, gimbals, or components for holding optics. (SUF ¶¶ 68, 70-72.) The "tall man" included a rectangular inch-thick beryllium ceramic piece, not any beryllium metal. (SUF ¶ 73.) Hardric did not manufacture the types of parts or work with the type of material that Suzanne Genereux used in ARCO windows or the tall man. (SUF ¶¶ 81-83.) The primary owner of Hardric, Peter Richards, did not remember ever supplying beryllium of any kind to Raytheon. (SUF ¶ 24.) Moreover, Hardric did not have the type of equipment or capacity to supply parts for use in Raytheon's assembly line production. (SUF ¶¶ 4-5.)

### C. Raytheon Knew of the Dangers of Beryllium and had Internal Precautions to Protect its Employees

Raytheon, a Forbes 100 Company that routinely used beryllium-containing products in the manufacture of electronic equipment for the Department of Defense, knew of the health risks of beryllium long before it employed Genereux. (SUF ¶¶ 10, 12, 25-52.) Not only was Raytheon aware of the dangers of beryllium independently, it was also routinely provided with extensive warnings and information from outside vendors. (SUF ¶¶ 26-28.) During the 1980s when Mrs. Genereux was employed by Raytheon Waltham, Raytheon was aware of the health dangers of beryllium dust and the need for special handling. (SUF ¶¶ 36-41.) In fact, Raytheon had such knowledge since at least

---

[1] The purchase orders contained in the Exhibits to the Richard and Chartier depositions (attached to the SUF as Exhibit 17), seem to contain twelve purchase orders. However, if the purchase orders are inspected, it becomes clear that several of the purchase orders are in fact duplicates.

1970; Raytheon's Safety Manager from 1970 to 1989 for the Microwave and Power Tube Division in the plant where Genereux worked stated, "A potential hazard of which I have been aware since at least 1970 for certain operations at the Waltham Facility was lung disease from exposure to airborne particles of 'beryllia' or beryllium oxide (BeO), a ceramic material used in some of the power tubes that Raytheon manufactured." (SUF ¶ 44.)

Raytheon's knowledge of the dangers of beryllium oxide, which is the only form of Beryllium that there is evidence of Raytheon using, is demonstrated by the policies that it had in place governing its handling. During the time that Mrs. Genereux was employed by Raytheon Waltham, Raytheon had policies in place to ensure the safe handling of beryllium ceramic to "establish the responsibility, procedure, and instruction for the handling of beryllia (beryllium oxide) and parts and assemblies containing beryllia." (SUF ¶¶ 45-46, 48.) Raytheon took the affirmative step of placing its own warning tags on beryllium oxide products upon receipt, removing the products from their original packaging and removing the manufacturer's warning labels. (SUF ¶¶ 60-65.) Raytheon's tags remained with the products during their course through the plant. (SUF ¶ 63.)

Raytheon Waltham also limited the types of work that could be performed on beryllium ceramic, further demonstrating its knowledge of its dangers. Specifically, Raytheon prohibited grinding and machining of beryllium ceramic parts. (SUF ¶¶ 46-48.) It also had a room dedicated to the sandblasting of beryllium ceramic in Building 1. (SUF ¶ 49.) Raytheon conducted training sessions to warn employees of beryllium ceramic, distributed parts with warnings, and also gave certain employees instruction

manuals for the safe handling of beryllium ceramic.  (SUF ¶ 62.)    All of these policies and procedures were designed to minimize employee exposure to beryllium, and control airborne levels to under the acceptable limit.  (SUF ¶¶ 58-60.)

**D.  Genereux's Alleged Injuries**

Genereux claims that she developed and was diagnosed with chronic beryllium disease ("CBD") as a direct and proximate result of her exposure to beryllium oxide dust during her employment at Raytheon, and that she suffers permanent physical, mental, and emotional injuries and damages.  (Complaint ¶¶ 36-41.)  The other claims alleged in the complaint are loss of consortium claims of Genereux's family, derived from her alleged exposure.

Genereux first told her doctors that her workplace exposure to beryllium could be causing adverse health effects in April of 1984.  (SUF ¶ 85.)  Genereux pursued this issue later, writing Senator Jack Reed in January of 2001 seeking help and telling him she was "forced to sandblast beryllium ceramics with no masks, open sandblasting units, and protective clothing."  (SUF ¶ 87.)  She was referred to a Colorado medical facility with experience in CBD.  (SUF ¶ 89.)  On or around June 8, 2001, Genereux brought material to her primary doctor, Dr. Ashley, to read regarding exposure to beryllium.  (SUF ¶ 90.)  Again, a week later on June 19, 2001, Genereux told Dr. Ashley that she believed her breathing problems were related to her beryllium exposure and that she wanted a special blood test for beryllium sensitivity.  (SUF ¶ 91.)  Her blood was drawn for the test on June 20, 2001. (SUF ¶ 94.)  Plaintiffs filed this action more than three years later, on June 22, 2004.  (SUF ¶ 95.)

