UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SUZANNE GENEREUX, et al., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|        v. | ) | C.A. No. 04-12137 |
| | ) | |
| HARDRIC LABORATORIES, INC., | ) | |
| et al., | ) | |
|     Defendants. | ) | |
| | | |
| ERNEST BETTUCHY, et al., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|        v. | ) | C.A. No. 10-11652 |
| | ) | |
| RAYTHEON COMPANY, | ) | |
|     Defendant. | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                      June 23, 2013

I.   SUMMARY

Plaintiffs in these consolidated actions are current and former employees of defendant Raytheon Company ("Raytheon"), and members of these employees' households. Plaintiffs seek a program of "medical monitoring" for beryllium-related diseases. The cause of action for medical monitoring was first recognized by the Massachusetts Supreme Judicial Court (the "SJC") in Donovan v. Philip Morris USA, Inc., 914 N.E.2d 891 (Mass. 2009) ("Donovan I").

Raytheon has filed a Motion for Summary Judgment, which plaintiffs oppose. The Motion for Summary Judgment contends that

plaintiffs would be unable to prove at trial that they have suffered "subcellular change," one of the seven elements of actions seeking medical monitoring delineated by Donovan I. A hearing on the Motion for Summary Judgment was held on June 11, 2013.

As explained below, the Motion for Summary Judgment is meritorious. Subcellular change is a necessary element of the claims plaintiffs assert. The record, construed in the light most favorable to plaintiffs, would not permit a reasonable trier of fact to conclude that plaintiffs have proven this element. Rather, the record indicates only that plaintiffs have suffered an "increased risk" of subcellular change. Consequently, this case presents no genuine dispute of material fact, and Raytheon is entitled to judgment as a matter of law. The court is, therefore, allowing the Motion for Summary Judgment.

II.   PROCEDURAL HISTORY

    A.   Background

    This proceeding involves two cases that have been consolidated for at least pretrial purposes. Genereux (C.A. No. 04-12137) was brought by Suzanne Genereux, who is a former Raytheon employee, and her family members, on behalf of themselves alone. See 2d Am. Compl. & Jury Claim ¶¶1-2, 10-11

("Genereux Compl."). The named plaintiffs in <u>Bettuchy</u> (C.A. No.
10-11652) seek to represent two classes of plaintiffs: (a)
individuals who worked at Raytheon's Waltham, Massachusetts
plant for at least one month, before December 31, 1996, who have
not been diagnosed with Chronic Beryllium Disease ("CBD"); and
(b) members of their households. <u>See</u> Am. Class Action Compl. ¶22
("Bettuchy Compl.").

Plaintiffs allege that Raytheon handled beryllium
negligently at its Waltham facility, exposing the employee
plaintiffs and, indirectly, members of their households to
elevated levels of beryllium. <u>See</u> Bettuchy Compl. ¶¶13, 26, 30.
Allegedly, plaintiffs' exposure to beryllium increased their
risk of suffering from beryllium-related diseases, particularly
CBD. <u>See</u> <u>id.</u> ¶20.

Suzanne Genereux, who has been diagnosed with CBD, brought
personal-injury claims against several suppliers who had
provided Raytheon with components containing beryllium. The
parties settled these claims. Suzanne Genereux's family members
seek medical monitoring from Raytheon. Both putative classes in
<u>Bettuchy</u> seek medical monitoring as well.

Neither the remaining Genereuxs nor the putative <u>Bettuchy</u>
class members exhibit any symptoms of CBD at present. <u>See</u>
Genereux Compl. ¶63; Bettuchy Compl. ¶22. Plaintiffs ask that
Raytheon be ordered to fund a "medical monitoring program . . .

3

including, but not limited to, testing, and preventative screening." Bettuchy Compl. ¶53.

The claim for medical monitoring in <u>Genereux</u> was initially dismissed for failure to allege damages. <u>See</u> May 12, 2005 Order (Tauro, J.). Subsequently, the SJC issued its decision in <u>Donovan I</u>. The plaintiffs in that case sought to represent a class of symptom-free cigarette smokers with smoking histories of twenty "pack-years." They asked the court to order medical monitoring. Before deciding whether to certify the class, the judge to whom the case had been reassigned, Judge Nancy Gertner, certified two questions to be answered by the SJC. One of the questions was whether a suit "for medical monitoring, based on . . . subclinical effects . . . state[s] a cognizable claim and/or permit[s] a remedy under Massachusetts state law." Feb. 23, 2009 Order.