## **STANDARD OF REVIEW**

Summary judgment should be granted where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The role of summary judgment is to "pierce the pleadings or assess the proof in order to see whether there is a genuine need for trial." Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991), quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).

In determining whether a genuine issue of material fact exists, the party moving for summary judgment must show that "there is an absence of evidence to support the nonmoving party's position." Hodgkins v. New Eng. Tel. Co., 82 F.3d 1226, 1229 (1st Cir. 1996), quoting Hope Furnace Assocs., 71 F.3d 39, 42 (1st Cir. 2001). An issue is genuine if "there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. Hope Furnace Associates, 71 F.3d at 42-3, quoting NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 32 (1st Cir. 1994). When a Rule 56 motion is made,

> "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).

Here, there is a total absence of evidence to support the plaintiffs claims against Hardric, and there are no genuine issues of material fact in this case relating to Hardric.

Therefore, Hardric is entitled to judgment as a matter of law.

## **ARGUMENT AND LAW**

Genereux cannot identify a single Hardric product that she worked with while at Raytheon, nor did Hardric manufacture any similar material to what Genereux claims caused the alleged injuries. Hardric was not even capable of manufacturing such materials in the quantities required by Raytheon. Moreover, the Genereux claims are barred by the applicable statute of limitations. Raytheon Waltham, Genereux's employer, was and is a knowledgeable user of beryllium ceramic products and was aware of the risks. If Hardric had ever supply any materials to Raytheon, it was entitled to rely upon Raytheon to take proper precautions and to warn its employees of any dangers in working with beryllium and is not liable to the Plaintiffs. Finally, the law is settled that the plaintiffs may not recover on either medical monitoring or strict liability for ultrahazardous materials claims. Therefore, the Plaintiffs will fail to provide any factual evidence to support any of the essential elements of their claims against Hardric, and summary judgment in favor of Hardric is appropriate.

I.     **Suzanne Genereux Never Worked with any Product Manufactured by Hardric**

In order to carry the burden in a products liability case, a plaintiff who sues a manufacturer "generally must be able to prove that the item which it is claimed caused the injury can be traced to that specific manufacturer." Mathers v. Midland-Ross Corp., 403 Mass. 688, 691 (1989); Piscitello v. Hobart Corp., 799 F. Supp. 224 (D. Mass. 1992). Further, in order to carry the burden on causation in a toxic tort case, "a plaintiff must demonstrate 'the levels of exposure that are hazardous to human beings generally *as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover* [emphasis added].'" McClain, et al. v. Metabolife Int'l, Inc., 401 F.3d 1233, 1241 (11th Cir. 2003), citing Mitchell v. Gencorp, 165 F.3d 778, 781 (10th Cir.

1999) and <u>Wright v. Willamette Indus., Inc.</u>, 91 F.3d 1105, 1106 (8th Cir. 1996).  The
Plaintiffs simply cannot prove that Mrs. Genereux was exposed to any beryllium metal,
which was the only type of beryllium Hardric worked with, much less that she was
exposed to any level of any toxic substance produced by Hardric, much less any level of
any substance produced by Hardric.  In a case such as this one where the Plaintiff cannot
prove evidence of her exposure to a particular defendant's product or even that the
defendant ever manufactured a product, that defendant is entitled to summary judgment.
<u>Spencer v. Baxter Int'l., Inc.,</u> 163 F. Supp. 2d 74, 78 (D. Mass. 2001).

**1.  Hardric Did Not Manufacture The Materials That Genereux Alleges Caused Her Injuries**

Hardric Laboratories, Inc. only machined beryllium metals during the years that
Suzanne Genereux was employed by Raytheon, and there is absolutely no evidence to the
contrary.  Although Suzanne Genereux did appear to work with beryllium ceramic
products, she never worked with beryllium metals.  Hardric produced optics, gimbals,
and components for holding optics, not the beryllium ceramic pieces used in the ARCO
windows and tall man pieces.  There is substantial evidence to demonstrate that Hardric
worked only with beryllium metals during the timeframe that Genereux was at Raytheon;
Hardric did not even arguably work with beryllium ceramics at ant relevant to this
lawsuit.  Hardric, knowing of the dangers of beryllium ceramics, specifically decided in
1965 <u>not</u> to machine beryllium ceramic products when they were a company of only six
people.

Moreover, Hardric could not have possibly produced any beryllium parts in the
quantities that Raytheon required for the products that Suzanne Genereux assembled.
Hardric is a small machining shop that never employed more than thirty employees at one

time. Genereux could produce perhaps twenty ARCO windows in one day, and she was not the only employee of the project that machined beryllium. There is simply no evidence to show that Hardric supplied the quantities of material that would be required for the ARCO project.