The SJC answered affirmatively. It stated that a cause of action may arise where "competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease <u>due to physiological changes</u> indicating a substantial increase in risk of harm from exposure to a known hazardous substance." <u>Donovan I</u>, 914 N.E.2d at 901 (emphasis added). The SJC held that a plaintiff seeking medical monitoring must prove the following:

4

(1) The defendant's negligence (2) caused (3) <u>the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes</u> that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint.

<u>Id.</u> at 901-02 (emphasis added). The decision uses the terms "subcellular change," "subclinical change," and "physiological change" nearly interchangeably. <u>See id.</u> at 894 (subclinical); <u>id.</u> at 901 (all three terms); <u>id.</u> at 902 (subcellular); <u>id.</u> at 903 (subcellular and physiological). It defines "subclinical" as "[d]enoting the presence of a disease without manifest symptoms; may be an early stage in the evolution of a disease." <u>Id.</u> at 894 n.3 (quoting <u>Stedman's Medical Dictionary</u> 1492 (25th ed. 1990)). The SJC wrote that it "leave[s] for another day consideration of cases that involve exposure to levels of chemicals or radiation known to cause cancer, for which immediate medical monitoring may be medically necessary although no symptoms or subclinical changes have occurred." <u>Id.</u> at 901.

In view of <u>Donovan I</u>, the claims of the Genereux family members to medical monitoring were reinstated. <u>See</u> Mar. 31, 2010 Order (Gertner, J.) (reconsidering dismissal); Apr. 28, 2010

Order (Gertner, J.) (reinstating Raytheon as a defendant).
Bettuchy was filed on September 28, 2010, by counsel for the
plaintiffs in Genereux. On January 24, 2011, the two cases were
consolidated for pre-trial purposes.

The operative complaints in both Genereux and Bettuchy seek
to state claims based on the cause of action defined and
validated in Donovan I. Among other things, the complaints
specifically allege that "[p]laintiffs have experienced
subcellular changes to their persons." Bettuchy Compl. ¶¶26(d),
28(c), 42; Genereux Compl. ¶64.

B.   The Motion for Summary Judgment

Raytheon filed its Motion for Summary Judgment on October
12, 2012. The Motion for Summary Judgment alleges "a specific
infirmity of Plaintiffs' claim." Mem. Supp. Mot. Summary
Judgment 1 n.1 ("Summ. J. Memo"). It relies on the SJC's holding
in Donovan I that plaintiffs seeking medical monitoring must
prove that a hazardous substance "produced, at least,
subcellular changes." 914 N.E.2d at 901-02. Raytheon contends
that plaintiffs' own expert testified that he cannot state, with
reasonable medical certainty, that any plaintiff has suffered
subcellular change. Summ. J. Memo at 3-6 (quoting Newman Dep.,
Aug. 23, 2011, at 91-98 ("Newman Dep.")).

Plaintiffs respond that the Motion for Summary Judgment
"ignores the rationale" behind Donovan I. The thrust of that

decision, they argue, was that individuals exposed to dangerous substances and placed at an increased risk of harm should be entitled to medical monitoring. See Incorp. Mem. Law Resp. Def.'s Mot. Summ. J. 1, 7 ("Opp'n Memo"). Plaintiffs maintain that the SJC, in Donovan I, was concerned that the "potential class of cigarette smokers . . . would improperly include casual or short-term smokers who were not at an increased risk for developing lung cancer." Opp'n Memo at 7-8. In the current cases, plaintiffs assert, "[t]here is no concern for false claims." Id. at 8. Plaintiffs contend, therefore, that the key elements they must prove at trial are exposure to beryllium and an increased risk of disease. See id. at 1, 3, 8-9.

In addition, plaintiffs assert that their medical expert, Dr. Lee Newman, has stated that plaintiffs "'would be at a significant increased risk of developing subcellular changes.'" Id. at 11 (quoting Newman Dep. at 92). Plaintiffs argue that this expert opinion is sufficient to permit their claims to go to trial.