**2. There is no Evidence Establishing that Hardric Supplied any Materials Supplied to Raytheon Waltham**

If Hardric had supplied the numbers of necessary parts, one would expect there to be purchase orders or similar documentation of Hardric as a regular part supplier. The Plaintiffs have produced no such evidence because there is no such evidence to be found. Hardric did not and could not have produced any beryllium ceramic parts handled by Suzanne Genereux, and therefore could not have caused her harm. The only evidence that connects Hardric to Raytheon is a set of three different purchase orders showing Raytheon paid Brush Wellman for beryllium metal that was shipped to Hardric; no corresponding documents have been produced to show material was shipped from Hardric to Raytheon Waltham. Similarly, although Hardric purchased beryllium metal from Brush Wellman in or around 1980, there is no indication that the metal wound up at Raytheon. Even if it had, Genereux would not have worked with it as she only worked with beryllium ceramics, not beryllium metals. In fact, the only individuals who could identify manufacturers of parts used in the two projects that Genereux worked on did not identify Hardric. The purchasing agent for Raytheon in charge of beryllium didn't even remember the Hardric name.

The Plaintiffs have failed to carry their burden against Hardric in this case. They cannot produce any evidence showing that Hardric supplied *any* products to Raytheon, much less any evidence that Hardric supplied any beryllium ceramic products. Plaintiffs

cannot even prove that Hardric machined beryllium ceramic during the years that Genereux worked for Raytheon.  In order to recover against a party, a plaintiff must at least show that the party caused the party's harm; the Plaintiffs here are trying to recover for alleged harm that could not have possibly been caused by Hardric.  Genereux can't even show that Raytheon Waltham machined beryllium metal, much less that she herself was ever exposed to beryllium metal, much less beryllium metal dust.

**II.  The Plaintiffs' Claims against Hardric are Barred by the Statute of Limitations**

The facts and the law applicable to those facts that demonstrate that the statute of limitations has run on the plaintiff's claims are identical for all defendants.  Accordingly, Defendant Hardric, pursuant to Fed. R. Civ. P. 10(c), adopts and incorporates by reference herein the arguments made by defendant, Brush Wellman, in the section entitled "**Plaintiff's Tort and Warranty Claims are Barred by the Applicable Statute of Limitations**" (pp. 18-20 in Brush Wellman's Memorandum).

**III.  Hardric Reasonably Relied on Raytheon to Warn Genereux of the Dangers of Beryllium and Therefore is Relieved of any Duty under the "Sophisticated User" Doctrine**

The sophisticated user doctrine relieves a manufacturer of liability "for failing to warn of a product's latent characteristics or dangers when 'the end user knows or reasonably should know of a product's dangers."  Carrel v. National Cord & Braid Corp., 447 Mass. 431, 440-1 (2006), quoting Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 629 (2001).  Raytheon knew of the dangers of beryllium, and therefore, Hardric is relieved of any duty to warn Genereux.

Because the sophisticated user doctrine should be analyzed for Hardric the same way as for all Defendants, Hardric adopts and incorporates by reference, pursuant to Fed.

R. Civ. P. 10(c), the section titled, "**Brush Wellman Had No Duty to Warn Plaintiff**

**Because Raytheon is a Sophisticated User of Beryllium Products**" (pp. 28-30 in Brush

Wellman's Memorandum).

### IV.  Even if Hardric Had any Duty to Warn, Hardric was Relieved of Such Duty because Raytheon Removed Hardric's Warnings

There is no evidence that any Hardric product was causally related to Genereux's

alleged injuries in any way.  However, even if there were, even if Hardric had a duty to

warn Genereux and breached that duty with inadequate warnings, the breach did not

cause Genereux's injuries.  If Raytheon received any products from Hardric, Raytheon

intentionally removed the labels before the product reached Genereux, who testified that

she never saw any warning labels provided by the suppliers of the beryllium ceramic with

which she worked.  Because Defendant Hardric's proximate cause argument is identical

to the analysis provided by Brush Wellman in their Memorandum of Law to support their

Motion for Summary Judgment, Hardric adopts and incorporates by reference herein,

pursuant to Fed. R. Civ. P. 10(c), the section entitled "**Brush Was Not the Proximate**

**Cause of Injury**" (pp. 30-33 in Brush Wellman's Memorandum).

Clearly, even if Hardric had supplied some product that Genereux ever handled,

which it did not, its warnings could not have possibly caused her injuries because

Raytheon's actions prevented her from ever seeing them.  If Genereux would have taken

more extensive precautions in handling beryllium ceramic upon seeing warnings on any

product manufactured by Hardric that she may have handled, Raytheon is ultimately at

fault for removing Hardric's warnings.  Because Raytheon removed warnings affixed by

more routine suppliers of beryllium ceramic, there is no evidence that they would have

13

failed to remove a more extensive warning.  Therefore, for this reason also, Hardric is not

the proximate cause of the Plaintiffs' alleged injuries.