Finally, plaintiffs briefly mention the question left by the SJC "for another day." They state that the SJC's "decision in Donovan I may not fit every type of chemical exposure case that nevertheless requires the medical monitoring remedy." Id. at 13.

7

The Motion for Summary Judgment, filed in the consolidated cases, referred only to the Bettuchy suit explicitly. However, the positions asserted by the parties apply to the Genereux suit as well. After consulting with the parties, the court informed them that it "will be treating this motion as a motion for summary judgment in both the Bettuchy class action and the Genereux individual action." May 10, 2013 Order (citing Apr. 26, 2013 Tr. 4-5). The oral argument proceeded on this understanding, with the parties addressing the evidence relating to the plaintiffs in both cases.

C.    Subsequent Proceedings

Several other motions are pending in these cases, including Raytheon's Motion for Partial Dismissal, plaintiffs' Motion for Class Certification, and Raytheon's Daubert Motion. On April 26, 2013, a status conference was held. After discussing the issue with the parties, the court stated its intention to decide the Motion for Summary Judgment before the other pending motions.

At the April 26, 2013 conference, the court noted that plaintiffs' complaints allege subcellular change. The court explained its view that plaintiffs would, therefore, be required to prove subcellular change in order to prevail on the merits. Apr. 26, 2013 Tr. 6-7. Focusing on Bettuchy, the court stated:

> The SJC, in Donovan [I], left open the issue of
> whether a cause of action could be stated for
> plaintiffs who did not allege that they had any

symptoms or subclinical changes. However, as I read it
at the moment, the amended complaint does not appear
to present that issue.

* * * *

[I]f I were hearing that motion today, [I] would be
focusing on whether there was sufficient evidence of
subcellular change on behalf of any of the named
plaintiffs . . . .

Apr. 26, 2013 Tr. 7, 12; see also id. 13-14, 15-16 (similar).

Plaintiffs' counsel agreed with this characterization of these

actions. See id. at 14, 16, 17-18. More specifically, after the

court noted that in Donovan I the SJC held that subcellular

change had to be proven to obtain relief in the form of medical

monitoring, plaintiffs' counsel stated that, "in candor, if you

were to determine, on a summary judgment basis, that one or

another of the elements from Donovan can't be satisfied in this

case, then I think it would be dispositive" of the class claims

in Bettuchy. Id. at 14. Similarly, after the court stated that

it did not "plan to decide the issue the SJC said 'it left open

for another day,'" id. at 15 (quoting Donovan I, 914 N.E.2d at

901), plaintiffs' counsel responded, "I agree, your Honor," id.

at 16. He also confirmed that plaintiffs' positions were stated

in plaintiffs' submissions concerning the Motion for Summary

Judgment, and that these positions were based on the record that

had been presented to the court. See id. at 20.

9

On May 10, 2013, however, plaintiffs moved to file a sur-reply brief in opposition to the Motion for Summary Judgment. The proposed sur-reply relied, as an alternative argument, on the SJC's statement that it leaves "for another day" cases in which medical monitoring may be medically appropriate "although no symptoms or subclinical changes have occurred." Donovan I, 914 N.E.2d at 901. Plaintiffs argued that the court "has the power to make an Erie guess as to how the SJC would resolve the issue." Pl.'s Sur-Reply Br. in Opp'n 4-6 ("Proposed Sur-Reply").

Plaintiffs' request to file the sur-reply brief was denied. The court explained that these cases were filed years ago, and that the Motion for Summary Judgment has long been fully briefed. See May 29, 2013 Mem. & Order 1-2, 6-7. The court stated that the April 26, 2013 conference sought to establish:

> a common understanding of the issues posed by the Motion for Summary Judgment. This common understanding includes the premise, which follows from plaintiffs' complaints, that in order to prevail, plaintiffs will be required to prove that they have suffered subcellular change.

Id. at 6. The court found that the proposed submission would alter the scope of the issues presented by the Motion for Summary Judgment. See id. In the circumstances, the court denied the motion to file the sur-reply brief because "[a]llowing [it] would require further briefing by defendant, delay the June 10, 2013 hearing, and frustrate the court's efforts to manage its

docket fairly and effectively." Id. at 7. Subsequently, the court denied plaintiffs' motion for reconsideration of this decision. See June 5, 2013 Mem. & Order.

A hearing on the Motion for Summary Judgment was held on June 11, 2013.