**V.  Plaintiffs' Consumer Protection Claims Fail Because they Cannot Prove the Underlying Liability of Hardric**

The facts and the law applicable to those facts that demonstrate that the plaintiffs'

consumer protection claims are barred are identical to all defendants.  Accordingly,

Defendant Hardric, pursuant to Fed. R. Civ. P. 10(c), adopts and incorporates by

reference herein the arguments made by Defendant American Beryllia, in the section

entitled "**AMERICAN BERYLLIA IS ENTITLED SUMMARY JUDGMENT ON**

**THE CONSUMER PROTECTION ALLEGATIONS OF THE COMPLAINT**" (pp.

30-31 of American Beryllia's Memorandum).

**VI.  The Loss of Consortium Claims are Also Barred**

The facts and the law applicable to those facts that demonstrate that the plaintiffs'

loss of consortium claims are barred are identical to all defendants.  Accordingly,

Defendant Hardric, pursuant to Fed. R. Civ. P. 10(c), adopts and incorporates by

reference herein the arguments made by Defendant Brush Wellman, in the section

entitled "**The consortium claims are also barred**" (p. 20 of Brush Wellman's

Memorandum) and the arguments made by Defendant American Beryllia in Footnote 4

(p. 11 of American Beryllia's Memorandum).

**VII.  Massachusetts does not Recognize a Claim for Fear of Future Injury or Medical Monitoring.**

The facts and the law applicable to those facts that demonstrate that the plaintiffs'

medical monitoring claims are barred are identical to all defendants.  Accordingly,

Defendant Hardric, pursuant to Fed. R. Civ. P. 10(c), adopts and incorporates by

reference herein the arguments made by Defendant Brush Wellman, in the section entitled "**No Independent Cause of Action Exists in Massachusetts for Medical Monitoring**," (pp. 14-16 of the Memorandum in Support of the Motion of Brush Wellman, Inc., Brush Ceramics, Inc. and Brush Wellman Ceramic Products, Inc. to Dismiss Counts IV, V, VI, VII, VIII, XII, and XIII of Plaintiffs' Amended Complaint for Failure to State Claims Upon Which Relief May Be Granted). Further, the medical monitoring claim, Count VIII, was dismissed against Brush Wellman on May 12, 2005. Since this Court has held that Massachusetts does not recognize a cause of action for medical monitoring, Hardric is entitled to summary judgment in its favor on Count VIII.

**VIII. Massachusetts does not Recognize Strict Liability for Ultra-Hazardous Materials in a Products Liability Claim**.

The facts and the law applicable to those facts that demonstrate that the plaintiffs' medical monitoring claims are barred are identical to all defendants. Accordingly, Defendant Hardric, pursuant to Fed. R. Civ. P. 10(c), adopts and incorporates by reference herein the arguments made by Defendant Brush Wellman, in the section entitled "**Counts IV and XII Fail to State Claims for Strict Liability Because the manufacturer of a Product is Not an Ultrahazardous Activity as a Matter of Law**," (pp. 3-5 of the Memorandum in Support of the Motion of Brush Wellman, Inc., Brush Ceramics, Inc. and Brush Wellman Ceramic Products, Inc. to Dismiss Counts IV, V, VI, VII, VIII, XII, and XIII of Plaintiffs' Amended Complaint for Failure to State Claims Upon Which Relief May Be Granted). Further, the strict liability claims, Counts IV and XII, were dismissed against Brush Wellman on February 14, 2005. Since this Court has held that Massachusetts law on ultra-hazardous activity does not apply in the products

liability context, Hardric is entitled to summary judgment in its favor on Counts IV, VII, and XII.

## **CONCLUSION**

For the reasons stated above, the Defendant Hardric Laboratories, Inc. respectfully requests that this Court grant its Motion for Summary Judgment as to all of Plaintiff's claims against Hardric, as Plaintiffs will not be able to prove the essential elements of their claims.  Upon entry of summary judgment there is no just reason for delay in entering separate and final judgment in favor of Hardric Laboratories, Inc. pursuant to Fed. R. Civ. P. 54(b).

Dated:  November 27, 2006                           Respectfully submitted,

                                                                    /s/ Frances C. Lindemann, Esq.
                                                                    Frances C. Lindemann, Esq.
                                                                    Attorney for the Defendant
                                                                    Pro Hac Vice
                                                                    Maine Bar No. 7499
                                                                    Nadeau & Associates, P.A.
                                                                    1332 Post Road
                                                                    Wells, ME 04090
                                                                    (207) 646-4000