III. THE SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute, therefore, precludes summary judgment if it is "material" and "genuine." See Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986).

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." Maymi v. Puerto Rico Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008); Martinez-Rodriguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

To determine if a factual dispute is "genuine," the court must assess whether "'the evidence is such that a reasonable

11

jury could return a verdict for the nonmoving party.'" Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting Anderson, 477 U.S. at 248); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). In making this determination, the court must "constru[e] the record in the light most favorable to the non-moving party." Douglas v. York Cnty., 433 F.3d 143, 149 (1st Cir. 2005); Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009). The record should not, however, be scrutinized piecemeal; rather, it must be "taken as a whole." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Kelly v. Cort Furniture, 717 F. Supp. 2d 120, 122 (D. Mass. 2010). Evidence submitted in inadmissible form may be considered only if it could be presented in a form that would be admissible at trial. See Federal Rule of Civil Procedure 56(c)(2); Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 475-76 (1st Cir. 2002); Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, the moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support

the nonmoving party's case." Id. at 325. Summary judgment is, therefore, mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; Gorski, 290 F.3d at 475-76; Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994).

IV.  EVIDENCE

    A.  The Evidence in the Record

    Raytheon's Motion for Summary Judgment relies on evidence presented by plaintiffs. The evidence pertinent to this motion is plaintiffs' evidence concerning the physical effects that exposure to beryllium has had on them. On this issue, plaintiffs rely on the opinions of Dr. Newman.

    Dr. Newman submitted expert declarations on June 29, 2010 and on March 8, 2011. In these declarations, Dr. Newman described CBD as a "multisystem granulomatous disorder that can cause significant disability or even premature death." Newman Decl., Mar. 8, 2011, ¶23 ("Newman 2011 Decl."). Dr. Newman opined that individuals exposed to elevated levels of beryllium, including plaintiffs, are "at a significantly increased risk for the development of beryllium related health effects in relation to an unexposed population." Id. In his view, medical monitoring

13

is, consequently, warranted for such individuals. See id. ¶¶11, 19, 23.

Dr. Newman described the process used to detect beryllium-related effects. This process generally relies on a test known as the BeLPT (the "Beryllium Lymphocyte Proliferation Test"). The BeLPT can detect beryllium sensitization, a condition that is sometimes a precursor to CBD. See Newman 2011 Decl. ¶6; see also Newman Dep. at 142, 164-65. Dr. Newman explained that "[b]eryllium sensitization is diagnosed with two abnormal BeLPTs." Newman 2011 Decl. ¶19.[1]

Dr. Newman stated, in his declarations, that "within a population of persons exposed to beryllium above background, some number of persons will have cellular changes in the blood or lung cells." Id. ¶12. Dr. Newman did not state that all individuals exposed to elevated beryllium levels necessarily suffer subcellular change. He also did not state that any specific plaintiff or plaintiffs have suffered beryllium-related subcellular change. He reported that "Barry, Krista and Angela Genereux, Claire and Francis Balint, and Ernest Bettuchy have

---

[1]     Dr. Newman added that "[i]f a person has had a single positive test with a second test that is normal, another test should be obtained in one year. At this time, if there are one or more abnormal tests on retesting (for a total of two abnormal BeLPTs), the individual should be offered clinical evaluation." Newman 2011 Decl. ¶19.

each previously had a normal BeLPT," and that "Jennifer Bettuchy has never been tested." Id. ¶21.

The BeLPT test results for the plaintiffs in Bettuchy are also included in plaintiffs' responses to Raytheon's interrogatories. See Howe Aff. Exs. 2-5. Plaintiffs' interrogatory responses match the information provided in Dr. Newman's declaration. Plaintiffs also report that plaintiff Claire Balint had one abnormal BeLPT, on March 16, 2005. See Howe Aff. Ex. 4, at 4. This abnormal result was followed by two normal results, however, on April 12, 2005 and June 27, 2006. See id.

In their motion to file a sur-reply, plaintiffs sought to introduce into the record a document reporting Ms. Balint's abnormal BeLPT result. See Motion to File at 2-3. Plaintiffs did not proffer Ms. Balint's two subsequent normal test results. Nevertheless, the court has considered the document submitted by plaintiffs. Raytheon did not specifically object to this request. In any event, the information in the document was already included in the record in plaintiffs' responses to Raytheon's interrogatories.

Dr. Newman provided additional testimony at a deposition taken on August 23, 2011. At his deposition, Dr. Newman reiterated his view that individuals exposed to elevated levels of beryllium are "at an increased risk of developing subcellular

15

and other physiologic and clinical abnormalities." Newman Dep. at 91-92. He agreed, when asked, that "beryllium sensitization . . . is the first evidence of the subcellular change you would detect." Id. at 165.

Dr. Newman also testified that he cannot state whether any one or more of the plaintiffs has suffered subcellular change. See id. at 91-94. With regard to each of the plaintiffs, he was asked whether he could state to a reasonable medical certainty that each plaintiff "has had any subcellular or physiologic response as a result of an alleged exposure to beryllium at Raytheon." Id. at 92, 94, 95, 96, 97, 103. In each instance, he replied that he "cannot say that at this time." Id. at 95; see also id. at 92, 95-96, 97, 98, 103.[2] Dr. Newman was then asked

---

[2]    The deposition transcript reads as follows:

   Q.   . . . How are you able to determine, as you sit here today, whether or not Barry Genereux has had any subcellular changes in his body as a result of any alleged exposure to beryllium at the Raytheon plant?

   A.   I can know it by virtue of information, if I were given information about exposure, to know that those individuals are at an increased risk of developing subcellular and other physiologic and clinical abnormalities.
   I can't say, sitting here today, about that one individual. I don't have enough information, sitting here today, to be able to answer that. . . .

   Q.   My question was really about today. As you sit here today, August 23, 2011, are you able to say, to a reasonable medical certainty, that Ernest Bettuchy has had a subcellular or physiologic response

whether he can "state, to a reasonable medical certainty, that
any of the putative potential class members . . . have had any
subcellular or physiologic changes as a result of alleged
exposure to beryllium at the Raytheon plant in Waltham?" Id. at
97-98. He replied:

> Without further information . . . I can't say at this
> time. Pending more information, that opinion could
> change as I learn more about exposure and the testing
> that has been done in those individuals.

Id. at 98.

B.   Evidence Not in the Record

The record before the court does not include one additional
declaration prepared by Dr. Newman, dated April 18, 2012. This
declaration, and a declaration by Dr. John Martyny, were
attached to plaintiffs' Motion for Class Certification. Raytheon

---

> as a result of an alleged exposure to beryllium at
> Raytheon?
>
>       A.   Not without the additional information that
> I described in my last statement. . . .
>
>       Q.   Let me ask you the same question about
> Claire Balint. Can you state, to reasonable medical
> certainty, whether Claire Balint has had any
> subcellular or physiologic changes as a result of any
> alleged exposure to beryllium, from Raytheon?
>
>       A.   Not without the additional information that
> I already described to you earlier. No, not at this
> time. . . .

Newman Dep. at 91-96; see also id. at 96-97 (same for Francis
Balint); id. at 97-98 (same for Jennifer Bettuchy); id. at 102-
03 (same for Krista Genereux); id. at 103 (same for Angela
Genereux).

moved to strike these two declarations because the deadline for the expert discovery had long passed. The court allowed Raytheon's motion, noting that "[t]his decision is subject to possible reconsideration based on matters discussed at the status conference" held on April 26, 2013. See March 14, 2013 Order, ¶4. Plaintiffs did not ask that this decision be reconsidered at the status conference. Nor have they done so since.

In any event, it does not appear that Dr. Newman's April 18, 2012 declaration offers new evidence. Dr. Newman does not state in that declaration that he seeks to alter the opinions he previously expressed. Indeed, plaintiffs asserted, in response to Raytheon's motion to strike plaintiffs' new expert declarations, that these declarations "do not contain any new opinions or analysis." Pls.' Opp'n to Def.'s Mot. to Strike 1. Plaintiffs have not retracted this assertion.[3]

---

[3]     Dr. Newman's 2012 declaration does state that "[e]xposure to beryllium causes subcellular changes that substantially increase the risk of becoming sensitized and developing CBD." Newman Decl., Apr. 18, 2012, ¶7. Read in isolation, this statement could, arguably, be understood to mean that beryllium exposure necessarily causes subcellular change. Cf. Proposed Sur-Reply at 1. This sentence should not be read in isolation, however; rather, it must be understood in light of the record as a whole. See Matsushita Elec., 475 U.S. at 587. In the context of the entire record, Dr. Newman's statement indicates that exposure to beryllium can cause subcellular change. Similarly, Dr. Newman states that "[b]eryllium exposure causes chronic beryllium disease (CBD)." Newman 2011 Decl. ¶5. Plaintiffs agree that this does not mean that beryllium exposure

At the June 11, 2013 hearing, the court decided not to hear testimony from the parties' expert witnesses. The parties had previously been ordered to have their witnesses available to testify at the hearing, if necessary. See Apr. 29, 2013 Order, ¶2. Raytheon did not ask to present testimony regarding the Motion for Summary Judgment. Plaintiffs sought to present testimony from Dr. Newman. In their Motion to File, plaintiffs asserted that "Dr. Newman's testimony . . . will explain and illuminate how exposure to beryllium necessarily causes subcellular harm." Motion to File at 3 (emphasis added).

In the decision denying the motion to file the sur-reply brief, the court noted that "the First Circuit has 'repeatedly held that a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed.'" May 29, 2013 Mem. & Order 7-8 (citations omitted) (quoting Abreu-Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001) and Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994); and citing Rockwood v. SKF USA Inc., 687 F.3d

---

necessarily causes CBD, but rather that such exposure can cause CBD. See, e.g., Apr. 26, 2013 Tr. 47. Correspondingly, the statement that "[e]xposure to beryllium causes subcellular change" must be interpreted to mean that exposure to beryllium can cause subcellular change in view of Dr. Newman's previous declarations and his deposition testimony. Neither Dr. Newman nor plaintiffs have indicated that Dr. Newman seeks to alter his prior testimony or declarations.

1, 12 (1st Cir. 2012)). The court stated, therefore, that it would not be likely to "hear expert testimony unless it determines that the experts' previous testimony requires clarification." Id.

The expert testimony pertinent to the Motion for Summary Judgment, Dr. Newman's testimony, does not require clarification. Dr. Newman's declarations state clearly that "within a population of persons exposed to beryllium above background, some number of persons will have cellular changes in the blood or lung cells." Newman 2011 Decl. ¶12. As discussed earlier, Dr. Newman said the same in his deposition, stating that plaintiffs and other similarly situated individuals are "at a significant increased risk of developing subcellular changes." Newman Dep. at 92. In response to repeated questioning, Dr. Newman testified that he "can't say at this time" whether any particular plaintiff has suffered subcellular change as a result of exposure to beryllium. Id. at 94-98. Dr. Newman's testimony has, therefore, been clear and consistent. Plaintiffs did not represent that Dr. Newman would alter his prior statements or offer any explanation as to why he might wish to do so. It was, therefore, not necessary or appropriate for the court to hear Dr. Newman's proposed testimony. See Federal Rule of Civil Procedure 56(c)(1) (listing the forms of evidence generally appropriate at summary judgment); Seamons v. Snow, 206 F.3d

1021, 1026 (10th Cir. 2000) ("oral testimony on summary judgment motions should be used sparingly and with great care"); MacLean v. Parkwood, Inc., 247 F. Supp. 188, 190 (D.N.H. 1965) (affidavits are preferable to oral testimony in summary-judgment proceedings), aff'd, 354 F.2d 770 (1st Cir. 1966); 10A Charles A. Wright et al., Federal Practice and Procedure §2723 (3d ed. 2010) (collecting sources).

V.    FACTS

Viewing the evidence in the light most favorable to the plaintiffs, it is sufficient to prove the following facts.

Raytheon handled beryllium negligently at its Waltham facility. For the limited purpose of the Motion for Summary Judgment, Raytheon does not contest this point.

Paintiffs were, as a consequence of Raytheon's conduct, exposed to beryllium. Some plaintiffs were exposed to beryllium directly, by working at Raytheon's Waltham plant. Other plaintiffs were exposed indirectly, through contact with members of their households who worked at that plant. These assertions are also not contested for present purposes.

All individuals exposed to levels of beryllium above ordinary levels are at an increased risk of adverse health effects. See Newman 2011 Decl. ¶¶5, 6, 23. These adverse health

effects, and particularly CBD, may be disabling, even life-threatening. See id. ¶5.

All individuals exposed to elevated levels of beryllium are at an increased risk of suffering harmful subcellular change. See Newman 2011 Decl. ¶7; Newman Dep. at 91-92. Subcellular change is first detectable as beryllium sensitization. See id. at 165. The test used to detect beryllium sensitization is the BeLPT. See Newman 2011 Decl. ¶6. The BeLPT sometimes yields false positive results. See id. ¶8. A determination that a person is sensitized to beryllium is made on the basis of two abnormal BeLPT results. See id. ¶19-20. No plaintiff in Genereux or Bettuchy has had two abnormal BeLPT tests. See id. ¶21; Howe Aff. Exs. 2-5.[4]

VI.   ANALYSIS

   A.   Subcellular Change Is a Necessary Element of Plaintiffs' Case

The elements of a cause of action for medical monitoring, as defined by the SJC, include the requirement that "the

---

[4]      At the June 11, 2013 hearing, plaintiffs' counsel suggested that a single abnormal BeLPT result indicates subcellular change and that Claire Balint's single abnormal BeLPT adequately supports plaintiffs' allegation of subcellular change. However, this suggestion by counsel is not supported by any evidence in the record. Specifically, Dr. Newman did not state, in his declarations, that Balint has suffered subcellular change, and at deposition he testified that he "cannot say that at this time" whether Balint has suffered such change. Newman Dep. at 95-96. Dr. Newman was aware of Balint's abnormal BeLPT test, since he administered the test himself.

plaintiff [was] exposed to a hazardous substance that produced, at least, <u>subcellular changes</u> that substantially increased the risk of serious disease, illness, or injury." <u>Donovan I</u>, 914 N.E.2d at 902 (emphasis added). The "subcellular change" element serves two primary purposes.

First, the "subcellular change" element ties the modern doctrine of medical monitoring into traditional tort law: "the physiological changes with the attendant substantial increase in risk of cancer, and the medical necessity of monitoring with its attendant cost, may adequately establish the elements of injury and damages." <u>Id.</u> at 901. Judge Gertner addressed this point in her decision, following <u>Donovan I</u>, to certify the class of smoker plaintiffs. <u>See</u> <u>Donovan v. Philip Morris USA, Inc.</u>, 268 F.R.D. 1 (D. Mass. 2010) (Gertner, J.) ("<u>Donovan II</u>"). In that decision, the court explained that the SJC "made clear it was not creating a new cause of action so much as addressing how subcellular injury and increased risk of illness fit into the traditional causes of action." 268 F.R.D. at 24.

In addition, the SJC explained that the "subcellular change" element serves as a check on the ability of plaintiffs seeking medical monitoring to prevail merely on the basis of increased risk of harm. As the SJC stated, "[n]o particular level or quantification of increase in risk of harm is necessary, so long as it is substantial and <u>so long as there has</u>

23

been at least a corresponding subcellular change." Donovan I, 914 N.E.2d at 901 (emphasis added).

The SJC noted that there may possibly be cases in which proving "subcellular change" would not be required. As indicated earlier, the court stated that it "leave[s] for another day consideration of cases . . . for which immediate medical monitoring may be medically necessary although no symptoms or subclinical changes have occurred." Id. at 901. The SJC did not, however, decide that such cases would state a cause of action under Massachusetts law.[5]

Plaintiffs' complaints rely on the cause of action defined by the SJC in Donovan I, not on the SJC's remark that the "subcellular change" requirement might possibly be relaxed in the category of cases left "for another day." The operative complaints allege that plaintiffs have "experienced subcellular changes to their persons." Bettuchy Compl. ¶¶26(d), 28(c), 42; Genereux Compl. ¶64. This court has repeatedly highlighted these allegations and the fact that they require that plaintiffs prove subcellular change in order to prevail on the merits of the claims they have asserted. See Apr. 26, 2013 Tr. 7, 12-16; May

---

[5]    Prior to the April 26, 2013 status conference, the parties were ordered to state their positions concerning whether the question left "for another day" in Donovan I should be certified to be answered by the SJC. See Mar. 14, 2013 Order, ¶10. The parties reported that they opposed certification. See Joint Report, Apr. 12, 2013.

29, 2013 Mem. & Order; June 5, 2013 Mem. & Order. Plaintiffs concurred with this characterization of their actions. See Apr. 26, 2013 Tr. at 16, 17-18. They have not sought to amend their complaints to withdraw the allegations of subcellular change. Subcellular change is, therefore, a necessary element of plaintiffs' causes of action.

B. <u>Plaintiffs Have Not Offered Any Evidence of Subcellular Change</u>

The burden to prove subcellular change at trial would be on plaintiffs. See <u>Donovan I</u>, 914 N.E.2d at 901-02 ("each plaintiff must prove . . . subcellular changes"). Consequently, in order to defeat the Motion for Summary Judgment, each plaintiff must submit sufficient admissible evidence to permit a reasonable fact finder to find that he or she has suffered subcellular change. See <u>Chadwick</u>, 561 F.3d at 43; <u>Gorski</u>, 290 F.3d at 475-76. If plaintiffs all fail to do so, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 322-23.

Examining the record as a whole in the light most favorable to plaintiffs, a reasonable fact finder could not conclude that plaintiffs have suffered subcellular change. Most directly, Dr. Newman, plaintiffs' medical expert, has not opined that any

plaintiff has suffered subcellular change. At his deposition, Dr. Newman testified repeatedly that he cannot now determine whether any of the plaintiffs has suffered subcellular change.

In addition, the record indicates that subcellular change would first be detectable as beryllium sensitization. Beryllium sensitization is diagnosed by two abnormal BeLPT results. No plaintiff has had two such results. Consequently, it could not be reasonably found that any plaintiff has suffered subcellular change.

Finally, a conclusion that plaintiffs have suffered subcellular change cannot be inferred from plaintiffs' exposure to elevated levels of beryllium alone. Dr. Newman's testimony does not indicate that every individual exposed to elevated levels of beryllium suffers subcellular change. Nor does it indicate that most individuals exposed to elevated levels of beryllium suffer subcellular change. Rather, it is Dr. Newman's position that individuals exposed to elevated beryllium levels are "at an increased risk" of subcellular change, and that within a population of persons exposed to beryllium, "some number" will suffer subcellular change. See Newman Dep. at 91-92; Newman 2011 Decl. ¶12. As Dr. Newman clarified at his deposition, this "increased risk" does not cause him to conclude that any one or more of the plaintiffs have suffered subcellular change. See Newman Dep. at 92, 95-96, 97, 98, 103.

26

Standing alone, "increased risk" of subcellular change is insufficient to prove plaintiffs' claims for medical monitoring. It does not satisfy the requirement of <u>Donovan I</u> of a physiological "impact" that fits the medical-monitoring doctrine into the rubrics of traditional tort law and tempers the prospect of purely risk-based recovery. <u>See</u> <u>Donovan I</u>, 914 N.E.2d at 900-01.

Contrary to plaintiffs' contention, this conclusion is not inconsistent with Judge Gertner's reasoning in <u>Donovan II</u>. In <u>Donovan II</u>, Judge Gertner was deciding whether to certify a class rather than deciding a motion for summary judgment, <u>see</u> 268 F.R.D. at 15-16, and the applicable standards are different. More significantly, the evidence in <u>Donovan II</u> was materially different than the evidence in the instant case. In <u>Donovan II</u>, plaintiffs' experts opined that "twenty pack-years of smoking <u>necessarily</u> causes subcellular harm" and that "<u>everyone</u> with a twenty pack-year smoking history has suffered subcellular harm." <u>Id.</u> at 16 (emphasis added). In contrast, as explained previously, Dr. Newman has only opined that plaintiffs are at increased risk of suffering subcellular harm because of their exposure to beryllium and he cannot, and does not, say that any plaintiff has actually suffered such harm.

In summary, the record, viewed in the light most favorable to plaintiffs, would not permit a reasonable trier of fact to

conclude that plaintiffs have suffered subcellular change as a result of exposure to beryllium. Because subcellular change is a necessary element of plaintiffs' cause of action, the Motion for Summary Judgment is meritorious.

VII. ORDER

In view of the foregoing, it is hereby ORDERED that defendant's Motion for Summary Judgment and Request for Oral Argument (Genereux Docket No. 333) is ALLOWED. Therefore, judgment shall enter for the defendant in Genereux and Bettuchy.

UNITED STATES DISTRICT JUDGE